IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RONALD A. KATZ TECHNOLOGY LICENSING, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-546-GMS |
| TIME WARNER CABLE INC., et al., | ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO STAY ACTION PENDING THE PATENT AND TRADEMARK OFFICE'S REEXAMINATION OF THE KATZ PATENTS

OF COUNSEL:

David K. Callahan
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, Delaware 19801
(302) 651-7700

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, Delaware 19801
(302) 651-7700

Dated: February 2, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

I.    KATZ DOES NOT SERIOUSLY CONTEST THE KEY FACTS
      SUPPORTING A STAY UNDER THE THREE-PART *XEROX*
      TEST .................................................................................................................... 2

      A.    Katz Has Shown No Prejudice Flowing From a Stay ........................... 2

            1.    Katz Seeks Only Monetary Relief. ............................................ 3

            2.    Katz Has Long Delayed Bringing This Suit. .............................. 3

            3.    Katz Continues to License Its Patents ....................................... 3

      B.    Katz Cannot Deny That The Reexaminations Will Impact The
            Scope and Trial of This Case. ............................................................... 4

            1.    Katz Vastly Underestimates the Percentage of Claims
                  Impacted by Reexamination. ..................................................... 4

            2.    Katz Ignores Many Issues Impacted By Reexamination. ........... 6

      C.    A Stay Will Strongly Promote Judicial Efficiency Given the
            Stage of the Proceedings. ..................................................................... 7

II.   KATZ'S ARGUMENTS OPPOSING A STAY ARE NOT
      FACTUALLY SUPPORTED. ................................................................................ 7

      A.    Defendants Did Not Initiate the Reexaminations In Response
            To This Case; If Anything, it Was Katz Who Filed in Response
            to the Reexaminations. .......................................................................... 8

      B.    Granting a Stay Will Promote This District As An Efficient,
            Fair Manager of Patent Cases. ............................................................. 9

III.  KATZ'S PROPOSED "WORK-AROUND" WILL CAUSE MORE
      EXPENSE AND LESS JUDICIAL EFFICIENCY ............................................. 10

CONCLUSION ................................................................................................................ 11

## TABLE OF AUTHORITIES

### CASES

**Page**

*Pegasus Dev. Corp. v. DirectTV, Inc., C.A. 00-1020-GMS*,
　　2003 WL. 21105073 (D. Del. May 14, 2003) ............................................... 1, 2

*Wahpeton Canvas Co., Inc. v. Frontier, Inc*,
　　870 F.2d 1546 (Fed. Cir. 1989) ............................................................... 3

*Xerox Corp. v. 3 Com Corp.*,
　　69 F. Supp. 2d 404 (W.D.N.Y. 1999) ....................................................... 2

### STATUTES

35 U.S.C. § 302 ................................................................................................ 1

RLF1-3111606-1

## INTRODUCTION

This Court examines three factors when determining whether to exercise its discretion to stay proceedings in light of reexamination.  Defendants demonstrated in their opening brief that each of these three factors strongly supports this Court exercising its discretion to stay this case.  Defendants showed how a stay will conserve the enormous judicial and party resources required to prepare and try this case until such time as the PTO has had the opportunity to apply its special expertise in reviewing the Katz patents and narrowing, if not removing altogether, the issues remaining for this Court to decide.  In response, Katz ignores the legal test entirely:

- Katz has not shown that a stay will cause it undue prejudice or a clear tactical disadvantage.  Indeed, Katz admits that it has waited years and years to bring this suit, and tacitly concedes that it can get only monetary relief, which will still be available following the PTO's completion of the reexamination process;

- Katz does not deny that allowing the PTO to apply its special expertise with these patents during reexamination will simplify, if not resolve, issues presented in this case—Katz quibbles only about the *extent* to which this is true; and

- The fact that this case is in its infancy, with nothing of substance having taken place, favors allowing reexamination to play out before taking up whatever issues remain—this factor is not "neutral" as Katz claims, but strongly favors the grant of a stay.

Instead of addressing the points that will drive this Court's decision, Katz responds with innuendo and policy arguments, which are both irrelevant to this Court's decision to grant a stay and factually incorrect, and proposes a "solution" that would *multiply*, rather than conserve, the resources required to prepare and try this case:

- Katz suggests that the Defendants filed the reexamination proceedings (or pressured the Commissioner to institute them) in response to this lawsuit.  Katz has no support for the innuendo that Defendants precipitated the numerous pending reexaminations, and they clearly did not do so in *response* to this case – all but two of the reexaminations having been instituted *before* Katz filed here;

- Katz suggests that this Court should deny the motion for a stay so as to not discourage plaintiffs from filing in this District, ignoring the fact that the enormous judicial resources this case would consume would necessarily take time away from the remainder of this Court's extensive patent docket; and

- Katz suggests (but makes no specific proposal) that this Court could somehow stay the case only as to those particular claims being reexamined by the PTO, ignoring the fact that determining which claims to stay, and then trying an already enormously complex case in two (or three) parts rather than one, would significantly *increase* the burdens on this Court and the parties, and ignoring the fact that the majority of claims Katz is likely to assert in this case are subject to reexamination.

Defendants have more than met their burden under the relevant test, and Katz's lack of a direct response proves that this Court should exercise its discretion and stay this case until the PTO has completed its reexamination of the Katz patents.

## I.    KATZ DOES NOT SERIOUSLY CONTEST THE KEY FACTS SUPPORTING A STAY UNDER THE THREE-PART *XEROX* TEST.

In their opening brief, Defendants addressed each of the factors this Court has repeatedly used to analyze the propriety of a stay pending reexamination, all of which strongly support a stay in this instance. In response, Katz largely ignores the test laid out in *Xerox Corp. v. 3 Com Corp.*, 69 F. Supp. 2d 404 (W.D.N.Y. 1999), as a result of which Defendants' arguments and evidence stand largely unrebutted.

### A.    Katz Has Shown No Prejudice Flowing From a Stay.

One of the key elements in the stay analysis is whether Katz can demonstrate *undue* prejudice flowing from this Court's decision to stay the litigation pending the PTO's completion of reexamination. Katz offers nothing on this point, save its argument that it is "entitled to its day in court." Katz Br., at 2, 11. This Court's granting of a stay will not *deny* Katz its day in Court; it will do no more than *delay* that day, and in light of the fact that Katz seeks only monetary relief and long delayed filing this suit, this delay will work no "undue" prejudice on Katz.

2

1.    **Katz Seeks Only Monetary Relief.**

Katz concedes that the only relief to which it is even arguably entitled is monetary. Katz sells no products, offers no services, and faces no risk of losing market share during the period of any stay. Katz seeks only money, and has not alleged any ill effects of a delay in being able to obtain money damages. Katz's ability to seek prejudgment interest on any damages award fully protects Katz even from any lost time value of a monetary damages award.

2.    **Katz Has Long Delayed Bringing This Suit.**

Katz's response admits that it has long delayed bringing this suit. Katz Br. at 1 ("… they have *long been on notice of the Katz patents*.") (emphasis added); *id.* at 2 ("Katz has offered Defendants "repeated opportunities *over many years* to resolve this matter") (emphasis added). Although Katz *claims* it has not delayed for 18 years (Katz Br., at 11, n.11), it neither denies that the patents in this suit began to issue 18 years ago (U.S. Patent No. 4,792,968 issued in December, 1988), nor that Defendants have long had customer service call centers of the types Katz now accuses of infringement. Indeed, because Katz has now waited so long to file suit that years and years of potential damages have vanished on statute of limitations grounds, Katz should not be heard to demand that this Court grant it its day in court and that it do so "right now."

3.    **Katz Continues to License Its Patents.**

Katz's business is licensing its patents, and it has submitted no evidence to suggest that either the reexamination proceedings or the pending litigations have in any way slowed that business down. Exactly the opposite is true—Katz has continued to license its patents, as evidenced by its recent press releases. Exs. A-C. This

3

demonstrates that Katz is likely to continue business as usual notwithstanding a stay of these proceedings.

### B. Katz Cannot Deny That The Reexaminations Will Impact The Scope and Trial of This Case.

Katz's response does not deny that reexamination proceedings can (and likely will) have an effect on the issues to be tried in this case.[1]  Instead, Katz tries to minimize the extent to which the reexamination proceedings will impact the preparation and trial of this case, boldly claiming that "[t]here *is no chance* that the reexaminations will eliminate or materially affect" the claims at issue in this case.  Katz Br., at 3 (emphasis added).  To do so, Katz has bent some facts to their breaking point, and ignored others.

### 1. Katz Vastly Underestimates the Percentage of Claims Impacted by Reexamination.

Well aware that the claims being reexamined are those Katz most frequently asserts,[2] Katz disingenuously argues that "less than four percent" of the claims of the patents at issue in this case are in reexamination.  Katz Br., at 4.  This statement is correct, but highly misleading.  *First*, the claims at issue in reexamination are

---

[1]    Ongoing developments at the PTO confirm that this is the case.  In the time since Defendants filed their opening brief, the PTO issued a final rejection of all claims in U.S. Patent No. 6,292,547 in light of numerous prior art references.  Ex. D.  In so doing, the PTO applied its expertise in examining and evaluating Katz's arguments as to the interpretation of a number of claim terms (Ex. D, at pp. 36-39), including "consumable key," "sequence," "qualification," "acknowledgement data," "item data," and "computer-generated dates."  In each instance, Katz sought to narrow the interpretation of its claims (which obviously impacts infringement issues) so as to avoid the prior art (validity issues).  The PTO action also spends a great deal of time discussing what is taught and disclosed by various prior art references.  The PTO is likely to continue to issue these types of actions in the various reexaminations, which will indisputably affect this litigation.

[2]    The reexamination proceedings have (not surprisingly) been targeted against the claims that Katz frequently asserts in connection with its litigation and licensing campaigns.  Examination of the claims at issue in the *Citibank* case pending in Texas indicates that the majority of claims at issue in that case are also being reexamined.

substantially all independent claims. Therefore, any proceedings that cause those independent claims to be non-infringed will also cause a whole host of ***dependent*** claims to be non-infringed. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."). Adding the dependent claims to the mix substantially increases the number of claims that are ***directly*** impacted by reexamination.

In addition, and as both Katz and this Court well know, Katz will never litigate ***each and every claim of every patent in suit***. Instead, Katz will (for reasons of applicability to the accused systems, validity, convenience, *etc.*) focus on a smaller (likely significantly smaller as there are over 1600 claims in the patents in suit) set of claims as it proceeds with the litigation. It is these fewer, most litigated claims that make up the bulk of the reexamination proceedings.

Taking these two practical realities into account, it is clear that reexamination will impact a markedly greater percentage of claims than the "four percent" Katz contends. Tellingly, Katz does not deny that it will assert—as it has in the *Citibank* litigation— many of the claims in reexamination in this case. If Katz intended to assert many claims ***not*** subject to reexamination, Katz would certainly have said so in its response brief. Assuming that the claims in reexamination are likely to be asserted in this case, even if this Court allows Katz to assert ***30 or 40*** of the claims in the patents in suit (Katz Br., at 4) (which seems exceptionally unlikely), then a much greater percentage of the claims would be impacted by reexamination. Add to those the claims that are dependent upon the reexamination claims, and the claims that share the same or similar terms as those

5

being reexamined, and it is clear that reexamination will affect the majority—if not all—of the claims at issue here.

### 2.    Katz Ignores Many Issues Impacted By Reexamination.

Katz also ignores many *issues* that reexamination will affect, claiming that the reexaminations can not simplify or streamline this case "in any meaningful fashion." Katz Br., at 13. This argument cannot be squared with Katz's concession that all of the numerous reexamination proceedings constitute part of the prosecution history. Katz Br., at 14.

This concession—*i.e.*, that the intrinsic record as to the patents in suit is not yet closed—is critical to this Court's determination of whether to grant a stay. It means that the construction of terms in the patents in this case would be premature until that record is closed, and the PTO has completed the application of its special expertise in this area to the patents in suit.

For this reason, reexamination will affect what this Court does on both infringement (based on interpretations of the claims coming out of reexamination) and validity (based on either cancellation or narrowed interpretations).

Nor does Katz contest the fact that reexamination may clarify issues relating to the priority to which Katz's patents are entitled. This issue potentially relates to *all* of the Katz patents, and will determine what prior art can be applied to invalidate the asserted claims in this case.

In short, the reexaminations will significantly impact virtually every issue in this case. Given the significant number of patents, claims, and parties at issue here, this Court and the parties would greatly benefit from the PTO's examination of these issues. *Pegasus Dev. Corp. v. DirectTV, Inc.*, No. Civ.A. 00-1020-GMS, 2003 WL 21105073, at

6

* 1 (D. Del. May 14, 2003) (explaining that given the complexity of the case (*i.e.*, two plaintiffs, four defendants, six asserted patents — two of which were in reexamination, and more than 300 related applications containing an estimated 10,000 claims) because "several issues including claim construction, enablement, adequacy of written description, indefiniteness and inequitable conduct" would likely be impacted by the related applications, "in this case, more than many, the court would benefit from a narrowing of the issues [the reexamination process will provide].").

### C.    A Stay Will Strongly Promote Judicial Efficiency Given the Stage of the Proceedings.

Katz claims—with no legal support—that the fact that nothing of substance has happened in this case is a "neutral factor that does not support a stay." Katz Br., at 5. This is simply not the case. Although courts have stayed cases even on the eve of trial (*see* Opening Br., at 22, n. 14), Defendants opening brief demonstrated that courts are more likely to grant stays sought early in the litigation before the parties or court have expended any resources on the case. *Id.*, at 21-22.

### II.    KATZ'S ARGUMENTS OPPOSING A STAY ARE NOT FACTUALLY SUPPORTED.

With no ability to oppose Defendants' motion on the merits of the relevant legal test, Katz resorts to insinuating some nefarious conspiracy among the Defendants and arguing that this Court must deny Defendants' motion or risk having future plaintiffs be reluctant to file suits in this District. Katz's allegations are unfounded, and its conclusion about the impact of perceptions of potential litigants about litigating here ignores the significant burden this litigation will place on this Court.

7

A.    **Defendants Did Not Initiate the Reexaminations In Response To This Case; If Anything, it Was Katz Who Filed in Response to the Reexaminations.**

Katz's response spends a great deal of time attacking the motives behind the pending reexaminations, suggesting both that there is something untoward about one or more parties taking legal actions designed to get the Patent Office to fix what the party or parties see as profound errors associated with the Katz patents, and that the Defendants in this case are behind such legal actions. In addition to having no legal relevance to this Court's decision, Katz's assertions are simply unfounded.

*First,* Katz suggests that the Defendants in this action worked to convince the Patent Office to institute the director-ordered reexaminations, and filed other reexamination themselves, but offers no evidence to support this allegation.

*Second*, there is nothing wrong with an interested party taking whatever legal actions it deems necessary to protect itself from what it believes are overly broad, wrongly issued patents, including particularly moving to have the Patent Office—which is presumed to have special expertise in this area—correct its mistakes in issuing such patents. 35 U.S.C. § 302 ("Any person at any time may file a request for reexamination by the [Patent] Office of any claim of a patent on the basis of any prior art cited under the provisions of section 301 of this title."). This Court has previously recognized the propriety of granting a stay and the legitimacy of invoking the patent statute under arguably more egregious circumstances:

> [T]he court reminds the plaintiffs that they affirmatively invoked the rights of the patent statute; they can hardly be heard to now complain of the rights afforded others by the same statutory framework. [The defendant] is legally entitled to invoke the reexamination mechanism, and the PTO has determined that reexamination is warranted. There is nothing facially untoward in that.

8

*Pegasus Dev. Corp. v. DirectTV, Inc.*, No. Civ.A. 00-1020-GMS, 2003 WL 21105073, at * 2 (D. Del. May 14, 2003) (granting stay where defendant had filed an *ex parte* reexamination request (which was granted) more than two years *after* complaint was filed). While Katz characterizes the Defendants in this and the other pending actions as "holdouts," because Katz wrongly presupposes that it is entitled to the licenses it seeks, the fact is that the Defendants have simply been unwilling to capitulate to Katz's licensing demands.

**B.    Granting a Stay Will Promote This District As An Efficient, Fair Manager of Patent Cases.**

Nor will this Court's grant of a stay make this District anathema to patent litigants. As an initial matter, Katz's suggestion that the reexaminations were filed as a delaying tactic in response to the filing of this case is simply wrong—all but two of the reexaminations at issue were filed *before*—in many instances long before—this case was ever filed. If anything, it was *Katz* that rushed to file these cases—and to press that they proceed at Katz's desired pace and on its terms—so as to avoid the presumably negative impact of the PTO's review of the Katz patents in reexamination.

The interests of other litigants—present and future—are also aligned with the grant of a stay. With dozens of patents, thousands of claims, and scores of defendants, this case promises to consume an enormous amount of this Court's scarce resources. This Court can best serve other patent litigants (and this District's reputation for dealing effectively with patent cases) by allowing the PTO to do its work, and then dealing with whatever remaining issues and litigants remain.

9

## III.    KATZ'S PROPOSED "WORK-AROUND" WILL CAUSE MORE EXPENSE AND LESS JUDICIAL EFFICIENCY.

Katz suggests that this Court need not stay this entire action, essentially recommending bifurcation of this matter into two parts. Katz does not suggest how this would be accomplished, other than the vague notion that it is a simple "matter of case management without a stay." Katz Br., at 5. Katz's failure to say *how* this would be accomplished is telling—bifurcation would even further complicate an already complex matter.

*First*, any bifurcation would entail significant dispute as to which claims will be impacted by reexamination. As demonstrated by this briefing, the parties disagree as to the number of claims in this case that will be impacted by the reexamination proceeding, and this Court would need to examine this issue in exceptionally close detail to determine whether and to what extent it was appropriate to go forward with any part of this case in light of the reexamination proceedings.

*Second*, dividing the liability case into pieces will dramatically increase the complexity of this case, requiring perhaps multiple *Markman* hearings, multiple summary judgment schedules, and significant additional redundancies. As it would make sense to have only a single damages proceeding upon the completion of *all* liability issues, Katz's proposal likely also assumes *trifurcation* of damages issues.

In short, Katz's proposal would make an already complex case even more complicated, adding further expense and burden to both the parties and to this Court.

10

## CONCLUSION.

For the foregoing reasons, and for the reasons set forth in Defendants' Opening Brief, Defendants respectfully request that this Court grant Defendants' Motion to Stay Action Pending the Patent and Trademark Office's Reexamination of the Katz Patents.

OF COUNSEL:

David K. Callahan
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Dated:  February 2, 2007

_____
Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, Delaware  19801
(302) 651-7700
*Attorneys for Defendants Qwest Communications Int'l Inc., Qwest Wireless, L.L.C., Qwest Communications Corp., Qwest LD Corp., Qwest Broadband Services, Inc., and Qwest Interprise America, Inc.*

11

_Frederick L. Cottrell, III (#2555)_
Cottrell@rlf.com
Kelly E. Farnan (#4395)
Farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, Delaware  19801
(302) 651-7700
*Attorneys for Defendants Time Warner Cable
Inc., Time Warner NY Cable LLC, Time Warner
Entertainment Company LP, AOL LLC,
Compuserve Interactive Services Inc., Netscape
Communications Corporation, United States
Cellular Corporation, TDS Telecommunications
Corporation, TDS Metrocom, LLC, Cablevision
Systems Corporation, CSC Holdings, Inc.,
Cablevision Systems New York City
Corporation, Cablevision of Brookhaven, Inc.,
Cablevision of Connecticut Corporation,
Cablevision of Hudson County, Inc., Cablevision
of Litchfield, Inc., Cablevision of Monmouth,
Inc., Cablevision of New Jersey, Inc.,
Cablevision of Oakland, LLC, Cablevision of
Rockland/Ramapo, LLC, Charter
Communications, Inc., Charter Communications
Holding Company, LLC, Charter
Communications Operating, LLC, and Charter*

Dated:  February 2, 2007          *Communications Entertainment I, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2007, I caused to be served by **HAND DELIVERY**

the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF

which will send notification of such filing(s) to the following:

Mary B. Graham
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
Wilmington, DE 19899

I hereby certify that on February 2, 2007, I caused to be sent by **FEDERAL EXPRESS**

the foregoing document to the following non-registered participants:

Robert T. Haslam                    Michael K. Plimack
Andrew C. Byrnes                    Dale A. Rice
Heller Ehrman LLP                   Heller Ehrman LLP
275 Middlefield Road                333 Bush Street
Menlo Park, CA  94025-3506          San Francisco, CA  94104-2878

Jeffrey L. Moyer (#3309)

EXHIBIT A

43 of 110 DOCUMENTS

Copyright 2007 PR Newswire Association LLC.
All Rights Reserved.
PR Newswire US

January 9, 2007 Tuesday 11:00 AM GMT

LENGTH: 558 words

HEADLINE: LaSalle Bank Corporation and Ronald A. Katz Technology Licensing, L.P. Settle Patent Lawsuit and Enter Into License Agreement

DATELINE: LOS ANGELES Jan. 9

BODY:

   LOS ANGELES, Jan. 9  /PRNewswire/ -- LaSalle Bank Corporation, headquartered in Chicago, an indirect subsidiary of Netherlands-based ABN AMRO Bank N.V., and Ronald A. Katz Technology Licensing, L.P., headquartered in Los Angeles, announced today the settlement of patent litigation between the parties and that, as part of the settlement, LaSalle has agreed to pay an undisclosed sum for a nonexclusive license under a comprehensive portfolio of patents that Katz owns relating to interactive voice applications.

   The patents held by Ronald A. Katz Technology Licensing, L.P. cover a wide range of interactive technology including automated forms of: customer service, securities trading, prescription refill services, merchandising, prepaid services, telephone conferences, registration, home shopping, as well as functions involved in securing information from databases by telephone, interactive cable transactions, and various other uses of toll free and local numbers.

   Ronald A. Katz stated, "We welcome LaSalle Bank Corporation to the large group of financial services companies who have purchased license rights under this portfolio."

   There are over 150 companies with license rights under this portfolio, including over 15 energy and utility companies. Companies in other industries with license rights under this portfolio include: Advanta Corp., American Century, American Express, Ameritrade Holding Corporation, Automatic Data Processing, Inc., AT&T Corp., Bank of America Corporation, BB&T Corporation, Capital One Services Inc., Cellco Partnership d/b/a Verizon Wireless, Certegy Inc., Dell Inc., Delta Air Lines, Inc., Edward D. Jones & Co., L.P., Equifax Inc., Excel Communications Inc., First Data Corporation, First National Bank of Omaha, First Tennessee National Corporation, Hewlett-Packard Company, Home Shopping Network Inc., Household International, Inc., HSBC Bank USA, International Business Machines (IBM), KeyCorp, MCI Inc., Mediacom Communications Corporation, Mellon Financial Corporation, Merck & Co., Merrill Lynch & Co., Inc.,  Metris Companies Inc., Microsoft, MoneyGram Payment Systems Inc., Nationwide, OppenheimerFunds, Inc., People's Bank, Principal Financial Group, Inc., Prudential Financial, Inc., QVC, Inc., Sears, Roebuck and Co., Shop At Home, Inc., Sprint Corporation, SouthTrust Bank, Sunoco, Inc., Synovus, The

  

Gallup Organization, T. Rowe Price Associates, Inc., The Vanguard Group, Inc., Verizon California Inc. and its affiliates, Wachovia Corporation, and Wells Fargo & Company.

Mr. Katz is the named inventor on a large number of patents primarily in the fields of telecommunications and computing. He also formed Telecredit, Inc., the nation's first on-line real time credit and check cashing authorization system, and was awarded a patent as co-inventor of that technology.

LaSalle Bank Corporation, also headquartered in Chicago, has $116 billion in assets. It is an indirect subsidiary of Netherlands-based ABN AMRO Bank N.V., a leading international bank with total assets of EUR 986 bln. ABN AMRO operates more than 3,500 branches in 60-plus countries and territories, and has more than 105,000 full-time employees worldwide.

CONTACT: Brian Rivette of A2D, L.P., +1-310-247-8191, brivette@a2dlp.com , for Ronald A. Katz Technology Licensing, L.P.

SOURCE Ronald A. Katz Technology Licensing, L.P.

URL: http://www.prnewswire.com

LOAD-DATE: January 10, 2007





EXHIBIT B

36 of 110 DOCUMENTS

Copyright 2007 PR Newswire Association LLC.
All Rights Reserved.
PR Newswire US

January 16, 2007 Tuesday 11:00 AM GMT

LENGTH: 663 words

**HEADLINE:** The PNC Financial Services Group, Inc. and Ronald A. Katz Technology Licensing, L.P. Settle Patent Lawsuit and Enter Into License Agreement

**DATELINE:** LOS ANGELES Jan. 16

**BODY:**

LOS ANGELES, Jan. 16  /PRNewswire/ -- The PNC Financial Services Group, Inc., (NYSE:PNC), headquartered in Pittsburgh, and Ronald A. Katz Technology Licensing, L.P., headquartered in Los Angeles, announced today the settlement of patent litigation between the parties and that, as part of the settlement, PNC has agreed to pay an undisclosed sum for a nonexclusive license under a comprehensive portfolio of patents that Katz owns relating to interactive voice applications.

The license covers services offered by The PNC Financial Services Group, Inc. in the "Financial Services Call Processing" and "Automated Securities Transactions" fields of use.  These services, including customer service provided to consumer and business accounts, are delivered through automated systems as well as the combination of automated systems and live agents. Other terms of the license were not disclosed.

The patents held by Ronald A. Katz Technology Licensing, L.P. cover a wide range of interactive technology including automated forms of: customer service, securities trading, prescription refill services, merchandising, prepaid services, telephone conferences, registration, home shopping, as well as functions involved in securing information from databases by telephone, interactive cable transactions, and various other uses of toll free and local numbers.

Ronald A. Katz, Chief Executive of Ronald A. Katz Technology Licensing, L.P. stated, "We are pleased to welcome The PNC Financial Services Group, Inc. to the significant list of financial services companies who have purchased license rights under this portfolio."

There are over 150 companies with license rights under this portfolio, including over 15 energy and utility companies.  Companies in other industries with license rights under this portfolio include: Advanta Corp., American Century, American Express, Ameritrade Holding Corporation, Automatic Data Processing, Inc., AT&T Corp., Bank of America Corporation, BB&T Corporation, Capital One Services Inc., Cellco Partnership d/b/a Verizon Wireless, Certegy Inc., Dell Inc., Delta Air Lines, Inc., Edward D. Jones & Co., L.P., Equifax Inc., Excel Communications Inc., First Data Corporation, First National Bank of

  

Omaha, First Tennessee National Corporation, Hewlett-Packard Company, Home
Shopping Network Inc., Household International, Inc., HSBC Bank USA,
International Business Machines (IBM), KeyCorp, LaSalle Bank Corporation, MCI
Inc., Mediacom Communications Corporation, Mellon Financial Corporation, Merck &
Co., Merrill Lynch & Co., Inc., Metris Companies Inc., Microsoft, MoneyGram
Payment Systems Inc., Nationwide, OppenheimerFunds, Inc., People's Bank,
Principal Financial Group, Inc., Prudential Financial, Inc., QVC, Inc., Sears,
Roebuck and Co., Shop At Home, Inc., Sprint Corporation, SouthTrust Bank,
Sunoco, Inc., Synovus, The Gallup Organization, T. Rowe Price Associates, Inc.,
The Vanguard Group, Inc., Verizon California Inc. and its affiliates, Wachovia
Corporation, and Wells Fargo & Company.

Mr. Katz is the named inventor on a large number of patents primarily in the
fields of telecommunications and computing. He also formed Telecredit, Inc.,
the nation's first on-line real time credit and check cashing authorization
system, and was awarded a patent as co-inventor of that technology.

The PNC Financial Services Group, Inc. ( http://www.pnc.com/ ) is one of the
nation's largest diversified financial services organizations providing retail
and business banking; specialized services for corporations and government
entities, including corporate banking, real estate finance and asset-based
lending; wealth management; asset management and global fund services.

CONTACT: Brian Rivette of A2D, L.P., +1-310-247-8191,
brivette@a2dlp.com , for Ronald A. Katz Technology Licensing, L.P.; or Brian
Goerke of PNC Financial Services Group, Inc., +1-412-762-4304, or
+1-412-762-3463,  brian.goerke@pnc.com

SOURCE Ronald A. Katz Technology Licensing, L.P.

URL: http://www.prnewswire.com

LOAD-DATE: January 17, 2007



# EXHIBIT C

1 of 46 DOCUMENTS

Copyright 2007 Associated Press
All Rights Reserved
Associated Press Financial Wire

January 23, 2007 Tuesday 11:06 AM GMT

SECTION: BUSINESS NEWS

LENGTH: 608 words

BODY:

bc-CA-Ronald-Katz-PetMed    01-23

1/8STK 3/8

1/8IN 3/8 FIN CPR

1/8SU 3/8 LAW LIC

TO BUSINESS AND LEGAL AFFAIRS EDITORS:

PetMed Express, Inc. and Ronald A. Katz Technology Licensing, L.P. Settle

Patent Lawsuit and Enter Into License Agreement

LOS ANGELES, Jan. 23 /PRNewswire/ -- PetMed Express, Inc., headquartered

in Pompano Beach, Florida, and Ronald A. Katz Technology Licensing, L.P.,

headquartered in Los Angeles, announced today the settlement of patent

litigation between the parties and that, as part of the settlement, PetMed

Express, Inc. has agreed to pay an undisclosed sum for a nonexclusive license

under a comprehensive portfolio of patents that Katz owns relating to

interactive voice applications.

The patents held by Ronald A. Katz Technology Licensing, L.P. cover a wide

range of interactive technology including automated forms of: customer

service, securities trading, prescription refill services, merchandising,

prepaid services, telephone conferences, registration, home shopping, as well

as functions involved in securing information from databases by telephone,

interactive cable transactions, and various other uses of toll free and local

numbers.



Ronald A. **Katz** stated, "We welcome PetMed Express, Inc. to the large group

of leading companies who have purchased license rights under this portfolio."

There are over 150 companies with license rights under this portfolio,

including over 15 energy and utility companies. Companies in other industries

with license rights under this portfolio include: Advanta Corp., American

Century, American Express, Ameritrade Holding Corporation, Automatic Data

Processing, Inc., AT&T Corp., Bank of America Corporation, BB&T Corporation,

Capital One Services Inc., Cellco Partnership d/b/a Verizon Wireless, Certegy

Inc., Dell Inc., Delta Air Lines, Inc., Edward D. Jones & Co., L.P., Equifax

Inc., Excel Communications Inc., First Data Corporation, First National Bank

of Omaha, First Tennessee National Corporation, Hewlett-Packard Company, Home

Shopping Network Inc., Household International, Inc., HSBC Bank USA,

International Business Machines (IBM), KeyCorp, MCI Inc., Mediacom

Communications Corporation, Mellon Financial Corporation, Merck & Co.,
Merrill

Lynch & Co., Inc., Metris Companies Inc., Microsoft, MoneyGram Payment
Systems

Inc., Nationwide, OppenheimerFunds, Inc., People's Bank, Principal Financial

Group, Inc., Prudential Financial, Inc., QVC, Inc., Sears, Roebuck and Co.,

Shop At Home, Inc., Sprint Corporation, SouthTrust Bank, Sunoco, Inc.,

Synovus, The Gallup Organization, T. Rowe Price Associates, Inc., The
Vanguard

Group, Inc., Verizon California Inc. and its affiliates, Wachovia
Corporation,

and Wells Fargo & Company.

Mr. **Katz** is the named inventor on a large number of patents primarily in

the fields of telecommunications and computing. He also formed Telecredit,

Inc., the nation's first on-line real time credit and check cashing

authorization system, and was awarded a patent as co-inventor of that

technology.

Founded in 1996, PetMed Express is America's Largest Pet Pharmacy,

  

delivering prescription and non-prescription pet medications and other health products for dogs, cats, and horses at competitive prices direct to the consumer through its 1-800-PetMeds toll free number and on the Internet through its website at http://www.1800petmeds.com.

SOURCE  Ronald A. Katz Technology Licensing, L.P.

-0-                        01/23/2007

/CONTACT:  Brian Rivette of A2D, L.P., +1-310-247-8191, brivette@a2dlp.com/

CO:  Ronald A. Katz Technology Licensing, L.P.; PetMed Express, Inc.

ST:  California, Florida

IN:  FIN CPR

SU:  LAW LIC

HA-DP

-- LATU017 --

1997 01/23/2007 06:00 EST http://www.prnewswire.com

LOAD-DATE: January 24, 2007



EXHIBIT D



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,087 | 06/09/2004 | 6292547 | 1321.43945REX | 6710 |

35554    7590    01/16/2007

REENA KUYPER, ESQ.
BYARD NILSSON, ESQ.
9255 SUNSET BOULEVARD
SUITE 810
LOS ANGELES, CA 90069

| EXAMINER |
|---|
| Erik Kielin |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 01/16/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)



United States Patent and Trademark Office

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

DO NOT USE IN PALM PRINTER
THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

DITTHAVONG & MORI, P.C.

10507 BRADDOCK ROAD

SUITE A

FAIRFAX, VA  22032

1/16/07



CLOSE     PRINT

## *EX PARTE*  REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/007087

PATENT NO.   6,292,547

ART UNI  3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Office Action in Ex Parte Reexamination* | Control No. 90/007,087 ~~&~~ 90/006,979 | Patent Under Reexamination 6292547 |
|---|---|---|
| | Examiner Erik Kielin | Art Unit 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a☒ Responsive to the communication(s) filed on <u>26 September 2006</u> .     b☒ This action is made FINAL.
c☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I     THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.     3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.     4. ☐ _____.

Part II     SUMMARY OF ACTION

1a. ☒ Claims <u>1-50</u> are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims <u>1-50</u> are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved   (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some*  c)☐ None     of the certified copies have

   1☐ been received.

   2☐ not been received.

   3☐ been filed in Application No. _____ .

   4☐ been filed in reexamination Control No. _____ .

   5☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)
U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-06)     Office Action in Ex Parte Reexamination     Part of Paper No. 20061213

## DETAILED ACTION

### *References*

(1) <u>VCT Quarterly Newsletter</u> Vol. 2, No. 3, Winter 1987

(2) Article to Yoshizawa et al. entitled "Voice Response System for Telephone
Betting" in <u>Hitachi Review</u> 26(6), June 1977, pp. 215-220

(3) <u>VCT Quarterly Newsletter</u> Vol. 1, No. 2, Winter 1986

(4) US 3,833,885 (Gentile et al.)

(5) Article Moosemiller entitled "AT&T's Conversant[TM] I Voice System"
    in <u>Speech Technology</u>, Mar/Apr 1986, pp. 88-93

(6) US 4,797,911 (Szlam et al.)

(7) US 4,797,913 (Kaplan et al.)

(8) US 3,778,553 (Rackman)

(9) Article to Emerson et al. entitled "Voice Response System -- Technology to the
Rescue for Business Users" in <u>Speech Technology</u> Jan/Feb 1983, pp. 99-103

(10) US 3,702,392 (St. Jean)

(11) US 4,788,682 (Vij et al.)

(12) US 3,651,503 (Kono)

### *Table of Contents*

### I. Rejections under 35 U.S.C. 102 or 102/103:

| | |
|---|---|
| Claims 1-9, 11, and 17-20 over *VCT '87* | p. 4 |
| Claims 21-23, 25, 37-39, 44, and 47 over *Yoshizawa* | p. 13 |

### II. Rejections under 35 U.S.C. 103(a):

| | |
|---|---|
| Claims 1-10 over *VCT '87* in view of *VCT '86* | p. 17 |
| Claims 12-16 over *VCT '87* in view of *VCT '86* and *Gentile* | p. 19 |
| Claims 1-6 and 8 over *Moosemiller* in view of *Szlam* | p. 20 |
| Claims 27 and 28 over *Yoshizawa* in view *Kaplan* | p. 23 |
| Claim 26 over *Yoshizawa* in view of *Moosemiller* | p. 25 |
| Claims 29-31, 34, and 35 over *Yoshizawa* in view of *Rackman* | p. 26 |
| Claim 32 and 33 over *Yoshizawa* in view of *Rackman* and *Gentile* | p. 28 |
| Claim 42 over *Yoshizawa* in view of *Emerson* | p. 28 |
| Claim 43 over *Yoshizawa* in view of *St. Jean* | p. 29 |

Control Number: 90/007,087 & 90/006,979                    Page 3

Art Unit: 3992

## III. Rejections added in the Office action filed 21 July 2006

Claims 24, 45 and 46 as anticipated by *Yoshizawa*                    p. 31
Claims 35 and 36 as obvious over *Yoshizawa* in view of *Vij*        p. 32
Claims 40, 41, and 48-50 as obvious over *Yoshizawa* in view of *Kono*    p. 33

## IV. Rebuttal to Arguments by Patent Owner

Narrowed construction of claim terms                    p. 36
VCT '87                                                 p. 39
Yoshizawa                                               p. 58
Rejections using VCT '87 as a base reference            p. 61
Rejections using Moosemiller as a base reference        p. 69
Rejections using Yoshizawa as a base reference          p. 74
Rejections added 21 July 2006                           p. 82
Klein Declaration is NOT Persuasive                     p. 85
Third Party Evidence of Non-Obviousness                 p. 86

## V. Conclusion                                          p. 99

### *Preface*

(1) The rejection of all of claims 1-50 has been maintained.

(2) The response to Patent Owner's arguments begins on page 36 of this document.

## I. *Claim Rejections - 35 USC § 102/103*

1.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

2.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3.    Claims 1-9, 11, and 17-20 are rejected under 35 U.S.C. 102(b) as being anticipated by or, alternatively --for claims 1-9 only-- under 35 U.S.C. 103(a) as obvious over, the <u>VCT Quarterly Newsletter</u> Vol. 2, No. 3, Winter 1987, (*VCT '87*, hereafter).

The concepts of using ANI (automatic call**ing** number identification data) and DNIS (automatic call**ed** number identification data) in the presently claimed process of controlling a telephonic interface system first appeared in the continuation-in-part application 07/194,258, filed 18 May 1988; therefore, 18 May 1988 is the earliest priority afforded claims 1-20. Because winter is Jan-Mar of any year, the publication date is not later than March 1987. Therefore, VCT '87 qualifies as prior art under 35 U.S.C. 102(b).

Regarding independent **claims 1 and 11**,

> **An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device, and a digital input device in the form of an array of alphabetic numeric buttons for providing caller data signals,** (claims 1 and 11)

*VCT '87* discloses a control system called the "VCT Advantage system" for automated telephone call processing for a variety of applications, such as customer service (p. 1, left-hand col.), credit authorization (p. 4, left-hand col.), and on-line college registration (p. 3; p. 4, right-hand col.). In this regard, *VCT '87* states,

> "A customer calls the service department and is greeted by the voice
> response system. The customer identifies himself by pressing
> appropriate keys on a Touch Tone telephone in response to verbal
> prompts." (p. 1, left-hand col., 5th paragraph)

Because the caller connects to the "voice response system" via a Touch Tone
telephone, the communication facility (i.e. the public telephone network) is
implicitly disclosed in *VCT '87*. A Touch Tone telephone is "a telephonic instrument
including a voice communication device, and a digital input device in the form of an
array of alphabetic numeric buttons." Because the caller "identifies himself by
pressing appropriate keys" the caller provides "caller data signals."

> **wherein said communication facility has a capability to
> automatically provide terminal digital data, indicating a
> calling telephone number** (claim 11 only)

This is Automatic Number Identification or ANI.[1]  In this regard, *VCT '87* states,

> "A second solution to the problem of integration is **Automatic
> Number Identification (ANI). ANI** allows the voice system to
> **identify the number from which the call is being placed**. With
> this type of identification, the voice response system can match the
> number with a customer's account and notify the host of a pending
> inquiry for that customer while at the same time answer the call." (p.
> 6, left-hand col., 2nd paragraph; emphasis added)

> **said analysis control system comprising:**

> **a processor unit for processing said caller data signals
> supplied by individual callers via said remote terminals;**
> (claim 1)

The excerpt from **p. 1** of *VCT '87*, above, provides one example of the voice
response system including a processing unit for processing caller data signals
supplied by the callers via the telephone, specifically greeting, prompting, collecting
the identification data signals, and identifying the caller.

> **interface structure for interfacing said communication
> facility to said processor unit wherein said interface**

---

[1] During the Markman hearing (63 F. Supp 2d 583; Aug. 26, 1999; beginning at p. 618,
section entitled "8. 'ANI' and 'Calling Number Identification Data' " --especially the last
paragraph of the section) it is indicated that Patent Owner agrees that "calling number
identification data" and "ANI" are equivalent terms. Accordingly, although the claim does
not recite the term "ANI," "ANI" can be used interchangeably with "calling number
identification data" for the purposes of explanation.

Control Number: 90/007,087 & 90/006,979                    Page 6
Art Unit: 3992

> **structure receives data signals prior to the close of
> communication with the caller,** (claim 1)

or

> **interface structure coupled to said communication
> facility to interface said remote terminals for voice and
> digital communication and including means to provide
> caller data signals representative of data relating to said
> individual callers provided from said remote terminals**
> (claim 11)

In this regard, *VCT '87* states,

> "For example, the VCT ADVANTAGE system can support T1 service.
> For departments with very high call volumes, a service such as T1 can
> provide substantial savings in telephone charges. Equipped with a **T1
> interface** the VCT AVANTAGE system can not only support T1 but can
> also provide some special services such as immediate identification for
> particular applications." (p. 1, right-hand col., last full paragraph;
> emphasis added)

Accordingly, the interface is at least the **T1 interface** and/or whatever
portion of the VCT receives the data signals from the communication facility.
The data signals are provided in an interactive manner between the caller's
Touch Tone remote terminal and the VCT ADVANTAGE system; therefore, the
limitations that the data signals are (1) "representative of data relating to the
individual caller," because the caller enters them, (2) "provided from said
remote terminals" because the caller enters them from a Touch Tone phone
(hence "digital"), and (3) received "prior to the close of communication with
the caller," because the caller's interaction is interactive in real time, are
each met.

The communication is both "voice and digital" because a Touch Tone
telephone is used by the caller, and because the voice response system
interacts with the caller and all signals pass through the T1 interface and the
interface portion of the voice response system.

> the data signals...**including called number data signals
> (DNIS)** (claim 1 only)

*VCT '87* continues regarding the VCT ADVANTAGE system with T1 service,

> "In one VCT application, several 800 numbers enter the service
> department over many T1 spans. These calls are received by the VCT
> ADVANTAGE before going to an ACD [automatic call distributor]. **DNIS
> codes received with each call** allow the voice response system to

identify the application before even speaking with the customer. 800 numbers (combined in a T1 service called Megacom) are provided to customers for credit card authorization, point of sale terminals, and corporate accounts. The **DNIS** codes associated with each 800 number are identified by the voice system and directed to the appropriate department before the call is even answered. The result is an efficient interface with an existing telephone service that enhances the economic benefits of T1." (paragraph bridging p. 1 with p. 6; emphasis added)

The Touch Tone signals provided by the caller to the communication facility are converted by the communication facility into DNIS codes associated with the 800 numbers to the VCT ADVANTAGE system for processing accordingly to application indicated by the DNIS codes.

> the data signals also including...**calling number identification data signals automatically provided by said communication facility** (claim 1 only)

or

> the data signals...**automatically provided by the communication facility with respect to the remote terminals prior to the close of communication with the callers including ... said terminal digital data indicative of a calling telephone number** (claim 11 only)

The feature "calling number identification data" is ANI. The *VCT '87* continues regarding the VCT ADVANTAGE system with T1 service,

> "A second solution to the problem of integration is **Automatic Number Identification (ANI). ANI** allows the voice system to **identify the number from which the call is being placed.** With this type of identification, the voice response system can match the number with a customer's account and notify the host of a pending inquiry for that customer while at the same time answer the call." (p. 6, left-hand col., 2nd paragraph; emphasis added)

> the data signals also including...**said caller data signals supplied by the individual callers via said remote terminals** (claim 1 only)

or

> the data signals also including... **caller personal identification data entered by the caller via the digital input device** (claim 11 only)

Control Number: 90/007,087 & 90/006,979                    Page 8

Art Unit: 3992

The identification signals that the caller dials by Touch Tone telephone is one example of the claimed "caller data signals" or "caller personal identification data" (p. 1, left-hand col., 5th paragraph).

> **voice generator for providing prompts to said individual callers in response to which said individual callers provide said caller data signals, said caller data signals including caller qualification data for qualifying said individual callers;** (claim 1 only)

The VCT ADVANTAGE system includes a voice generator providing voice prompts to the caller, for example, to dial an identification number (p. 1. left-hand col., 5th paragraph). One example of qualification data is the identification signals. Other examples of qualification data are provided by the on-line college registration. The PAN or "Personal Access Number" is provided to each student each quarter. The social security number (SSN) is also provided by the caller (p. 3, left-most col., 3rd paragraph). Yet another example of qualification data is the "authorization code" provided by a department to the student. The authorization code allows only those student callers having the code to register for a given class (p. 4, right-hand col. 2nd and 3rd paragraphs).

Based upon this forgoing information, VCT '87 also discloses the feature below,

> **testing caller customer number data as part of said caller qualification data supplied by the individual callers as at least certain of said caller data signals against a file of stored customer number data;** (claim 1 only)

or

> **record testing structure connected to receive and test said caller data signals indicative of said terminal digital data representative of said calling telephone number and said caller personal identification data against previously stored terminal digital data and caller personal identification data;** (claim 11 only)

The "customer number data" or "caller personal identification data" include the PAN, SSN, and/or authorization code. The data is kept in a

> **"master database of student records** received each quarter from a Burroughs 7805, the Student Information System Host. Among the database files to be **located on the VCT system** are **student identification numbers**, course numbers, course authorization codes..." (p. 4, right-hand col., 2nd paragraph' emphasis added).

The identification data is tested to qualify each student because a student can only gain access to the system if, *inter alia*, the PAN and SSN are valid. (p. 3, left-most col., 3rd paragraph). Additionally, the feature of "terminal digital data representative of said calling telephone number" is disclosed. As noted above, *VCT '87* states,

> "**ANI** allows the voice system to **identify the number from which the call is being placed.** With this type of identification, the **voice response system can match the number with a customer's account**..." (p. 6, left-hand col., 2nd paragraph; emphasis added)

Because the VCT ADVANTAGE system holds the files, as noted above, the system necessarily has a storage structure. *VCT '87* therefore reads on the limitation,

> **storage structure for storing certain of said data provided by said individual callers including item data for ordering particular items;** (claim 11 only)
>
> **means for controlling said processor unit in accordance with said called number identification data signals (DNIS) to process at least certain of said caller data signals in accordance with a select format from a plurality of formats identified by said called number identification data signals (DNIS);** (claim 1 only)

As noted above in the excerpted paragraph regarding the DNIS feature of the VCT ADVANTAGE system,

> "DNIS codes received with each call allow the voice response system to identify the application before even speaking with the customer... The DNIS codes associated with each 800 number are **identified by** the voice system and **directed to** the appropriate department before the call is even answered." (*supra*)

Each application is a different "select format." The identification and direction of the calls based upon the communication facility-provided DNIS signals are "processing" examples.

> **analysis structure for receiving and processing said caller data signals under control of said record testing structure** (claim 11 only)

Using the telephone college registration example in *VCT '87*, the portion of the VCT ADVANTAGE system that enables the student caller to actually enter course numbers for registration is the analysis structure. Because the analysis structure only receives and processes the data if the student caller passes the record testing structure's test of PAN and SSN, the analysis structure is under the control of the record testing structure. The analysis structure portion of the VCT ADVANTAGE

system analyzes the student caller's courses for, *inter alia*, availability to the student. (p. 4, left-hand col., e.g. 3rd paragraph)

> **a switch that transfers the individual callers to a manual operation in the event the individual callers do not qualify during the testing step** (claim 1 only)

*VCT '87* discloses "automatically switching a call to an operator attendant for manual operation when it is determined that operator assistance is required based on the caller's response to a prompt," stating,

> "If a question can be answered by the voice response system the call will be handled without human involvement. If the question requires an unstructured solution, the call and data gathered by the voice system, can be simultaneously transferred to a service representative." (p. 1, col. 2, 6th paragraph, wherein a voice system structure capable of such transfer is disclosed).

For example, using the college registration example, if a student PAN or SSN does not match the data of record, then the student caller would fail to gain access to the system and would be unable to register for classes. While authorizing the student access to the voice system for registration would normally fall under the umbrella of "a question [that] can be answered by the voice response system," failure to pass the qualifying test of authorization of access would fall under the umbrella of a "question [that] requires an unstructured solution" thereby requiring human assistance. Accordingly, it is implicitly taught in *VCT '87* that when a caller fails the qualifying test, the caller is transferred to "a manual operation," i.e. someone in registration in order to find the solution to the problem of gaining access to the system to register.

Alternatively, if it is thought for some reason that this feature is not implicitly taught, then this may be a difference. However, the *VCT '87* states,

> "Reliability and Responsiveness. Two key ingredients in any customer service organization. In fact, for many customers quality service is one of the deciding factors for purchasing the product." (p. 1, left-hand, col. 1st paragraph).

*VCT '87* continues,

> "Through complete automation of selected routine inquiry calls, and partial automation of all calls, the voice response system can increase productivity by freeing up trained representatives to handle the involved and complicated inquiries made by customers. The result, customers receive better service since the voice system can provide immediate answers to routine inquiries and representatives are free to

>   handle the difficult calls for which they have been trained." (p. 1,
>   right-hand, col. 3rd full paragraph).

Instead of leaving a customer (student) hopelessly unable to access the system, in contradiction to providing good customer service, it would have been obvious for one of ordinary skill in the art, at the time of the invention to pass the customer (student) to the manual operation of a customer service representative (registration representative) upon failure of the qualifying test (access to the system to register) in order to provide good customer service, as taught to be critical in *VCT '87*.

Accordingly, is the feature of transferring a caller if the caller "do[es] not qualify during the testing step" would at least be obvious in the interest of customer service if not implicitly disclosed in *VCT '87*.

Regarding **claim 2**, *VCT '87* discloses,

>   **A control system according to claim 1, wherein at least
>   certain of said individual callers at certain of said
>   remote terminals are also subject to qualification based
>   on said calling number identification data signals.**

As stated in the excerpt above directed to ANI, *VCT '87* states,

>   "A second solution to the problem of integration is Automatic Number
>   Identification (ANI). ANI allows the voice system to identify the
>   number from which the call is being placed. With this type of
>   identification, **the voice response system can match the number
>   with a customer's account** and notify the host of a pending inquiry
>   for that customer while at the same time answer the call." (p. 6, left-
>   hand col., 2nd paragraph; emphasis added)

Matching the calling number identification data with the account number is qualification based on the calling number identification data.

Regarding **claims 3 and 17**, *VCT '87* discloses,

>   **A control system according to claim 1, wherein said
>   processor unit generates data identifying an order and
>   provides the data to the individual callers.** (claim 3)

>   **A control system according to claim 11, wherein said
>   analysis structure further comprises a processor that
>   generates data identifying an order and provides at least
>   certain of the data to the individual callers.** (claim 17)

Considering the college registration example, *VCT '87* states,

> "This method of interface allows the telephone registration system to perform all the functions of an operator at a terminal and in a real-time environment to provide students with **immediate verification of their class schedules**." (p. 4, right-hand col., 4[th] paragraph).

The processor unit generates data identifying an order (for example, the courses registered for) and provides the data to the individual callers (for example, in the form of the "class schedule.")

Regarding **claims 4-6, 8, and 18-20**, *VCT '87* discloses,

> **A control system according to claim 3 or claim 11, wherein the data identifying the order is number data** (claim 4 or 18, respectively), **wherein the number data is provided as acknowledgement data to the individual callers** (claim 5 or 18, respectively) or, **wherein the number data is provided in chronological sequence** (claim 6 or 20, respectively).

> **A control system according to claim 1, wherein the caller data signals include item number data** (claim 8).

A "verification of their class schedule" is "acknowledgment data" provided by the telephone registration system to the student call and includes the student's name, **SSN**, **PAN**, as well as course **numbers** and course **times** and therefore is "number data" "identifying the order." As just noted the class schedule is "number data." By its very nature a schedule is includes a chronological sequence. Therefore, the class schedule is "number data provided in chronological sequence." A course number is item number data.

Regarding **claim 7**, *VCT '87* discloses

> **A control system according to claim 1, wherein the qualification data is indicative of a consumable key**.

Considering again the college registration example, *VCT '87* discloses

> "The USCD telephone registration system will model the current procedures of registration allowing students to waitlist for closed courses and allowing Departmental offices to control registration for specific courses through assigned **authorization codes**. These authorization codes are currently **given to each department prior to registration** and are given only to students meeting course pre-requisite requirements. The codes will be assigned by the departmental advisor and matched with duplicate files located on the telephone registration system." (p. 4, right-hand col., 3[rd] paragraph).

The "authorization code" is a "consumable participation key" because it limits a student to enroll in a predetermined class for which the student qualifies and can be used for only that one class, one time. Once the student uses the code, the code is consumed.

Regarding **claim 9**, *VCT '87* discloses

> **A control system according to claim 1, wherein the caller data signals include a second form of identification data.**

The PAN and SSN are required for access to the telephone registration system. This is a first and second form of identification data.

4.    Claims 21-23, 25, 37-39, 44, and 47 are rejected under 35 U.S.C. 102(b) as being anticipated by the article to Yoshizawa et al. entitled "Voice Response System for Telephone Betting" in <u>Hitachi Review</u> 26(6), June 1977, pp. 215-220 (*Yoshizawa*, hereafter).

Regarding **claims 21-23**, *Yoshizawa* discloses,

> **A method for implementing a service for controlling an order of an item or items for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device and a digital input device in the form of an array of alphabetic numeric buttons for providing data,**

*Yoshizawa* discloses an automated telephonic system and method enabling a subscriber/caller to bet on horse races, stating "the subscriber can make bets [i.e. the 'order of an item or items'] through any push-button telephone set" (p. 216, left-hand col., lines 2-4). Push-button telephones inherently have (1) an array of alphabetic numeric buttons and (2) provide for voice communication. The "communication facility" is the public telephone network. Additionally, Figure 1 of *Yoshizawa* depicts two individuals (subscribers/callers) at terminals having push-button telephones.

The system analyzes the caller-entered bet data to determine subsets of winning bets and losing bets associated with the subscribers/callers, and controls the voice generator, the storage of information, the manipulation of data, etcetera, and thus is as "an analysis control system." (p. 216, left-hand col.).

> **said method comprising the steps of:**

> **interfacing said remote terminals for voice and digital
> communication and receiving data signals prior to the
> close of communication from callers at said remote
> terminals including said caller data signals developed by
> said remote terminals;**

Fig. 1 of *Yoshizawa* shows the public telephone network coupled to the voice
response unit. Fig. 2 on p. 218 shows the voice response unit having an interface
structure (the input trunk, push-button signal receiver or PBR, and input controller)
selectively coupled to the telephone-switching network of the public telephone
network. The interface structure (Fig. 2) accepts push-button telephone data using
the PBR (push-button signal receiver) via the input trunk. The data accepted
includes data relating to the caller, such as the caller's subscriber number and
password (Table 1, p. 217). As shown in Table 1, the transaction is interactive
between the caller and the Voice Response System; therefore, the data signals a
received "prior to the close of communication."

> **providing prompts to said individual callers in response
> to which said individual callers can provide said caller
> data signals including caller qualification data for
> qualifying callers;**
>
> **receiving from said callers customer number data in
> addition to one other form of identification data as a
> part of the caller qualification data;**

Table 1 on p. 217 shows several exemplary prompts provided to callers to which
the callers respond. The "qualification data"/"customer number data" dialed in by
the caller includes the account number and password and may additionally include
the registration number in the instance of changing a race bet, such as to cancel
the bet.

> **verifying said customer number data and said other
> form of identification data entered by said callers;**

In this regard, *Yoshizawa*, states at p. 216, left-hand col.,

> "[A subscriber] calls the telephone betting center and inputs his
> account number, password, and the desired pari-mutuel tickets. The
> voice response unit transmits these inputs to the central processing
> unit [CPU] through the data communication lines."

As shown in Table 1 on p. 217, after the subscriber number password and password
are entered, the caller is told to wait by the voice generator, so that verification of
the "customer number data" entered by the caller can be carried out. Then the
voice generator tells the caller that the bet will be accepted.

> **receiving from said callers order data including item
> data entered by said callers via said digital input device;**

> **receiving from said callers additional data relating to
> said item data;**

As noted in the excerpt above, the caller enters the "order data" in the form of placing a bet on a race, including item data in the form of the race course, race number, forecast (win, place or show), horse number, and number of tickets (Table 1 on p. 217).

> **processing said caller entered data to implement said
> order; and**

The race bets (i.e. "caller entered data") requested by the callers, for example, are necessarily processed to place the bet, bill for the bet, and to determine if a bet is a winning or losing one (p. 219).

> **providing individual callers with computer generated
> data to identify said order for individual callers** (claim
> 21), **wherein the computer generated data identifying
> the order is provided to the individual callers as
> acknowledgement data** (claim 22), or **wherein the
> computer generated number data is provided to the
> individual callers in chronological sequence** (claim 23)**.**

Table 1 on p. 217 provides the exemplary acknowledgement, "Registration has been completed. Thank you." Table 1 also shows that the central processing unit (i.e. "computer") generates numbers in the form of "registration numbers" identifying the order (i.e. race bet) and a time stamp (therefore in chronological sequence), indicative of a caller's bet, which is stored so that the caller may use the registration number to update the bet data, such as by cancellation.

Regarding **claim 25**, *Yoshizawa* discloses

> **A method according to claim 21, wherein data
> identifying the order facilitates tracing.**

Because the registration number is used by the caller to change the race bet associated with the registration number, the registration number clearly "facilitates tracing" the race bet (i.e. the order).

Regarding **claim 37**, *Yoshizawa* discloses,

Control Number: 90/007,087 & 90/006,979                        Page 16
Art Unit: 3992

> A method according to claim 21, wherein the customer
> number data provided by the callers is associated with a
> limit restricting use of the service to an extent of a
> dollar value.

In this regard, *Yoshizawa* states,

> "Betting data sent from the voice response unit are entered on
> the disk file in an area corresponding to the account file. At the
> same time, a new purchase limit is set by deducting the bet
> amount from the daily maximum of □100,000. The newly set limit
> is the maximum amount that can be used in the next bet of the
> day." (p. 219, section entitled "*On-line tasks:*" first sentence;
> emphasis added)

Regarding **claim 38**, *Yoshizawa* discloses,

> A method according to claim 21, wherein the customer
> number data provided by the callers is associated with a
> limit restricting use of the service up to a certain
> number of uses.

The "customer number data" (i.e. the account number and password) is associated
with the dollar amount available which limits the number of uses. In this regard,
the Voice Response Unit responds "Your bet will be accepted. You make purchase
**up to 123 tickets.**" (Table 1, p. 217; emphasis added.) The limit on the number of
tickets reads on the feature, "a limit restricting use of the service up to a certain
number of uses" in that each ticket is a use.

Regarding **claim 39**, *Yoshizawa* discloses,

> A method according to claim 21, wherein the customer
> number data provided by the callers is associated with a
> limit restricting use of the service to a limited period of
> time.

The "customer number data" (i.e. the account number and password) is associated
with the dollar amount available **for a given day** ("daily maximum of □100,000")
and the amount is **reset each day**. Accordingly, the "customer number data" is
associated with a dollar limit restricting use to the given day, which reads on the
"limited period of time."

Regarding **claim 44**, *Yoshizawa* discloses,

> A method according to claim 21 wherein said other form
> of identification data is PIN data.

The account number and password are PIN data.

Regarding **claim 47**, *Yoshizawa* discloses,

> **A method according to claim 21, wherein the data identifying the order identifies the order for a facility operating the service.**

The registration number identifies the order (i.e. the race bet). The race bet includes the location of a given race course, such as Tokyo (i.e. "the facility operating the service of race betting"). Therefore, "the data identifying the order [i.e. registration number] identifies the order [i.e. race bet] for a facility operating the service [i.e. race course]."

## II. *Claim Rejections - 35 USC § 103*

5.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

6.    Claims 1-10 are alternatively rejected under 35 U.S.C. 103(a) as being unpatentable over *VCT '87* in view of the <u>VCT Quarterly Newsletter</u> Vol. 1, No. 2, Winter 1986, (*VCT '86*, hereafter).

Regarding **claim 1**, while Examiner maintains that *VCT '87* alone either anticipates or makes obvious the feature of transferring the caller under the condition that

> the individual callers do not qualify during the testing step,

is either anticipated or obvious over *VCT '87* alone. If it is still thought that this limitation is neither anticipated nor rendered obvious, then this may be a difference.

However, *VCT '86* discloses this specific feature in conjunction with an exemplary credit authorization application of the voice response system used by American Express (*VCT '86*, pp. 1 and 5). (Note that *VCT '87* also includes information regarding American Express's use of a voice response system for credit authorization [*VCT '87*, p. 4, left-hand col.].) *VCT '86* states,

> "In a second method, specific 800 numbers are handled entirely by the voice response unit. Merchants interact with voice prompts to enter their **merchant number, card number**, and amount of purchase by pressing appropriate keys on their Touch Tone phones. The voice response unit bypasses the Relayers to communicate directly to the host...If the purchase is **not** approved, the **call is transferred** along with the appropriate data **to an Authorizer** for special handling."
> (*VCT '86*, p. 5, paragraph bridging left- and right-hand cols.)

Because the merchant number and card number are used to "qualify" the merchant to authorize the charge for the purchase, these numbers are exemplary qualification data. The merchant may fail the qualification and, in that event, is switched to an Authorizer. Accordingly, *VCT '86* teaches the limitation

> a switch that transfers the individual callers [i.e. merchants] to a manual operation in the event the individual callers [i.e. merchants] do not qualify during the testing step.

It would have been obvious for one of ordinary skill in the art, at the time of the invention to transfer the caller (i.e. the merchant) upon failure to pass the credit verification test in the American Express credit authorization of *VCT '87*, in order to meet American Express's policy of never declining an approval without first talking with the customer, as taught in *VCT '86* (p. 5, left-hand col., last sentence of 1st partial paragraph).

Regarding **claims 2-9**, *VCT '87* discloses each of these features for the reasons indicated in the rejection of the claims 1-9 under 35 USC 102(a).

Regarding **claim 10**, *VCT '87* does not disclose that

> **said file of stored customer number data includes negative file data.**

*VCT' 86* teaches additional examples of telephone college registration, stating,

> "Before interacting with the Student Records System Registration Screens of ISIS system, three pieces of information must be gathered form the caller, the Social Security Number, level (undergraduate or graduate) and term, when more than one semester's registration is active at the same time. This information is keyed by the caller on the telephone key pad and submitted to the system's registration screen.

If the student has **holds**, the voice response system initiates a hold message which indicates the type of hold and the office placing the hold on the student record." (*VCT '86*, p. 4, right-hand col., 1st full paragraph)

The "hold" is "stored customer number data" that is "negative file data."

It would have been obvious for one of ordinary skill in the art, at the time of the invention to include negative file data on the college registration system of *VCT '87*, in order to prevent an ineligible student from registering for courses, until the problem is solved, as taught in *VCT '86*.

7.    Claims 12-16 are rejected under 35 U.S.C. 103(a) as being unpatentable over *VCT '87* in view of *VCT '86* and US 3,833,885 to Gentile et al. (*Gentile*, hereafter).

Regarding **claims 12-16**, *VCT' 87* discusses American Express's automated credit authorization using the VCT system, as noted above, but does not provide all of the details, such as

> **An analysis control structure according to claim 11, wherein said callers further provide credit card number data as caller data signals** (claim 12), **wherein said individual callers further provide expiration data with respect to said credit card number data as caller data signals** (claim 13), **wherein said individual callers receive authorization on-line** (claim 14), **wherein the credit card number data is received as billing data** (claim 15), **wherein said analysis structure further comprises a processor that generates data identifying an order and provides at least certain of the data to the individual callers** (claim 16).

As noted above, *VCT '86* provides the at least some of the details of American Express's automated telephone credit authorization, including,

> "In a second method, specific 800 numbers are handled entirely by the voice response unit. Merchants interact with voice prompts to enter their **merchant number**, **card number**, and amount of purchase by pressing appropriate keys on their Touch Tone phones. The voice response unit bypasses the Relayers to communicate directly to the host. If the purchase amount is approved, the host sends the **authorization code** to the voice response unit to be **spoken back to**

> **the caller.**" (*VCT '86*, p. 5, paragraph bridging left- and right-hand
> cols.; emphasis added)

Therefore, the callers receive the authorization "on-line." The credit card number
data is used to place a purchase order and is therefore received as billing data. The
authorization code relayed to the caller by the voice response system is "data
identifying an order."

Then the only difference is that *VCT '87* and *VCT '86* do not indicate that the caller
provides the expiration date along with the credit card number.

*Gentile* teaches an automated credit authorization system which includes the
determination of the **expiration of the credit card** and the verification that the
card is still valid as of the date upon which a request is be processed (col. 5, lines
40-45).

It would have been obvious for one of ordinary skill in the art, at the time of the
invention to have the caller provide the expiration date in the American Express
automated telephone credit authorization discussed in *VCT '87* and *VCT '86*, to
ensure that the card was, in fact, still valid as of the date the order is requested, as
taught to be known in *Gentile*.


8.    Claims 1-6 and 8 are rejected under 35 U.S.C. 103(a) as being unpatentable
over the article to Moosemiller entitled "AT&T's Conversant™ I Voice System" in
Speech Technology, Mar/Apr 1986, pp. 88-93 (*Moosemiller*, hereafter) in view of
US 4,797,911 to Szlam et al. (*Szlam*, hereafter).

Regarding **claim 1**, *Moosemiller* discloses

> **A control system for use with a communication facility
> including remote terminals for individual callers,
> wherein each of said remote terminals comprises a
> telephonic instrument including a voice communication
> device, and a digital input device in the form of an array
> of alphabetic numeric buttons for providing caller data
> signals,**

*Moosemiller* discloses a control system (see for example, *Moosemiller* at page 89
and Figure 1.) for use with a public telephone network (*Moosemiller* at p. 88, first
column, first paragraph) for individual callers. The telephone callers can access the
control system using touch-tone signals or by speaking isolated words and digit
strings, (*Moosemiller* at p. 88, first column, second paragraph).

> said control system comprising:

Control Number: 90/007,087 & 90/006,979                    Page 21

Art Unit: 3992

> **a processor unit four processing said caller data signals supplied by individual callers via said remote terminals;**

The system controller of *Moosemiller* performs transaction control and speech subsystem management using touch-tone signals or speech commands received from the caller. (*Moosemiller* at page 89, first column.)

> **interface structure for interfacing said communication facility to said processor unit wherein said interface structure receives data signals, prior to the close of communication with the caller, including called number data signals (DNIS) and calling number identification data signals automatically provided by said communication facility and said caller data signals supplied by the individual callers via said remote terminals;**

While *Moosemiller* does not explicitly teach the receiving of calling number identification data signals automatically provided by the facility, *Moosemiller* does teach that the trunk interfaces receive data signals communicated via the telephone network, including Dialed Number Identification Signals (DNIS), touch-tone and voice command signals received from callers. (*Moosemiller* at p. 88, third column, last two paragraphs; also at page 89 and Figure 1.) Such information would inferentially contain the phone number gathered by ANI systems, as suggested by *Szlam*, described below.

> voice generator for providing prompts to said individual callers in response to which said individual callers provide said caller data signals, said caller data signals including caller qualification data for qualifying said individual callers;

The voice response unit of *Moosemiller* provides prompts to callers who respond with touch-tone or voice data signals. (See *Moosemiller* at p. 88, third column, last paragraph - p. 89, first column, first paragraph.). As an example, *Moosemiller* teaches a stock quotation application in which a caller must enter a user ID number for qualification. (*Moosemiller* at p. 93, first column.)

> testing caller customer number data as part of said caller qualification data supplied by the individual callers as at least certain of said caller data signals against a file of stored customer number data;

*Moosemiller* teaches testing caller customer number data against stored customer number data in its feature that the received user ID number is validated by a stock quotation data base host with customer account information. (*Moosemiller* at p. 93, first column.)

Control Number: 90/007,087 & 90/006,979                    Page 22

Art Unit: 3992

> means for controlling said processor unit in accordance with said called
> number identification data signals (DNIS) to process at least certain of
> said caller data signals in accordance with a select format from a
> plurality of formats identified by said called number identification data
> signals (DNIS); and

DNIS information is used to classify incoming calls in advance for different
applications so that the appropriate script is executed by the System Controller.
(See *Moosemiller* at p. 88, first column, second paragraph and at p.91, section
titled "Development.")

> a switch that transfers the individual callers to a manual operation in
> the event the individual callers do not qualify during the testing step.

While *Moosemiller* provides for transferring a call to an attendant for help (at p. 89,
second column), *Moosemiller* does not specify transferring to an attendant in the
event that the caller does not qualify during the testing step.

*Szalm* teaches that it is conventional in the art of telephony to use calling number
identification data signals automatically provided by the telephone network (via ANI
decoder 10a24) in order to identify a caller's telephone number and to retrieve any
previously stored customer account information associated with the calling
telephone number prior to answering the incoming call (*Szlam*, col. 12, lines 9-42).
*Szlam* also teaches the desirability of automatically switching a call to an operator
attendant for manual operation when it is determined that operator assistance is
required based on the caller's response to a prompt. (*Szlam* col. 12, lines 31-54;
col. 14, lines 3-18, 33-37; col. 27, lines 41-66.) Therefore, *Szlam* also teaches,

> **A control system according to claim 1, wherein at least
> certain of said individual callers at certain of said
> remote terminals are also subject to qualification based
> on said calling number identification data signals** (claim
> 2).

It would have been obvious for one of ordinary skill in the art, at the time of the
invention to have incorporated the receiving of calling number identification data
signals (ANI), as taught by *Szlam*, within the system of *Moosemiller* so that a
calling customer could be identified (qualified) prior to answering of the call. The
modification would prove beneficial in shortening the call handling time and
improving customer service to the caller.

Regarding **claims 3-6 and 8**, *Moosemiller* discloses,

> **A control system according to claim 1, wherein said
> processor unit generates data identifying an order and
> provides the data to the individual callers** (claim 3),

> wherein the data identifying the order is number data
> (claim 4) **wherein the number data is provided as
> acknowledgement data to the individual callers** (claim 5),
> or **wherein the number data is provided in chronological
> sequence** (claim 6).
>
> **A control system according to claim 1, wherein the caller
> data signals include item number data** (claim 8).

In the stock quote example, *Moosemiller* discloses that a caller enters a stock
identification number (i.e. "item number data" of claim 8), and the Conversant™
system's command "DOW" "returns Dow plus time and date" (p. 93, left-most col.).
These number data are computer- (processor unit-) generated number data,
generated by the computer that is the Stock Quote Data Base, identifying the
"order" (i.e. the requested stock quote). The Conversant™ system speaks the stock
quote, time, and date to the caller; therefore, these number data are
acknowledgement data. Because there is a time/date stamp provided along with
the stock quote, the number data is provided to callers in "chronological sequence."

9.    Claims 27 and 28 are rejected under 35 U.S.C. 103(a) as being unpatentable
over *Yoshizawa* in view of US 4,797,913 to Kaplan et al. (*Kaplan*, hereafter).

The concepts of using ANI (automatic call**ing** number identification data) and DNIS
(automatic call**ed** number identification data) in the presently claimed process of
controlling a telephonic interface system first appeared in the continuation-in-part
application 07/194,258, filed 18 May 1988; therefore, 18 May 1988 is the earliest
priority afforded claims 27 and 28. Therefore, *Kaplan* qualifies as prior art under 35
U.S.C. 102(e).

*Yoshizawa* discloses that the voice response system can be used for other
applications including credit authorization and order entry. In this regard,
*Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2)
> telephone charge service, (3) automatic intercept system (AIS), (4)
> stock prices information service, (5) winning lot number service, (6)
> CAI, (7) **credit card checking**, (8) deposit balance information, (9)
> seat reservations (for trains, planes, and theaters), (10) hotel and
> hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220,
> left hand col., section entitled "OTHER APPLICATIONS OF VOICE
> RESPONSE UNIT"; emphasis added)

and

> "This [telephone betting system] is not the only application of the voice response unit. **Other possible applications include** information and **sales services**." (p. 220, right-hand col., second paragraph; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for credit card authorization and sales services, including order entry. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for various details about the other applications of the Voice Response Unit.

*Kaplan* discloses an automated telephonic ordering system and method of using the system for a caller to place orders. A given system serves a plurality of vendors selling products. In this regard, *Kaplan* states,

> "In accordance with the system, **various vendors will subscribe to the ordering service**. A given vendor will be **assigned a vendor number**. Additionally, for a given vendor, **various numbers will be assigned to the various products being offered for sale by that particular vendor** according to a planned numbering code." (*Kaplan*, col. 4, lines 20-26; emphasis added)

Accordingly, *Kaplan* is drawn to the same automated order entry feature of *Yoshizawa*.

Regarding **claims 27 and 28**, the prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for

> **A method according to claim 21, further comprising the step of: receiving calling number identification signals automatically provided by said communication facility as a part of said data signals** (claim 27).

> **A method according to claim 21, wherein the receiving step includes receiving calling number identification signals automatically provided by said communication facility as a part of said data signals** (claim 28).

In this regard, *Kaplan* teaches that the communication facility automatically provides the caller's telephone number, stating,

> "Another feature of the **Feature Group D** service is the **identification of the calling customer's telephone number**. When the 15 digit number has been dialed and handed off to an interexchange carrier, the calling customer's telephone number can likewise be passed along to the interexchange carrier. This service is known as **Automatic Number Identification or ANI**." (col. 3, lines 53-59; emphasis added).

and

> "Optionally, the particular vendor involved can also provide subscribing **customer telephone numbers and credit information** which can be placed in the **data storage memory 16**. The data processor may likewise compare the ANI information to determine if the calling customer is in fact a subscribing customer and if the customer's credit is satisfactory." (col. 5, lines 20-27; emphasis added)

It would have been obvious for one of ordinary skill in the art, at the time of the invention to receive the telephone number of the caller as automatically provided by the communication facility in *Yoshizawa*, in order to identify the calling customer, as taught by *Kaplan*. The motivation at the time of the invention would have been to "determine if the calling customer is in fact a subscribing customer and if the customer's credit is satisfactory," as taught by *Kaplan*.

10.    Claim 26 is rejected under 35 U.S.C. 103(a) as being unpatentable over *Yoshizawa* in view of *Moosemiller*.

The concepts of using ANI (automatic call**ing** number identification data) and DNIS (automatic call**ed** number identification data) in the presently claimed process of controlling a telephonic interface system first appeared in the continuation-in-part application 07/194,258, filed 18 May 1988; therefore, 18 May 1988 is the earliest priority afforded claims 26-28.

*Yoshizawa* discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system other application. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for indicating how to implement the Voice Response Unit to handle other applications, or more specifically,

> **A method according to claim 21, further comprising the step of: receiving called number identification signals**

### (DNIS) automatically provided by said communication facility as a part of said data signals.

*Moosemiller*, like Yoshizawa, teaches a multi-application automated voice response system. Moosemiller teaches that DNIS signals provided by the communication facility automatically classify calls based upon DNIS signals, stating,

> "The Dialed Number Identification Service (DNIS) has been used with a Direct Inward Dialing (DID) trunk interface to receive dialed digits as part of the call setup protocol. This allows advance classification of incoming calls for different applications which are greeted by appropriate prompts." (p. 88, right-most col., first full paragraph)

It would have been obvious for one of ordinary skill in the art, at the time of the invention to use DNIS signals automatically provided by the communication facility, as taught in *Moosemiller*, to enable the *Yoshizawa* voice response system to handle the different applications suggested in *Yoshizawa*. *Yoshizawa* is silent to manner by which the multiple applications is implemented by the voice response system, such that one of ordinary skill would use known methods, such as using the DNIS signals taught in *Moosemiller*. The motivation at the time of the invention would be to enable the *Yoshizawa* voice response system to pre-classify the calls as to application, and thereby alleviate the need for human operators to perform that function, as taught in *Moosemiller*.

11.    Claims 29-31, 33, and 34 are rejected under 35 U.S.C. 103(a) as being unpatentable over *Yoshizawa* in view of US 3,778,553 to Rackman (*Rackman*, hereafter).

*Yoshizawa* discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for **credit card authorization** and sales services, including order entry. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for various details about the other applications of the Voice Response Unit.

Control Number: 90/007,087 & 90/006,979        Page 27

Art Unit: 3992

*Rackman* teaches that it is known in the art of automated telephone credit authorization to have the caller dial the credit card number, to which an automated voice reply is provided indicating the credit status of the card, stating,

> "A very cheap data terminal is the ordinary telephone because it is usually already available. Data can be transmitted by operating the push-buttons, and data can be received by listening to a spoken response. One application of the use of telephone data terminals is in banking... Another application is credit card verification; a store clerk dials the credit-card company computer, followed by the **dialing of the customer's credit card number**, and then listens to a verbal report"
>
> ...
>
> "The equipment which enables a computer to send back a verbal message is called a **'voice response' system**. Typically, such a system has several hundred pre-recorded words. The **computer composes a message** to be delivered and then controls the recording equipment to **play back over the telephone line** the selected words in the proper sequence." (*Rackman*, col. 1, lines 27-51; emphasis added)

Accordingly, *Rackman* teaches

> **A method according to claim 21, wherein in response to prompts said individual callers enter credit card data** (claim 29), **wherein said callers enter credit card number data as credit card data** (claim 31).

The prompts are implicit in *Rackman* and explicit in *Yoshizawa*. One would not know if one were connected to the credit authorization system if there exists no prompt indicating so. Accordingly the credit card number is only entered when it is known with certainty that the number can be entered, which is a "prompt." Note also that the response regarding the credit status is given on-line such that on-line credit authorization is taught in *Rackman*.

Regarding **claim 30**,

> **A method according to claim 29, wherein in response to prompts said individual callers enter data on a type of credit card.**

Implicit in any credit card number is the "type of credit card." In other words, MasterCard, VISA, American Express, all have the type of card coded in the credit number; therefore, mere entry of the credit card number necessarily includes the type of credit card.

Regarding **claim 34,**

> **A method according to claim 31, wherein said credit
> card number data is received as billing data.**

Credit card data is inherently billing data since credit cards are given to charge a
purchase.

It would have been obvious for one of ordinary skill in the art, at the time of the
invention to use the credit authorization methodology of *Rackman* to implement
credit authorization in *Yoshizawa*, because *Yoshizawa* explicitly suggests using the
voice response system for credit authorization but fails to provide the details
thereof, such that one of ordinary skill would use known methods to implement
credit authorization, such as that taught to be well known, as in *Rackman*.

12.    Claims 32 and 33 are rejected under 35 U.S.C. 103(a) as being unpatentable
over *Yoshizawa* in view of *Rackman* as applied to claims 29-31 and 34 above, and
further in view of *Gentile*.

The prior art of *Yoshizawa* in view of *Rackman*, as explained above, discloses each
of the claimed features except for indicating

> **A method according to claim 31 wherein in response to
> said prompts said callers enter <u>credit card expiration
> data</u> as credit card data** (claim 32), **further comprising
> the step of: verifying on-line the credit card number
> data and the <u>credit card expiration data</u>** (claim 33).

*Gentile* teaches an automated credit authorization system which includes the
determination of the **expiration of the credit card** and the verification that the
card is still valid as of the date upon which a request is be processed (col. 5, lines
40-45).

It would have been obvious for one of ordinary skill in the art, at the time of the
invention to have the caller provide the expiration date in response to a prompt in
the automated telephone credit authorization method of *Yoshizawa* in view of
*Rackman*, to ensure that the card was, in fact, still valid as of the date the order
was requested, as taught to be known in *Gentile*.

13.    Claim 42 is rejected under 35 U.S.C. 103(a) as being unpatentable over
*Yoshizawa* in view of the article to Emerson et al. entitled "Voice Response System -
- Technology to the Rescue for Business Users" in <u>Speech Technology</u> Jan/Feb
1983, pp. 99-103 (*Emerson*, hereafter).

*Yoshizawa* discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for **credit card authorization** and sales services, including order entry. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for various details about the other applications of the Voice Response Unit for credit authorization, or more specifically,

> **A method according to claim 21 wherein the verifying step further comprises the step of: verifying the customer number data provided by the callers against a <u>list of negative customer numbers</u>.**

*Emerson* discloses that it is known for credit card to be "checked by sales clerks using periodically published listings of 'hot' (stolen) cards." (*Emerson*, p. 100, center col.) The credit card number is a customer number.

It would have been obvious for one of ordinary skill in the art, at the time of the invention to have the credit authorization system of *Yoshizawa* automatically compare the credit card number (customer number) against a look-up table of stolen card numbers (negative customer numbers), because *Yoshizawa* explicitly suggests using the voice response system for credit authorization but fails to provide the details thereof, such that one of ordinary skill would use known methods to implement credit authorization, such as that in *Emerson*.


14.    Claim 43 is rejected under 35 U.S.C. 103(a) as being unpatentable over *Yoshizawa* in view of US 3,702,392 to St. Jean (*St. Jean*, hereafter).

*Yoshizawa* discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4)

> stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for **credit card authorization** and sales services, including order entry. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for various details about the other applications of the Voice Response Unit. More specifically, *Yoshizawa* does not discuss

> A method according to claim 21 wherein said other form of identification data is social security number data **(claim 43)**.

*St. Jean* teaches that it is important in the art of identification to "verify[] that the identity code presented by a bearer of a credit card, security card or the like" (col. 1, lines 6-9; emphasis added) is being used by an authorized user associated with the identity code (col. 1, lines 10-27 --especially lines 24-27). *St. Jean* teaches continues that it is a "virtual necessity" to make the determination at the instant of use (col. 1, lines 28-41 --especially lines 39-41). In addition to credit cards, security cards and the like, *St. Jean* also indicates that the system described therein can be used for "any other identification purposes" (col. 4, lines 16-25).

*St. Jean* also teaches commonly used forms of information that one uses to identify himself, and suggests storing the identifying information on a storage medium like magnetic tape in a single location, stating

> "[I]dentification cards may be developed upon which are encoded in machine readable form an individual's birth certificate information, physical characteristics, **social security number**, service record, employer's identification, employee's number, residential telephone number, life insurance policies, next of kin information, fingerprint classification number and/or **any other form of suitable identifying data** with which he may periodically have to identify himself." (*St Jean*, col. 1, lines 47-56)

It would have been obvious for one of ordinary skill in the art at the time of the invention to require the caller to provide any of the additional identification data indicated in the *St. Jean* list, alone or in combination, in the *Yoshizawa*, in order to verify that the caller is, in fact, the individual authorized to access the voice response system for credit authorization and sales order entry. This additional identification data would thereby provide security for calls from telephone numbers accessing and capable of using the system and prevent unauthorized users claiming to be rightful owners of the identity code from fraudulently accessing and using the

system without proper verification, as taught by *St. Jean* (*St. Jean*, col. 1, lines 4-27; col. 2, lines 14-22).

### III. *Rejections added in the Office action filed 21 July 2006*

15.    Claims 24, 45, and 46 are rejected under 35 U.S.C. 102(b) as anticipated by *Yoshizawa*.

Regarding **claim 24**, *Yoshizawa* discloses

> **A method according to claim 21, wherein the data identifying the order identifies the order for a mail order house.**

The "mail order house" is the race course, for example, "#5 Tokyo", (*Yoshizawa*, p. 217, Table 1(a), item "2"). As noted above, the data identifying the order is the registration number and the time stamp (*Yoshizawa*, p. 217, Table 1(a), items "5" and "6"). The registration number is the caller's order number for the race, and the race and race bet service provided by the race course (i.e. "mail order house"). Therefore the identifying registration number (i.e. "the data identifying the order") identifies the race bet ("the order") for the race course (i.e. "mail order house").

Similar information would be required for the order entry (*Yoshizawa*, p. 220, left-hand col., section entitled, "Inquiry services", item "(11)").

Regarding **claim 46**, *Yoshizawa* discloses

> **A method according to claim 21, wherein the callers order multiple items during the course of a call** (claim 45).

A caller orders "10 tickets" in the example on p. 217 (Yoshizawa, p. 217, Table 1(a), steps "2" and "3").

Regarding **claim 46**, *Yoshizawa* discloses

> **A method according to claim 45, wherein the facility operating the service is a mail order house** (claim 46).

See explanation for claim 24 above.

16.    Claims 35 and 36 are rejected under 35 U.S.C. 103(a) as being unpatentable over *Yoshizawa* in view of US 4,788,682 to Vij et al. (*Vij*, hereafter).

*Yoshizawa* discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

and

> "This [telephone betting system] is not the only application of the voice response unit. **Other possible applications include** information and **sales services**." (p. 220, right-hand col., second paragraph; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for credit card authorization and sales services, including order entry. The prior art of *Yoshizawa*, as explained above, discloses each of the claimed features except for various details about the other applications of the Voice Response Unit.

**Claims 35 and 36**, read

> **A method according to claim 21, wherein said order is a television initiated order** (claim 35), **wherein at least certain of the data relating to the order entered by said callers is coded data displayed on the television** (claim 36).

*Vij* teaches that television advertisement of items for sale was well known at least by the filing date of the *Vij* application (of 23 Sept 1986), stating,

> "Advertisements of merchandise and services via the electronic medium of **television** and radio are **well known** commercial activities. Some of these advertisements **solicit a telephone response** in order to **facilitate delivery of merchandise** and **payment** for same. **Upon witnessing a particular advertisement, an interested person dials a telephone number as given in the advertisement**…" (*Vij*, col. 1, lines 13-20; emphasis added)

It would have been obvious for one of ordinary skill in the art, at the time of the invention to use telephone initiated orders in the sale order entry of *Yoshizawa*, in order to beneficially increase the orders or sales or services of the advertiser or merchandiser, as taught to be notoriously well known in *Vij*, stating

> "Thus, soon after an occurrence of the advertisement, a great many telephone calls may be directed to the merchandising agent." (*Vij* at col. 1, lines 24-26)

*Vij* also teaches that the product information is coded, stating,

> "The invention is a telephone method for automatically identifying an item of purchase to a merchandising agent...The method includes the steps of assigning a plurality of directory numbers to the telephone station set and storing a product information in association with each of the telephone directory numbers, in a storage medium." (Vij, col. 2, lines 22-26)

Therefore the product information is encoded as telephone directory numbers. Because, the telephone numbers are advertised on television, "**at least certain of the data relating to the order entered by said callers is <u>coded data displayed on the television</u>.**"

It would have been obvious for one of ordinary skill in the art, at the time of the invention to code the data relating to the order entered by the caller in *Yoshizawa*, in order to increase the optimize the number of calls that can be processed by automatically identifying the item ordered, thereby freeing up processing time in entering of extraneous data, as taught in *Vij* (*Vij*, col. 2, lines 5-9 and 18-35).

17.   Claims 40, 41, and 48-50 are rejected under 35 U.S.C. 103(a) as being unpatentable over *Yoshizawa* in view of US 3,651,503 to Kono (*Kono*, hereafter).

*Yoshizawa* discloses that the voice response system can be used for other applications including order entry. In this regard, *Yoshizawa* states,

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) **credit card checking**, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) **order entry**. (*Yoshizawa*, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF VOICE RESPONSE UNIT"; emphasis added)

and

> "This [telephone betting system] is not the only application of the
> voice response unit. **Other possible applications include**
> information and **sales services**." (p. 220, right-hand col., second
> paragraph; emphasis added)

Accordingly, *Yoshizawa* explicitly suggests using the voice response system for
sales services, including order entry. In the example of race betting, the example in
Table 1 on page 217 shows that the caller must enter several pieces of item
information including the race number, forecast (win, place, show), horse number,
and number of tickets (*Yoshizawa*, p. 217, Table 1(a), steps "2" and "3").

*Yoshizawa*, does not indicate the product information for other products, or as
presently claimed in claims 48-50,

> **A method according to claim 21, wherein the additional
> data provided by the callers includes the <u>size</u> of the item**
> (claim 48)

> **A method according to claim 21, wherein the additional
> data provided by the caller includes the <u>color</u> of the item**
> (claim 49)

> **A method according to claim 21, wherein the additional
> data provided by the caller includes the <u>size and color</u> of
> the item** (claim 50)

*Kono* teaches a method of digitally encoding clothing item information, stating,

> "In a preferred form of the system in accordance with applicant's
> invention, 26 individual digits are used, eight of which are duplicates
> with respect to the price and **size**. Thus, as shown in FIG. 1 on the
> thumb-wheel panel 48 a four-digit unit 172, a second four-digit unit
> 174, a five-digit unit 176 and a three-digit unit 178 are shown. A two-
> digit unit 180 is used for identifying the **color** of a garment. A
> duplicate of units 176 and 178 for visual printing by unit 52 (top of
> FIG. 1) are shown as 184 and 182. A three-digit unit 182 is shown as
> well as a five-digit 184. The switch units 172 may represent a number
> representing a particular store, 174, the manufacturer's identifying
> number, 180, the **color** of the garment, 172a, the type of garment
> (blouse, dress, slacks, etc.), 174a, the style of the garment, such as
> plain, flared, bell-bottom, etc." (*Kono*, col. 5, lines 46-60; emphasis
> added)

Given the plural pieces of information entered in the race betting example provided
in *Yoshizawa*, one of ordinary skill would recognize by the teaching in *Kono*, that
similar product information would be required for ordering a specific item, as in the

"order entry" function proposed by *Yoshizawa*, (*Yoshizawa*, p. 220, left-hand col.).
For example, a caller ordering a product, such as clothing, would enter the codes
indicative of color and size, as taught by *Kono*, to ensure that the item was to the
caller's liking and fit.

It would have been obvious for one of ordinary skill in the art, at the time of the
invention for a caller ordering clothing in the sales order entry function of the
*Yoshizawa* system to enter data indicating the color and size of the clothing item, as
suggested by *Kono*, to ensure that the item was to the caller's liking and fit.

Regarding **claims 40 and 41**, *Yoshizawa* does not give the details of the order
entry application of the system and therefore does not teach,

> **A method according to claim 21, further comprising the
> step of: controlling inventory of items with certain order
> data** (claim 40), **wherein the controlling step controls the
> inventory of items on-line** (claim 41).

*Kono* teaches

> "A reader is provided to respond to the insertion of a tag into a slot.
> The magnetic indicia is then "read" and transmitted to a storage tape.
> Many such transactions are thus repeated with similar tags of the
> same or similar information. **Periodically the information from the
> storage tape is retransmitted to a data processing center for
> sorting, classifying and tabulating the information for inventory
> and accounting purposes.**" (*Kono*, col. 1, lines 58-65; emphasis
> added)

Therefore, *Kono* teaches that the digital product information can be used for
inventory control. Since a caller in the system of *Yoshizawa* enters digital
information regarding the product ordered (*Yoshizawa*, p. 217, Table 1(a), steps "2"
and "3"), it could be used to control the inventory in the example or sales order
entry in *Yoshizawa*, since *Kono* teaches that the digital information is used for
inventory control.

It would have been obvious for one of ordinary skill in the art, at the time of the
invention to control the inventory using the order data and to control to inventory
in real-time (i.e. on-line), as taught by *Kono*, in *Yoshizawa*'s order entry
application, in order to, *inter alia*, alert callers to the availability of items and
ensure that items are not oversold.

Control Number: 90/007,087 & 90/006,979                     Page 36

Art Unit: 3992

### Response to Arguments

<u>Narrowed construction of claim terms</u>

A. *Comments directed to Patent Owner's Legal Argument*

On pages 13-14 of the Response filed 26 September 2006, Patent Owner provides excerpts from MPEP 2258(G) and supporting case law indicating that a narrow claim construction "should be" applied to preserve the validity of claims (*Ex parte Papst-Motoren*). In this regard, Patent Owner argues that claims "must" be interpreted in a manner to preserve the claims validity. Examiner respectfully disagrees. Patent Owner excerpted the prohibitions to the *Papst-Motoren* ruling, as expressed in *Ex Parte Bowles* and *Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*, in the Response but may not have appreciated them. As excerpted in the Response,

> "It is recognized that the *Papst-Motoren* rule is limited by the prohibition against reading limitations from the specification into the claims, apart from the need to interpret what the patentee meant by the words of the claims." *Ex parte Bowles*, 23 USPQ2d 1015 (BPAI 1991) and the prohibition against revising or ignoring the explicit language of the claims. *Elekta Instrument S.A. vs. O.U.R. Scientific International, Inc.*, 214 F3d 1302, 1309 (Fed. Cir. 2000).

Therefore there exists no "must" requirement as argued by Patent Owner. In other words, Patent Owner cannot arbitrarily read a limitation into a claim term, if such interpretation extends beyond "interpret[ing] what the patentee **meant by the words** of the claims." (Emphasis added.) Also, Patent Owner cannot revise or ignore the explicit language of the claims.

In complying with the *Papst-Motoren* rule, Examiner believes that the above remaining rejections and the following rebuttal of Patent Owner's traversal of the rejections complies with the *Papst-Motoren* rule. Examiner agrees with some of Patent Owner's narrower constructions of certain claim terms, as not reading limitations into the claims "apart from the need to interpret what the patentee **meant by the words** of the claims" and not "revising or ignoring the explicit language of the claims." Examiner disagrees with other of Patent Owner's claim constructions because they, in Examiner's opinion, violate of the prohibitions expressed in *Ex parte Bowles* and *Elekta Instruments*.

From pages 30-33 of the Response, Patent Owner provides a table of Patent Owner's (Patentee's) claim construction versus Examiner's. Examiner considers Patent Owner's construction, as follows.

B. *Narrow construction of "consumable key"*

In the table on p. 15 of the Response, Patent Owner argues,

> Claim 7; "consumable key" must be interpreted as a finite number of
> uses accorded to a caller in a defined or a non- recurring period of
> time that once consumed are not automatically refreshed by the
> system (Response, p. 15, Table, center col.)

Patent Owner's construction above runs afoul of Patent Owner's own construction of
the "consumable key" argued in Appendix A of Patent Owner's present Response
(filed 26 September 2006). Patent Owner has repeatedly constructed "consumable
key" in concert with the Court to mean,

> "**a number or word** that allows a caller access to a service or part of
> a service a predefined limited number of times and which cannot be
> refreshed or recharged" (*Katz et al. v. AT&T Corp. et al.*, 63 F.supp.2d
> 623; emphasis added).

See for example Patent Owner's Appendix A at p. 116 of the present Response by
Patent Owner stating,

> A "consumable key" is a **code** provided by a caller, which is examined
> by the system to determine whether further access to the system is to
> be allowed... (Patent Owner's Response of 26 September 2006, p.
> 116, second row of table, 1st sentence, p. 117, second row of table, 1st
> sentence; p. 118, second row of table, 1st sentence; emphasis added)

Examiner respectfully submits the Patent Owner has omitted the critical portion of
the definition that the "consumable key" is a **number** or **word**. It is NOT a "finite
number of uses" but is, instead, "a **number** or **word** that allows a caller access to
a service or part of a service". The consumable key is indicative of a limited number
of uses, it is NOT the number of uses itself. Examiner also respectfully submits that
the omission may distract from the fact that the "**authorization code**" presented
in VCT '87's college registration example reads directedly on a "consumable key"
because it is "**a number or word** that allows a caller access to a service or part of
a service a **predefined limited number of times** and which cannot be refreshed
or recharged".

With the above in mind, then, the narrowed construction of the term "consumable
participation key" is taken to be that given by the Court, *supra*.

C. *Narrow construction of "sequence"*

In the table on p. 16 of the Response, Patent Owner argues,

> Claims 6, 20, and 23; "sequence data" must be interpreted as data
> that indicates the sequence or order in which the callers call the
> system (two callers cannot be accorded the same sequence number,
> an order between two must be established); a time/date stamp is not
> an indication of sequence.

Claim 6 directly recites "**chronological** sequence" (emphasis added). Therefore, Patent Owner's construction that sequence cannot be a time/date stamp (1) directly contradicts the meaning of "sequence" in the claim 6; and (2) "ignores the explicit language of the claims" in direct violation of the decision in *Elekta Instrument*. For at least these reasons, Examiner respectfully disagrees that a time/date stamp is not indicative of sequence --especially since the claims of the '547 patent indicate that it **is**.

D. *Narrow construction of "qualification"*

In the table on p. 16 of the Response, Patent Owner argues,

> Claims 1, 2, 7, and 21; "qualification" must be interpreted as "determining or assessing whether a call meets one or more conditions or requirements" (See Verizon Markman ruling).

Examiner agrees. This feature will be discussed as it directly applies to the claims. Examiner respectfully submits that the applied references meet the limitation of qualification as presently construed by the Verizon Court and by Patent Owner.

E. *Narrow construction of "acknowledgement data"*

In the table on p. 17 of the Response, Patent Owner argues,

> Claims 5, 19, and 22; "acknowledgement data" must be interpreted as computer generated data provided to the caller to identify a transaction, such as an order during a call.

Although the references applied to reject the claims meet this definition, Examiner respectfully submits that requiring the acknowledgement data to be computer-generated data to identify a transaction incorporates limitations from the specification into the claims in violation of the decision in *Ex parte Bowles*.

F. *Narrow construction of "item data"*

In the table on p. 18 of the Response, Patent Owner argues,

> Claims 8, 11, 21, 40-41, and 48-50; "item data" must be interpreted as an object for purchase.

Patent Owner's construction, yet again, runs afoul of Patent Owner's own arguments. In Table 1 of Patent Owner's present Response (filed 26 September 2006) at pages 86-96, Patent Owner has applied a real-life example of the use of an IVR system for telephone trading of stocks, called "touch-tone trading" as presented in the Krauss Declaration filed 10 February 2006. A caller places an **electronic** order for **stocks** over the phone (the Krauss Declaration filed 10 February 2006, section 2.3, pp. 8-9). Yet, in contradiction to this, Patent Owner

argues that Yoshizawa's pari-mutuel **tickets --also electronic--** are not "items" (Patent Owner's Response, Table at p. 18; pp. 37-38). Examiner respectfully submits that Patent Owner's argument is inconsistent. Patent Owner cannot have it both ways. If an electronic stock **trade** is an "item" within the meaning of the '547 claims, then so is the electronic pari-mutuel **ticket** of Yoshizawa. Accordingly, Patent Owner's arguments directly contradict Patent Owner's own meaning of "item". Examiner submits that Yoshizawa's electronic pari-mutuel tickets are "items" to every extent that Krauss's electronic stock trades are.

G. *Narrow construction of "computer-generated data"*

In the cols. bridging pages 18 and 19 of the table of the Response, Patent Owner argues,

> "computer generated data" must be interpreted as data generated during the course of a communication

Examiner respectfully disagrees. "Computer-generated data" is just that, computer-generated data". There is nothing explicit, implicit, or inherent in the meaning that incorporated that the data must be generated during a telephone call. In this regard, Patent Owner's construction of the term adds a limitation into the claim in violation of the decision in *Ex parte Bowles*.


VCT '87

Beginning at the end of p. 22 of the Response filed 26 September 2006, Patent Owner states,

> In paragraph 3 of the office action, Claims 1-9, 11, and 17-20 are rejected under 35 U.S.C. 102(b) as being anticipated by VCT `87. The Patent Owner respectfully submits that all the limitations in the rejected claims are not met by VCT `87. By way of example, some of the distinctions between the claims and VCT `87 are addressed below.

Patent Owner acknowledges that inclusion of DNIS in the claims limits their priority date to 16 May 1988 and this date therefore applies to claims 1-10. Patent Owner disagrees that ANI first appeared in the CIP application 07/194,258, stating

> Indeed, the reference to DNIS (automatic called number identification data) first appears in the continuation-in-part application 07/194,258. However, the concept of taking the telephone number directly from the system as it is available in certain telephone apparatus of the communication facility C (i.e., the PSTN), is disclosed in the prior parent U.S. Patent 4,792,968, which has a filing date of February 24,

1987. ANI is one specific example of this concept and caller ID is another.

> "Acting on the instructions the caller would push the buttons 14 in sequence to indicate his telephone number, e.g. "6200711." This data could be taken directly from the system as it is available in certain telephone apparatus of the facility C." `968 patent, column 5, lines. 57-61.

<u>VCT `87 is Not Prior Art to Claim 11</u>

Because the parent `968 patent supports claim 11, VCT `87 does not qualify as prior art to that claim. Applicant has indicated exemplary locations in the `968 patent that supports claim 11. Applicant requests the Examiner to withdraw the 102 rejection of claim 11 and to confirm it.

(Footnotes from the above excerpt, while acknowledged, have been omitted here. The Table on p. 23 of the Response directed to support in the '968 patent for the claim 11 elements has also been omitted as being irrelevant here. Examiner only contests the priority with respect to the ANI functionality or its equivalents for claim 11.)

Examiner respectfully disagrees that the above excerpt from the '968 patent (col. 5, lines 57-61) equates to ANI or its equivalent. The present patent ('547) claims 1 and 11 state,

> "data signals...including called number data signals (DNIS) and <u>**calling number identification data**</u> signals **automatically provided by** said communication facility (claim 1; emphasis added )

> "wherein said communication facility has a capability **to automatically provide** terminal digital data, indicating a **calling telephone number**"(claim 11 only; emphasis added)

The excerpt from the '968 patent that Patent Owner uses to argue the priority data of ANI makes no mention of "calling number identification data" **automatically provided by** the communication facility. Examiner respectfully submits that some un-indicated "data" that may be "**taken**" (emphasis added) from an un-indicated "**system**" (emphasis added) does not provide the required written descriptive support for the communication facility **automatically providing** the "calling number identification data" or the "calling telephone number." The footnote numbered "1" in Patent Owner's Response on p. 22, provides a definition for ANI from the <u>Newton's Telecom Dictionary</u>, stating in pertinent part,

> [1]ANI Automatic Number Identification. A phone call arrives at your home or office. **At the front of the phone call is a series of digits**

> **which tell you the phone number of the phone calling you.**
> These digits may arrive in analog or digital form on the same circuit or
> on a separate circuit. **You will need some equipment to decipher
> the digits AND to do "something" with them**... (Newton's Telecom
> Dictionary, 8th Updated Edition, 1994) (bold emphasis added by
> Examiner)

It is clear from the above definition of ANI that the communication facility
automatically provides the calling number --not that the number is "*taken
directly from the system as it is available in certain telephone apparatus of
the facility*" as stated in the '968 patent (col. 5, lines 57-61). The term "take" is
suggestive of polling the "certain telephone apparatus of the facility" for the
telephone number, such as by a software command. "Taking" is unnecessary if the
number is "automatically provided". The ANI data would simply be received into the
"equipment" used to "decipher the digits," as stated in the definition provided in
footnote "1" of the Response by Patent Owner, above.

By contrast to the singular statement made in the '968 patent (filed **February 24,
1987**), the patent US 4,845,739 (the '739 patent, hereafter) arising from the
**later**-filed **CIP** application (filed **May 16, 1988**) provides much detail about ANI,
for example, defining ANI capability,

> "The interface **20** incorporates modems, tone decoders, switching
> mechanisms, DNIS and **ANI capability** (call data analyzer **20a**) along
> with voice interface capability... Generally, DNIS capability is a function
> of **the communication facility C** (composite telephone system) **to
> provide** called terminal digital data indicating the called number. **ANI
> capability is a similar function** whereby the digital data indicates
> **the calling number** with calling terminal digital signals." (the **'739
> patent** at col. 4, lines 50-63)

Furthermore, ANI and DNIS are discussed throughout the '739 patent.

At least the patent literature shows that the terms "automatic number
identification" and "ANI" were being used in the **early 1960's**. (For example, see
US 3,194,892, Figs. 4, 5, and col. 2, lines 39-43 and col. 3, line 45 to col. 4, line
21, and see also US 3,243,514, Fig. 1 and col. 1, lines 50-65 and col. 3, lines 63-
75.) If the excerpt "*This data could be taken directly from the system as it is
available in certain telephone apparatus of the facility C*" (the '968 patent, column
5, lines 57-61), meant ANI, then why didn't Patent Owner simply use ANI, given
that the terminology, "ANI", had been used for at least 25 years **prior** to the filing
date of the application (filed February 24, 1987) that became the '968 patent? Why
did Patent Owner wait 15 more months, until the next-filed CIP application (filed
May 16, 1988) to use the notoriously well-known terminology, "ANI" and then also
explain what ANI was, if it had been apparent from the **earlier** filed application?

Examiner concludes because Patent Owner did not mean ANI in the earlier filed application.

With all of the above in mind, then, Examiner respectfully submits that the record shows that Patent Owner did not mean ANI by the excerpt, "*This data could be taken directly from the system as it is available in certain telephone apparatus of the facility C*" (the '968 patent, column 5, lines 57-61). Accordingly, Examiner maintains that the earliest priority date for which the feature ANI and its equivalent "calling number identification data" is May 16, 1988.[2] Therefore, VCT '87 qualifies as prior art under 35 USC 102(b) for both of '547 independent claims 1 and 11 and the claims depending therefrom (claims 2-10 and 11-20).

At the middle of p. 26, Patent Owner states,

> Distinction 1. Claim 1 generally recites the following:

> > *An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device, and a digital input device in the form of an array of alphabetic numeric buttons for providing caller data signals, (claims 1)*

> To satisfy this general recitation, the Examiner points to VCT '87 indicating that it discloses

> > *a control system called the "VCT Advantage system" for automated telephone call processing for a variety of applications, such as customer service (p. 1, left-hand col.), credit authorization (p. 4, left-hand col.), and on-line college registration (p. 3; p. 4, right-hand col.).*

> The VCT Advantage system is disclosed in connection with a unitary customer service application that includes credit card authorization, point of sale terminals and corporate accounts. On page 3, an on-line college registration is described, which is a different and dedicated application. On page 3 there is no mention that this on-line college registration is operated with the customer service application on the same VCT Advantage system. In addition, on page 4 of the VCT '87, a telephone registration system for UCSD is disclosed. Again, this is a dedicated single application operated by UCSD on a system purchased from VCT. The Examiner has taken suggestions with respect to

---

[2] At least one *Markman* hearing, directed to several of the Katz family of patents under reexamination, indicates that defendants and Patent Owner agree that **ANI** and **calling number identification data** "have the same meaning." (See 63 F. Supp. 2d 583, pages 618-620.)

particular capabilities and functionalities that are disclosed for each of these separate applications and has combined them and has made assumptions that each of these distinct applications are combined to operate within a unitary system. Applicant respectfully submits that such assumptions and leaps that bridge the gaps between disparate teachings are not proper for a 102 rejection.

Examiner respectfully disagrees that the VCT '87 IVR system (the VCT ADVANTAGE) is dedicated to a single application. Simply because single applications are discussed does not negative that VCT '87 expressly discloses using DNIS to select one from many applications (i.e. "formats" as presently claimed). VCT '87 states in this regard,

**DNIS codes received with each call allow the voice response system to <u>identify the application</u>** before even speaking with the customer. (VCT '87, paragraph bridging p. 1 with p. 6; emphasis added)

There is simply no reason to use DNIS to "identify the application" if there is only one. Therefore, Patent Owner and Declarant Klein quite simply ignore the expressed teaching in VCT '87. The other arguments presented by Patent Owner and Declarant Klein directed to this alleged distinction (at pages 27-29 are merely attempted distractions from the **factual** teaching in VCT '87 and are therefore not persuasive. Again, the **fact** is that the VCT Advantage IVR system uses DNIS to select a single application from a plurality of applications, as expressly stated in VCT '87.

Beginning at p. 29 of the Response filed 26 September 2006, Patent Owner states,

Distinction 2. Claim 1 recites DNIS for the purpose of processing data in connection with a select format from a plurality of formats identified by the called number identification data signals (DNIS).

"*the data signals... including called number data signals (DNIS) (claim 1 only)*"

"*means for controlling said processor unit in accordance with said called number identification data signals (DNIS) to process at least certain of said caller data signals in accordance with a select format from a plurality of formats identif ed by said called number identification data signals (DNIS); (claim 1 only)*"

VCT '87 indicates that in "one VCT application, several 800 numbers enter the service department over many T1 spans. These calls are received by the VCT Advantage system, before going to an ACD. DNIS

codes received with each call allow the voice response to identify the
application before even speaking with the customer. 800 numbers are
provided to customers for credit card authorization, point of sale
terminals and corporate accounts." The customers in the credit card
authorization application are merchants that call on behalf of their
customers to seek authorization by telephone before making charges
to credit cards. The application involving a point of sale terminal (for
example, found at grocery stores) apparently refers to routing calls to
the department handling such point of sale terminals (terminals where
credit cards are swiped by cardholders at the point of sale, these
terminals do not involve any voice prompting).

That VCT '87 point of sale terminals are "(terminals where credit cards are swiped
by cardholders at the point of sale, these terminals do not involve any voice
prompting)" is a conclusory observation by Patent Owner. This conclusory
observation contradicts the very passage Patent Owner quotes. A credit card
swiping terminal would not require "800 numbers...provided to customers for...point
of sale terminals," as expressly stated in VCT '87; ergo, Patent Owner observation
contradicts the **facts** of record and is therefore not persuasive. In addition, VCT '87
expressly states that the applications may be partially or fully **automated**, stating,

> "In some situations the voice response system may be used to
> **automate the complete** customer service function while in **other
> instances** it is more desirable to automate **only a selected portion**
> of the transaction...
>
> A customer calls the service department and is greeted by the **voice
> response system** [--**not a service operator**--]. The customer
> identifies himself and his problem by pressing appropriate keys on a
> Touch Tone telephone in response to **verbal prompts**." (VCT '87, p.
> 1, left-hand col.; emphasis added)

Patent Owner continues on p. 29 of the Response, in the same paragraph as above.

> Hence, the DNIS codes associated with each 800 number are identified
> by the voice system and <u>directed to the appropriate department</u> before
> the call is even answered. The Examiner alleges that
>
> > "*Each application is a different 'select format.' The identification
> > and direction of the calls based upon the communication facility
> > provided DNIS signals are 'processing' examples.*"

Although VCT '87 discloses DNIS, it is namely for directing a call to
the appropriate department or location that is operating one of the
dedicated services that VCT '87 mentions. Hence, in VCT '87, DNIS is
used only to route a call to a particular physical location, i.e., the
appropriate department (that operates either the credit card

authorization service by telephone for merchants or the point of sale
terminal service or a service for corporate accounts). This is distinct
from use of DNIS for selecting a particular set of possible prompts
from a pool of other possible sets of prompts. Each set of prompts
represents a unique call flow experienced by a caller for the purpose of
gathering data that is processed by the claimed system. Directing of
calls is not an example of processing in the context of the claims,
which recites processing in the context of processing data provided by
callers.

First, Patent Owner's argument that "DNIS is used only to route a call to a
particular physical location, i.e., the appropriate department" would diminish the
**Voice Response** Unit to a Call Directing Unit devoid of voice prompts, contrary to
the disclosure in VCT '87. (See, for example, **VCT '87 p. 1, left-hand col. 4th and
5th paragraphs.**) Again, VCT '87 states,

> "In some situations the voice response system may be used to
> **automate the complete** customer service function while in **other
> instances** it is more desirable to automate **only a selected portion**
> of the transaction...
>
> A customer calls the service department and is greeted by the **voice
> response system** [--**not a service operator**--]. The customer
> identifies himself and his problem by pressing appropriate keys on a
> Touch Tone telephone in response to **verbal prompts**." (VCT '87, p.
> 1, left-hand col.; emphasis added)

Accordingly, Patent Owner's argument is entirely without merit.

Second, Examiner respectfully disagrees that "Directing of calls is not an example
of processing in the context of the claims, which recites processing in the context of
processing data provided by callers," as argued by Patent Owner. Rather, call
directing to a specific format is **exactly** that which the '547 specification and claim
1 state is the **one and only** purpose for DNIS, as presented in the table below.

| '547 patent | VCT '87 |
|---|---|
| means for controlling said processor unit **in accordance with** said called number identification data signals (DNIS) to process at least certain of said caller data signals **in accordance with** a select format from a **plurality of formats identified by said called number identification data signals** (DNIS); | In one VCT application, **several 800 numbers** enter the service department over many T1 spans. These calls are received by the VCT ADVANTAGE before going to an ACD [automatic call distributor]. **DNIS codes received with each call allow the voice response system to identify the** |

| (claim 1; emphasis added)<br><br>Receiving the **call signal**, the automatic call distributor AC1 **associates the called number** ((213) 627-3333, rendered available using standard telephone **DNIS** techniques) through the interface 20 and the switch 21 to attain connection **with the specific processor**, e.g. the processor PR1 **formatting the health-related program**. (col. 6, lines 38-44; emphasis added) | **application** before even speaking with the customer. 800 numbers (combined in a T1 service called Megacom) are provided to customers for credit card authorization, point of sale terminals, and corporate accounts. The **DNIS codes associated with each 800 number** are identified by the voice system and **directed to the appropriate department** before the call is even answered. (paragraph bridging p. 1 with p. 6; emphasis added) |

Accordingly, the "means for controlling said processor unit" is the automatic call distributor AC1 --not the DNIS signal. The DNIS signal is only for determining to which format a caller will be connected **by the automatic call distributor** and **nothing more**, as made clear in both the '547 specification and claims. Therefore, DNIS is specifically and only used as data to route calls to a specific format, contrary to Patent Owner's argument.

Furthermore, the '547 use of DNIS is exactly the same as in VCT '87, as in the table above. To be sure, there would otherwise be no purpose for "several 800 numbers" or "DNIS codes associated with each 800 number" if all callers were to get the same set of voice prompts (i.e. only called for he same application). Why would companies waste money for reserving extra 800 numbers when one would clearly suffice? It is wholly unbelievable that any voice response unit handing **multiple** applications could do so with only a **single** set of prompts. For example, a student calling to register for a given semester would not get the same voice prompts as a student calling about financial aid, nor as a student calling about admissions (VCT '87, p. 3). The same reasoning applies to credit authorization, point of sales, and corporate accounts (VCT '87, p. 4).

Examiner maintains that the underlying use of DNIS in VCT '87 is **exactly** the same as that use in the '547 patent, certainly to every extent claimed, that is to provide data for directing callers to the application/"select format" associated with the called telephone number (DNIS code).

On p. 30, 1st full paragraph, Patent Owner continues in this regard,

> Further insight into the VCT system is gleaned from page 4, which indicates that the VCT system performs "call routing" and "card authorization functions" to enhance productivity of service operators. The voice system will identify the call according to DNIS codes, which

are associated with each of the many 800 service numbers that enter
the center. Based on these codes, the voice system will instruct the
ACD to route the call to the appropriate department (which is
obviously attended by a service operator). In the case of a credit
authorization call, the VCT system will instruct the ACD to <u>send the call
to an operator called a Relayer</u>, who keys in transaction data provided
by the merchant. Once the data has been entered, the VRU will either
speak an authorization code, or <u>transfer the call to a representative
who is reviewing the transaction</u>. Thus, there is a clear distinction
between routing and direction of a call contained in VCT and
processing based on DNIS taught in claim 1. Accordingly, on this basis
alone, rejection of claim 1 should be reversed.

As already discussed above, Patent Owner again conveniently takes a single
example out of context and ignores the broader picture indicated in the introduction
of VCT '87, at page 1, left-hand col., which states in pertinent part,

"In some situations the voice response system may be used to
**automate the complete** customer service function while in **other
instances** it is more desirable to automate **only a selected portion**
of the transaction...

A customer calls the service department and is greeted by the **voice
response system** [--**not a service operator**--]. The customer
identifies himself and his problem by pressing appropriate keys on a
Touch Tone telephone in response to **verbal prompts**." (emphasis
added)

Ergo while the specific example referred to by Patent Owner is an example of partial
automation it does not negative that VCT '87 indicates that the **entire function
can be automated.** That means **no service operators are used.** Total
automation employing DNIS then requires plural sets prompts, one set for each
application associated with each 800 number. For this reason routing to a particular
department, in the partial automation example, would not be a requirement of total
automation.

For at least the above reasons, Patent Owner's arguments are not persuasive.


Beginning at the end of p. 30, Patent Owner states,

<u>Distinction 3</u>. Claim 1 recites the following recitation, which is not
explicitly taught in VCT '87.

> *a switch that transfers the individual callers to a manual operation
> in the event the individual callers do not qualify during the testing
> step (claim 1 only)*

The Examiner erroneously contends that VCT `87 discloses

> *automatically switching a call to an operator attendant for manual
> operation when it is determined that operator assistance is required
> based on the caller's response to a prompt,*

Applicant finds no evidence of that in VCT `87. Transfer to an operator
in VCT `87 is for reasons entirely different than what is claimed. The
Examiner alleges that VCT `87 discloses a switch to an operator in the
event a question *"requires an unstructured solution."* In supporting
that allegation, the Examiner uses the college registration examples
and makes assumptions involving the circumstances that may cause a
switch to an operator.

> *"For example, using the college registration example, if a student
> PAN or SSN does not match the data of record, then the student
> caller would fail to gain access to the system and would be unable
> to register for classes. While authorizing the student access to the
> voice system for registration would normally fall under the
> umbrella of "a question [that] can be answered by the voice
> response system, "failure to pass the qualifying test of
> authorization of access would fall under the umbrella of a
> "question [that] requires an unstructured solution" thereby
> requiring human assistance. Accordingly, it is implicitly taught in
> VCT '87 that when a caller fails the qualifying test, the caller is
> transferred to "a manual operation, " i.e. someone in registration
> in order to find the solution to the problem of gaining access to the
> system to register."*

Examiner does not believe that assumptions have been made. As stated in the
rejection, Examiner believes and maintains that this teaching is implicit in VCT '87
for the reasons indicated. Further in this regard, Patent Owner appears to have
ignored that the rejection of claims 1-9 was posed alternatively under 35 USC
103(a), in addition to under 35 USC 102(b). Patent Owner does not address the
rejection under 35 USC 103(a) at all. In this respect, Patent Owner's Response is
not persuasive.

Patent Owner continues,

> Patentee's claim 1 explicitly requires that the system determines when
> a caller is switched to a manual operator, specifically, in the event the
> caller does not qualify during the testing step (during which the

customer number provided by the caller must be compared against stored customer number data). With interest, Patentee notes the college registration systems for Colorado State University (page 3 of VCT `87) makes no mention of an option to switch to an operator. Likewise, the college registration system for UCSD (page 4 of the VCT `87) mentions an operator only in the context that the new method of interface will allow the "telephone registration system to perform all functions of an operator at a terminal and in a real-time environment to provide students with immediate verification of their class schedules."

Even in its customer service application, VCT `87 mentions use of an operator in its partial automation system, however for a different reason. It discloses that a customer calls the service department and after identifying himself and his problem is then transferred to a service representative along with a data screen which represents the information gathered initially by the voice system. Here also VCT `87 makes no distinction of when a caller is transferred to an operator. It teaches transferring all callers to an operator after some initial automated processing, not just those who fail to qualify as taught in claim 1.

In its complete automation system, VCT `87 discloses that if a question requires an unstructured solution, the call and data gathered by the voice system can be simultaneously transferred to a service representative. There is no indication in VCT `87 of transferring calls to a service representative specifically in the event callers fail qualification in the testing step. A switch to the operator is based on a decision by the system after conducting a test to determine if information is available rather than at a caller's condition. To transfer to an operator because a caller question requires an unstructured solution is not the same as failing a qualification test.

Examiner notes that Patent Owner is, again, taking examples out of context and ignores the broader teachings presented. To repeat from the **rejection of claim 1 above**,

VCT '87 discloses "automatically switching a call to an operator attendant for manual operation when it is determined that operator assistance is required based on the caller's response to a prompt," stating,

"If a question can be answered by the voice response system the call will be handled without human involvement. **If the question requires an unstructured solution, the call and data gathered by the voice system, can be simultaneously**

**transferred to a service representative.**" (p. 1, col. 2, 6th paragraph, wherein a voice system structure capable of such transfer is disclosed).

...

"If it is thought for some reason that this feature is not implicitly taught, then this may be a difference. However, the *VCT '87* states,

> "Reliability and Responsiveness. Two key ingredients in any customer service organization. In fact, for many customers quality service is one of the deciding factors for purchasing the product." (p. 1, left-hand, col. 1st paragraph).

*VCT '87* continues,

> "Through complete automation of selected routine inquiry calls, and partial automation of all calls, the voice response system can increase productivity by freeing up trained representatives to handle the involved and complicated inquiries made by customers. The result, customers receive better service since the voice system can provide immediate answers to routine inquiries and representatives are free to handle the difficult calls for which they have been trained." (p. 1, right-hand, col. 3rd full paragraph).

> **Instead of leaving a customer** (student) **hopelessly unable to access the system, in contradiction to providing good customer service, it would have been obvious for one of ordinary skill in the art, at the time of the invention to pass the customer** (student) **to the manual operation of a customer service representative** (registration representative) **upon failure of the qualifying test** (access to the system to register) **in order to provide good customer service, as taught to be critical in VCT '87**.

> Accordingly, is the feature of transferring a caller if the caller "do[es] not qualify during the testing step" **would at least be obvious in the interest of customer service if not implicitly disclosed in VCT '87**." (EMPHASIS ADDED)

Again, Patent Owner fails to address the reasoning applied in the rejection.

Beginning at the end of p. 32, Patent Owner argues with respect to '547 **claim 2**,

> Regarding claim 2, the Examiner takes the position that VCT `87 discloses the following recitation,

> "*A control system according to claim 1, wherein at least certain of said individual callers at certain of said remote terminals are also subject to qualification based on said calling number identification data signals.*"

The Examiner relies on an excerpt in VCT `87 for a teaching of receiving ANI, but disregards the limitation that use of ANI in VCT `87 is for the purpose of identifying the number from which the call is placed, rather than for qualification. The claimed recitation qualification requires a system to not only receive ANI, but to compare or test it against stored ANI data. The Examiner, once again, attempts to fill that void in VCT `87 with an assumption that the "*voice response system can match the number with a customer's account and notify the host of a pending inquiry for that customer while at the same time answer the call.*" The Examiner alleges that "*[m]atching the calling number identification data with the account number is qualification based on the calling number identification data.*" Applicant respectfully submits that the claimed recitation qualification is to qualify a caller or determine a caller's "entitlement" based on a check of ANI against a database. To match a caller's ANI with his or her account number may only be for the purpose of locating a caller's record or rerouting a call etc.

First, Examiner maintains, as noted by Patent Owner above, that "[m]atching the calling number identification data with the account number is qualification based on the calling number identification data."

Second, it is axiomatic in matching the ANI with the account number that if there exists no match, then the qualifying test fails the caller for entitlement. This would happen anytime a caller called from a telephone at any other location than that location associated with the caller's account, e.g. calling from work, a cell phone, a pay phone, another country as in international travel. This would also happen if the caller did not have an account. By contrast, if there exists an account matching the ANI signal, then the caller is calling from the designated phone number (e.g. home) associated with the account and has a passing test for entitlement to the system.

Third, Patent Owner disregards the claim language of claim 2, which states,

> A control system according to claim 1, wherein at least certain of said individual callers at certain of said remote terminals are also subject to qualification **based on said calling number identification data signals.**

This is not "determin[ing] a caller's 'entitlement' based on a check of ANI against a database," as argued by Patent Owner. There is no such language in the claims. Rather claim 2 is far broader requiring only "qualification **based on** said calling

number identification data signals [i.e. ANI]." Claim 2 provided no limit on how or what type of qualification is carried out on the ANI. Accordingly, Patent Owner is reading limitations into the claims that do not exist, in violation of the prohibition expressed in *Ex parte Bowles, supra*.

Patent Owner continues with respect to claim 2 in the first paragraph of p. 33,

> To match a caller's ANI with his or her account number may only be
> for the purpose of locating a caller's record or rerouting a call etc.
> Contrary to the Examiner's indication on page 46 of the SOA, there is
> no factual teaching in VCT '87 that demonstrates qualification based
> on ANI.

First, express recitation is never a requirement for anticipation. Inherent and implicit teaching may anticipate a claim feature. For the reasons indicated above, Examiner respectfully submits that VCT '87 anticipates the additional qualification based on ANI in '547 claim 2.

Second, VCT '87 factually discloses matching an account with an ANI signal; this is a qualification test. The qualification test is that an account exists or does not exist. If one exists the caller is entitled; if one does not exist, then the caller is not entitled. It would make no sense for VCT '87 to point out that matching ANI to an account number occurs but then is never used for any purpose. Whatever the purpose is that part of the system to which the caller is entitled, be it billing or routing, as argued by Patent Owner, or something else. Note that in Patent Owner's **previous** Response, Patent Owner admitted that ANI was known for use in billing or routing, stating,

> To match a caller's ANI with his or her account number may only be
> for the purpose of locating a caller's record or rerouting a call etc. ANI
> Number Identification (ANI) was implemented by phone companies to
> send a calling party's telephone to other company offices or to network
> switching systems. This was largely to automate the process of billing
> or for routing a telephone call. (Patent Owner's Response filed **10
> February 2006**, p. 22 at top)

Again, if the caller does not have an account then the qualification fails. Accordingly, Patent Owner's previous comments only support Examiner's position that determining the presence or absence of an account by matching using the ANI is qualification within the meaning in the '547 patent.

Further in this regard, Patent Owner argues at p. 16 that the term "qualification" must be interpreted as,

> determining or assessing whether a call meets one or more conditions
> or requirements (Table at p. 16, center col., last row)

quoting from the Verizon Markman ruling, and therefore already narrowly constructed. Examiner respectfully submits that determining whether or not the caller has an account --by matching the ANI with the account number-- clearly reads on this definition, because such determination or assessment is an essential condition or requirement of the test performed by the VCT Advantage IVR system: does the caller's number (ANI) have an associated account or not? If the caller does **not** have an account, the "condition" or "requirement" of the call fails, while, by contrast, if the caller **does** have an account, the "condition" or "requirement" of the call passes. Therefore, VCT teaches the use of ANI in the qualification.

Beginning near the middle of p. 33, Patent Owner argues with respect to '547 **claims 3 and 17**,

> Regarding claim 3, the Examiner alleges that VCT '87 discloses a system as defined by claim 1, "*wherein said processor unit generates data identifying an order and provides the data to the individual callers, (claim 3).*" Regarding claim 17, the Examiner alleges that VCT '87 discloses a
>
>> *control system according to claim 11, wherein said analysis structure further comprises a processor that generates data identifying an order and provides at least certain of the data to the individual callers.*
>
> To satisfy these claims, the Examiner points to the *college registration example* in VCT '87, in particular to the disclosure that says
>
>> *[t]his method of interface allows the telephone registration system to perform all the functions of an operator at a terminal and in a real-time environment to provide students with immediate verification of their class schedules* (p. 4, right-hand col., 4th paragraph).
>
> Again, claims 3 and 17 are not only distinct for the reasons that are indicated above with respect to the claims from which they depend, but also because, at best, VCT '87 carries a general statement of "*providing immediate verification of class schedules.*" Class schedules indicate course specifics and times, which are pre-established and merely identify for each student his or her picks. The present claims require <u>the computer to generate data to identify an order and provide it to a caller during the caller's interaction with the claimed system</u>.

The student's schedule is one example of computer-generated data; the "verification" is another example. The '547 claims 3 and 17 are in no manner

limited to what the data is or how it is generated so long as the computer generates it. While a student may choose a class the computer still generates the schedule and the verification of the schedule. The claimed "order" is the registration for classes and the schedule and its verification are computer-generated data indicative of the order.

Near the top of p. 34 of the Response, Patent Owner summarizes the rejection of **claims 4-6, 8, and 18-20**, stating

> Regarding claims 4-6, 8, and 18-20, the Examiner alleges that VCT `87 discloses a

>> *control system according to claim 3 or claim 11, wherein the data identifying the order is number data (claim 4 or 18, respectively), wherein the number data is provided as acknowledgement data to the individual callers (claim 5 or 18, respectively) or, wherein the number data is provided in chronological sequence (claim 6 or 20, respectively)."*

> Claim 8 recites that *"caller data signals include item number data (claim 8)."* The Examiner alleges that in VCT `87, a

>> *'verification of their class schedule' is 'acknowledgment data'* provided by the telephone registration system to the student call and includes the student's name, SSN, PAN, as well as course numbers and course times and therefore is *'number data "identifying the order.' As just noted the class schedule is 'number data.' By its very nature a schedule is includes a chronological sequence. Therefore, the class schedule is 'number data provided in chronological sequence. ' A course number is item number data."*

Patent Owner then argues,

> Not only are the claims distinct by virtue of the fact that they depend on claim 1 and are therefore, distinct for the reasons claim 1 is distinct, but also, because the additional limitations they recite are not met by VCT `87.

> Patentee submits that verification of a class schedule is in the context of checking courses that a student is entitled to take. On page 4, with respect to UCSD telephone registration system, VCT `87 indicates that the host computer is used to generate schedule confirmations, which are not provided by the system to student caller during a telephone, but rather are mailed to each student. The telephone registration system of Colorado State University (page 3 of VCT `87), does not

provide any confirmation information to students. VCT '87 indicates
that student must confirm their registration by picking up their class
schedule from the Department of Admissions and Records. Along with
a confirmation of their course selections, students receive a statement
of tuition and fees as well as housing information and a student
activity card. There is no evidence that the VCT system provides
confirmation numbers, much less those that are sequential or during
the call (see '547 patent, e.g. Fig. 3 and related description). As
affirmed by the expert (Klein IV, paragraph 25), VCT '87 does not
demonstrate its system for real-time operation and merely
contemplates a phase two implementation.

Phase two of the implementation eliminates mailing because the process is done in
"real-time." Declarant Klein's statement at paragraph 25 does nothing to change
the **fact** the VCT '87 **disclosed** real-time confirmation to the public before the '547
patent did. As already quoted in the Office action and repeated here, VCT '87
states,

"This method of interface allows the **telephone registration system**
to perform all the functions of an operator at a terminal and **in a real-
time environment** to provide students with **immediate verification
of their class schedules.**" (p. 4, right-hand col., 4th paragraph;
emphasis added).

Examiner respectfully submits that mailing is neither "real-time" nor "immediate
verification." Accordingly, verification of the class schedules is done over the
telephone. Verification of the schedule requires all elements of the schedule (e.g.
course number, times, dates, locations) be generated by the computer and given to
the caller. Again, that the caller selects the courses does not negative that the
computer must generate the schedule and give this information to the caller. That
is "verification of their class schedule." Clearly chronological number data (course
times and dates) and item number data (course number) is provided to the student
in a "real-time environment"; therefore, Examiner maintains each of the features of
claims 4-6, 8, and 18-20 is disclosed in VCT '87.

Finally, simply because the UCSD mails schedules to students in the phase one
example does not negative that real-time verification is disclosed in the phase two
example which obviates mailing. This is disclosed in VCT '87 whether or not it was
actually being used, and disclosure is all that is required for anticipation.
Furthermore, the mailing of schedules in the Colorado State University registration
example, on p. 3 of VCT '87, does not negative the disclosure on p. 4. Accordingly,
Patent Owner's arguments are not persuasive.

Beginning at the middle of p. 35 of the Response, Patent Owner summarizes the rejection of **claim 7** as follows,

> Regarding claim 7, the Examiner alleges that VCT `87 discloses that the
>
> > *qualification data is indicative of a consumable key. Considering again the college registration example, VCT '87 discloses '[T]he USCD telephone registration system will model the current procedures of registration allowing students to waitlist for closed courses and allowing Departmental offices to control registration for specific courses though assigned authorization codes. These authorization codes are currently given to each department prior to registration and are given only to students meeting course pre-requisite requirements. The codes will be assigned by the departmental advisor and matched with duplicate files located on the telephone registration system. ' (p. 4, right-hand col., 3rd paragraph).*
>
> The Examiner believes that the " *'authorization code' is a 'consumable participation key' because it limits a student to enroll in a predetermined class for which the student qualifies and can be used for only that one class, one time. Once the student uses the code, the code is consumed."*

Patent Owner then argues,

> Claim 9 [sic; 7] is distinct at first by virtue of its dependency on claim 1, which has been distinguished above. Moreover, the term "consumable key" as claimed here and in his other related applications has a defined interpretation. A "consumable participation key" is one that indicates a number of uses to the system with which a caller using the key interacts and once that limit is used up or consumed, the participation key is ineffective and may not be automatically refreshed. To demonstrate that the capability "consumable key" has not only been described repeatedly and firmly established before the Patent Office, Applicant draws the Examiner's attention to attached Appendix A that indicates excerpts from various prosecution histories.
>
> Moreover, at page 49, the Examiner indicates that the authorization codes in VCT '87 serve as a consumable key and that "the student uses the authorization code once, and only once, to gain access to the portion of the system allowing registration for the restricted access." The Patentee cannot find the basis for this statement in VCT '87. Consumable key means "a number or word that allows a caller access to a service or part of a service a predefined limited number of times

and which cannot be refreshed or recharged." VCT '87 indicates the following:

> The UCSD telephone registration will model the current procedures of registration allowing students to waitlist for closed courses and allowing Departmental offices to Continue to control registration for specific courses through assigned authorization codes. These authorization codes are currently given to each department prior to registration and are given only to students meeting course pre-requisite requirements. The codes will be assigned by the departmental advisor and matched with duplicate files located on the telephone registration system.  (VCT '87, p. 4).

> VCT '87 does not indicate if the authorization codes are unique to the student or unique to a class or department. If an authorization code is unique to a class or department, it may be repeatedly used multiple times by different students. Also, the authorization codes may be re-used every semester. The attached expert testimony (see Klein IV, paragraph 26) affirms this teaching in VCT '87.

Examiner respectfully disagrees that "may be repeatedly used multiple times by different students...[and] may be re-used every semester." Rather, the only conclusion that can be drawn is that the authorization codes are used one time and only one time.  If the authorization codes were not unique to the each student for each semester, then the any student given an authorization code could give it to any other student (e.g. a friend, fraternity brother, sorority sister), thereby allowing an unauthorized student access to the class, not only for the given semester, but also for subsequent semesters. Out of necessity, then, of preventing unauthorized students from gaining enrollment to a class for which the student is not entitled, the authorization codes must be unique to each student, for each class, for each department. If they are not used up after one use (i.e. consumed) they could be surreptitiously given out in subsequent semesters or during the same registration period. Therefore, it is implicit in the enrollment system of USCD that the authorization codes read on consumable participation keys --even under the narrowed definition.

Inasmuch as Declarant Klein does nothing more than repeat Patent Owner's argument, in this regard, it is unclear what Klein offers. If Klein has no specific personal knowledge as to the actual workings of the VCT Advantage IVR system or to the registration at USCD, then Klein's comments are nothing more than speculation, just as are Patent Owner. As for Klein's comments on obviousness, obviousness is drawn to the ultimate legal conclusion and therefore is not entitled to weight.

Finally Patent Owner argues with respect to the VCT '87 patent,

> "Applicant respectfully submits that claim 9 depends on claim 1, and
> on that basis alone, is distinct."

'547 claim 1 is not distinguished over VCT '87 therefore neither is '547 claim 9.

This concludes Patent Owner's arguments traversing the rejections of the claims
over VCT '87, alone.


## YOSHIZAWA

Beginning at the end of p. 37, Patent Owner states,

> In paragraph 4 of the office action, Claims 21-23, 25, 37-39, 44, and
> 47 are rejected under 35 U.S.C. 102(b) as being anticipated by the
> article by Yoshizawa et al., entitled *Voice Response System for
> Telephone Betting*" in Hitachi Review 26(6), June 1977, pp. 21 5-220,
> (hereafter "Yoshizawa").
>
> Distinction 1. Claims 21-23 explicitly recites the following recitation,
> for which there is no explicit teaching in Yoshizawa.
>
>> "*A method for implementing a service for controlling **an order of
>> an item or items** for use with a communication facility including
>> remote terminals for individual callers, wherein each of said
>> remote terminals comprises a telephonic instrument including a
>> voice communication device and a digital input device in the form
>> of an array of alphabetic numeric buttons for providing data*,
>> (emphasis by bold added)"

Patent Owner summarizes portions of the rejections and then argues,

> Yoshizawa developed a telephone betting system to avoid the
> purchase of a "ticket" (an object) for the horse races, suggesting that
> it is in the interest of "preventing littering" of the areas surrounding
> horse courses with missed pari-mutuel tickets. Thus, Yoshizawa
> teaches <u>away</u> from a system that orders an object.

Patent Owner's argument quite transparently ignores the facts. Yoshizawa states
that the IVR system can be used for, *inter alia*, "(9) seat reservations (for trains,
planes, and theaters), (10) hotel and hospital reservations systems, (11) **order
entry** (Yoshizawa, p. 220, left hand col., section entitled "OTHER APPLICATIONS OF
VOICE RESPONSE UNIT"; emphasis added). At the very least, order entry reads on
Patent Owner's improperly narrow interpretation of "item".

Patent Owner continues in the same paragraph,

A "bet" is not an item, which is an object, especially in the context of ordering. In contrast, a bet is a "wager" or "stake" that represents an agreement between two parties that the one who has made an incorrect prediction will forfeit something stipulated to the other (usually money). If anything, Yoshizawa developed a telephone betting system to avoid the purchase of a "ticket" (an object) for the horse races, suggesting that it is in the interest of "preventing littering" of the areas surrounding horse courses with missed pari-mutuel tickets. Thus, Applicant respectfully submits that Yoshizawa teaches away from a system that orders an object.

Patent Owner's argument is premised on the erroneous notion that the term "item" is limited to physical objects, violating the prohibition against reading limitations into the claims beyond that allowed, as expressed in *Ex parte Bowles*. There exists nothing explicit or implicit in the definition of the word "item" that limits it to a physical object. Even if "item" were so limited, this feature most certainly would not make the instant claims novel, since Yoshizawa teaches the use of the system for "order entry" and "train and airplane seat reservations" which are most assuredly physical objects requiring more than just one piece of information (e.g. time and date of reservation and seat number). Accordingly, Patent Owner's argument in this regard is without merit.

Patent Owner continues arguing near the beginning of p. 38,

In addition, Yoshizawa does not disclose the following recitations:

"*receiving from said callers order data including item data entered by said callers via said digital input device*;

and

*receiving from said callers additional data relating to said item data*; "

Moreover, in a typical betting scenario (page 5 of Yoshizawa), there is no evidence that the caller is either prompted for by the system or provides any additional data that relates to the item that the caller desires to purchase. On page 51 of the SOA, the Examiner indicates that the race number is item data and the horse number etc, is the additional data. The Examiner conveniently argues that both the "bet" and "race" are items. As demonstrated above, neither is an object for purchase. The Examiner must give the term "item" its proper construction, because the '547 patent is an expired patent.

Patent Owner ignores the express example on p. 217 wherein the race number, horse number, number of tickets, and Win, Place, or E.O. Forecast. The race number is item data, and the remaining information is additional item data. There is

nothing "convenient" in the **fact** that the order to place a bet requires **several** distinct pieces of data.

Finally, Examiner respectfully submits that the correct construction for "item" is anything that has information (i.e. data) associated therewith and should not be further narrowed. Such narrowing would violate the legal precedent expressed in *Ex parte Bowles* of reading limitations into the claims.

Beginning at the middle of p. 38 of the Response, Patent Owner states,

> Distinction 2: Claims 21-23 explicitly recite the following recitations, for which there is no explicit teaching in Yoshizawa.

> > *Providing individual callers **with computer generated data to identify said order for individual callers** (claim 21), wherein **the computer generated data identifying the order is provided to the individual callers as acknowledgement data** (claim 22), or wherein **the computer generated number data is provided to the individual callers in chronological sequence** (claim 23).*

> The Examiner argues the following:

> > *Table 1 on p. 217 provides the exemplary acknowledgement, "Registration has been completed. Thank you." Table 1 also shows that the central processing unit (i.e. "computer') generates numbers in the form of "registration numbers" identifying the order (i.e. race bet) and a time stamp (therefore in chronological sequence), indicative of a caller's bet, which is stored so that the caller may use the registration number to update the bet data, such as by cancellation.*

> A date time stamp is <u>not</u> sequence data, as more than one caller calling at the same instant would receive the same date time stamp. However, for data to be sequential, an order of priority is established by the system.

Patent Owner's argument ignores the example in Table I(a), at step "5" on p. 217 states,

> "Hold on a second, please. (Wait signal) The purchases you have just made are for a total of 12 tickets. Registration **time is 12:32**. Registration number is **0100, repeat 0100**."

> "Please enter the registration number."

Even if time were not sequence --which it is-- the sequence data includes the time and a registration number, which must be unique to the caller's call. REcall that the call is recorded so the sequence date (e.g. time and registration number) is essential to locating the recording associated with the specific call (Yoshizawa, p. 218, left-hand col., last sentence).

Patent Owner finally argues with respect to Yoshizawa,

> The claims that depend on claim 21 are distinct at least for the reasons urged with respect to claim 21. Applicant respectfully submits that claims 48, 49 and 50 further recite that an item as claimed is an object.

Patent Owner appears to be misdirected as none of claims 48-50 were rejected over Yoshizawa alone. Instead, claims 48-50 were rejected over Yoshizawa in view of Kono. Additionally, since claim 21 is not distinct from Yoshizawa, none of the dependent claims are taken to be.

## 35 USC 103(a) Rejections using VCT '87 as a base reference

Beginning at the top of p. 27 of Response, Patent Owner states,

> Rejection of Claims 1-10 Under VCT `87 in View of VCT `86 (SOA, page 17)
>
> In paragraph 6 of the office action, Claims 1-10 are rejected under 35 U.S.C. 103(a) as being unpatentable over VCT `87 in view of VCT `86. Regarding claim 1, the Examiner maintains that VCT `87 alone either anticipates or makes obvious the feature of transferring the caller under the condition that the individual callers do not qualify during the testing step. Applicant has demonstrated above how VCT `87 does not anticipate claim 1. In addition, VCT `87 (a single reference) cannot, on its own, render Claim 1 obvious. *B.F. Goodrich:* 72 F.3d 1577, 1582; *In Re Kotzab:* 217 F.3d 1365, 1370; and *Sibia Neurosciences*: 225 F.3d 1349, 1356.

As expressed above, Examiner disagrees that the arguments presented by Patent Owner with render the '547 claims novel over VCT '87 alone. Patent Owner failed to address the rejection as alternatively applied under 35 USC 103(a). Presently Patent Owner fails to apply the case law to the specifics of the VCT '87 reference. Examiner maintains that VCT '87 alone does render the claims obvious if not anticipated for the reasons presented in the rejection and as further explained herein above with respect to VCT '87. Patent Owner's failure to apply the case law to the present case prevents Examiner from knowing that which Patent Owner intends. Accordingly, Examiner cannot address this.

Patent Owner continues summarizing the rejection under 35 USC 103(a) over VCT '87 in view of VCT '86, which will not be repeated here for brevity. Patent Owner then argues beginning in the last paragraph on p. 27 of the Response,

> Patentee respectfully submits that his Claim 1 requires that individual callers calling the system provide their own customer number data to the system that is tested before any processing on that data is carried out. VCT `86 is directed to a credit authorization application where the caller is a merchant and not a customer that is calling on his or her own behalf. The merchants interact with voice prompts to enter their merchant number, card number and amount of purchase by a customer of the merchant in situations where a customer is making a purchase in person and the merchant is seeking authorization to charge the customer's credit card. That situation is vastly different from a caller interacting with voice prompts to order an item and to indicate additional details relating to the order. Applicant's claim 1 recites capabilities by which individual callers interact directly with a control system to conduct their own transactions.

First, as quoted from VCT '86 in the rejection,

> "In a second method, specific 800 numbers are handled entirely by the voice response unit. Merchants interact with voice prompts to enter their **merchant number, card number**, and amount of purchase by pressing appropriate keys on their Touch Tone phones. The voice response unit **bypasses the Relayers** to communicate directly to the host...If the purchase is **not** approved, the **call is transferred** along with the appropriate data **to an Authorizer** for special handling."
> (*VCT '86*, p. 5, paragraph bridging left- and right-hand cols.)

There exists nothing in the '547 claims that even remotely hints that the caller cannot be the merchant calling on behalf of the person making the purchase. Claim 1 states,

> **testing caller customer number data [merchant number and card number] as part of said caller qualification data supplied by the individual callers [merchants] as at least certain of said caller data signals against a file of stored customer number data [stored merchant number and card number and purchase limits]**

The merchant is the caller. The merchant provides a merchant number and card number (i.e. "**said caller data signals**") that are compared against stored merchant numbers and card numbers (i.e. "**a file of stored customer number data**"). The merchant number and the card number are "part of the qualification data". There is simply no requirement in claim 1 that a caller making a purchase be

Control Number: 90/007,087 & 90/006,979                    Page 63

Art Unit: 3992

the one calling. Examiner acknowledges that Patent Owner argues that this above claim feature requires this, but it simply does not require this. That the merchant has some person's card number does not contradict any feature of claim 1. Therefore, Examiner does not find the argument persuasive.

Patent Owner continues,

> The Examiner takes the position that:
>
>> "it would have been obvious for one of ordinary skill in the art, at the time of the invention to transfer the caller upon failure to pass the credit verification test in the American Express credit authorization of VCT `87, in order to meet American Express's policy of never declining an approval without first talking with the customer, as taught in VCT `86 (col. 5, left-hand col., last sentence of 1" partial paragraph)."
>
> Patentee notes that if a customer's credit is not authorized, it is the merchant calling the VCT system who is transferred to an operator and not the customer who failed to qualify. For that reason, the claim 1 is distinct from the combination of the two references VCT `87 and VCT `86.

Claim 1 states,

> **a switch that transfers the individual callers to a manual operation in the event the individual callers do not qualify during the testing step.**

The merchant as the individual caller fails to qualify in that the merchant cannot authorize the credit transaction. Again, there remains nothing inconsistent with the merchant being the individual caller calling on behalf of a person making a person. The merchant fails the qualification and is switched to an Authorizer. VCT '86 was used to show that it would have been obvious for one of ordinary skill in the art, at the time of the invention to transfer the caller (i.e. the merchant) upon failure to pass the credit verification test in the American Express credit authorization of VCT `87, in order to meet American Express's policy of never declining an approval without first talking with the customer (i.e. the merchant), as taught in VCT '86 (p. 5, left-hand col., last sentence of 1st partial paragraph).

Beginning near the end of p. 41, Patent Owner argues with respect to **claims 2-9**,

> Regarding claims 2-9, the Examiner takes the position "that VCT '87 discloses each of these features for the reasons indicated in the rejection of the claims 1-9 under 3 5 USC 102(a). " Applicant

Control Number: 90/007,087 & 90/006,979                    Page 64

Art Unit: 3992

> respectfully submits that the dependent claims 2-9 are distinct at least
> for the reasons urged above with respect to claim 1.

Examiner respectfully disagrees that claim 1 is distinct from the combination of VCT
'87 combined with VCT '86 and maintains that claims 2-9 are not distinct.

Patent Owner continues on p. 41 of the Response summarizing the rejection of
**claim 10**,

> Regarding claim 10, the Examiner acknowledges that "VCT '87 does
> not disclose that "said file of stored customer number data includes
> negative file data. " The Examiner takes the position that VCT' 86
> teaches additional examples of telephone college registration, stating,

>> [b]efore interacting with the Student Records System Registration
>> Screens of ISIS system, three pieces of information must be
>> gathered form the caller, the Social Security Number, level
>> (undergraduate or graduate) and term, when more than one
>> semester's registration is active at the same time. This information
>> is keyed by the caller on the telephone key pad and submitted to
>> the system 's registration screen. lithe student has holds, the voice
>> response system initiates a hold message which indicates the type
>> of hold and the office placing the hold on the student record. " (VCT
>> `86, p. 4, right-hand col., 1 s` full paragraph) The "hold" is "stored
>> customer number data" that is "negative file data.

> From this the Examiner concludes that

>> [it] would have been obvious for one of ordinary skill in the art, at
>> the time of the invention to include negative file data on the college
>> registration system of VCT '87, in order to prevent an ineligible
>> student from registering for courses, until the problem is solved, as
>> taught in VCT '86.

Patent Owner then argues,

> The teachings in VCT '87 and VCT '86 because they relate to different
> types of systems and methods and the Examiner combines
> functionalities relating to one distinct application, the customer service
> application, in VCT '86 with the functionalities relating to another
> separate application, the college registration application in VCT '87. On
> page 56, the Examiner argues that the claims are drawn to a device
> not a method. Indeed, as noted above, if the device is modified with
> different hardware and software components and configurations, it is
> no longer the same device. On page 57 and other locations of the
> SOA, the Examiner repeatedly asserts that the Patentee is relying on

functional recitations to distinguish the prior art. In fact, the Patentee
is pointing to concrete structural components within an electronic
system, for example, specific data components processed by the
system. On page 57, for example, the prior art distinction is that the
data provided to the system is the caller's own credit card data.

First, Examiner is not combining disparate teachings. VCT '87 and VCT '86
applications are drawn to **the very same IVR system**: the **VCT Advantage IVR
system**.

Second, as already argued above, the claims 1-10 are drawn to a device --not a
method of using a device. Examiner respectfully submits that idea of "disparate
teachings" does not negative the capability of the system to perform the function.
Furthermore, Examiner maintains that it would have been obvious for one of
ordinary skill in the art, at the time of the invention to include negative file data on
the college registration system of *VCT '87*, in order to prevent an ineligible student
from registering for courses, until the problem is solved, as taught in *VCT '86*.

In this regard, it has been held that the strongest rationale for combining
references is a recognition, expressly or impliedly in the prior art or drawn from a
convincing line of reasoning based on established scientific principles or legal
precedent, that some advantage or expected beneficial result would have been
produced by their combination. *In re Sernaker*, 702 F.2d 989, 994-95, 217 USPQ 1,
5-6 (Fed. Cir. 1983). The benefit of negative file data is to prevent ineligible
students from applying and would be applicable to the registration examples of VCT
'87 as well. On a broader level, one of ordinary skill would recognize that the holds
placed on a students registration based upon "negative file data," are more broadly
applicable to holds on any customer account.

Beginning at the end of p. 42 of the Response, Patent Owner states,

> Rejection of Claim 12-16 Under VCT `87 in View of VCT `86 and
> Gentile (SOA, page 19)

Patent Owner first quotes the rejection in the Office action, which can be found
herein above in its original form, as it has not changed. Patent Owner then argues,

> The Examiner alleges that the only difference is that "*VCT `87 and
> VCT `86 do not indicate that the caller provides the expiration date
> along with the credit card number.*" Applicant respectfully submits that
> an additional, even more important difference is that the claim
> requires a caller to provide his or her own credit card, not a third party
> (such as a merchant) to provide credit card data for another individual.

Examiner respectfully disagrees (1) that "an additional, even more important difference is that the claim requires a caller to provide his or her own credit card..." and (2) that the claims require the credit card number to be that of the caller.

With respect to (1), again, claims 11-20 are drawn to a device or apparatus --not to the method of using the apparatus nor to the data worked on. In this regard, MPEP 2114 states,

> "APPARATUS CLAIMS MUST BE **STRUCTURALLY** DISTINGUISHABLE FROM THE PRIOR ART
>
> While features of an apparatus may be recited either structurally or functionally, **claims directed to an apparatus** must be distinguished from the prior art in terms of **structure rather than function**. *In re Schreiber*, 128 F.3d 1473, 1477-78, 44 USPQ2d 1429, 1431-32 (Fed. Cir. 1997) (The absence of a disclosure in a prior art reference relating to function did not defeat the Board's finding of anticipation of claimed apparatus because the limitations at issue were found to be inherent in the prior art reference); see also *In re Swinehart*, 439 F.2d 210, 212-13, 169 USPQ 226, 228-29 (CCPA 1971); *In reDanly*, 263 F.2d 844, 847, 120 USPQ 528, 531 (CCPA 1959). **"[A]pparatus claims cover what a device is, not what a device does**." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (italicized emphasis in original; bold emphasis added)."
>
> "MANNER OF **OPERATING** THE DEVICE DOES NOT DIFFERENTIATE APPARATUS CLAIM FROM THE PRIOR ART
>
> A claim containing a 'recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus,' if the prior art apparatus teaches all the **structural** limitations of the claim. *Ex parte Masham*, 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987) (The preamble of claim 1 recited that the apparatus was "for mixing flowing developer material" and the body of the claim recited "means for mixing ..., said mixing means being stationary and completely submerged in the developer material". The claim was rejected over a reference which taught all the structural limitations of the claim for the intended use of mixing flowing developer. However, the mixer was only partially submerged in the developer material. The Board held that the amount of submersion is immaterial to the structure of the mixer and thus the claim was properly rejected.)."

As established by precedent then, the person who calls to enter the identifying information does not distinguish the claimed "analysis control system" from the VCT

Advantage system of VCT '87/VCT '86, because the caller is not part of the system. Accordingly, Patent Owner's argument is not persuasive.

Further in this regard, MPEP 2115 [R-2] states,

> "MATERIAL OR ARTICLE **WORKED UPON** DOES NOT LIMIT APPARATUS CLAIMS
>
> 'Expressions relating the apparatus to contents thereof during an intended operation are of no significance in determining patentability of the apparatus claim.' *Ex parte Thibault*, 164 USPQ 666, 667 (Bd. App. 1969). Furthermore, '[i]nclusion of material or article worked upon by a structure being claimed does not impart patentability to the claims.' *In re Young*, 75 F.2d *>996<, 25 USPQ 69 (CCPA 1935) (as restated in *In re Otto*, 312 F.2d 937, 136 USPQ 458, 459 (CCPA 1963)).
>
> In *In re Young*, a claim to a machine for making concrete beams included a limitation to the concrete reinforced members made by the machine as well as the structural elements of the machine itself. The court held that the inclusion of the article formed within the body of the claim did not, without more, make the claim patentable.
>
> In *In re Casey*, 370 F.2d 576, 152 USPQ 235 (CCPA 1967), an apparatus claim recited "[a] taping machine comprising a supporting structure, a brush attached to said supporting structure, said brush being formed with projecting bristles which terminate in free ends to collectively define a surface to which adhesive tape will detachably adhere, and means for providing relative motion between said brush and said supporting structure while said adhesive tape is adhered to said surface." An obviousness rejection was made over a reference to Kienzle which taught a machine for perforating sheets. The court upheld the rejection stating that "the references in claim 1 to adhesive tape handling do not expressly or impliedly require any particular structure in addition to that of Kienzle." The perforating device had the structure of the taping device as claimed, the difference was in the use of the device, and "**the manner or method in which such machine is to be utilized is not germane to the issue of patentability of the machine itself**." (Emphasis added.)

With this in mind then, the data entered itself does not distinguish the claimed "analysis control system" from the VCT Advantage system of VCT '87/VCT '86 because the data is only the "material or article worked on." While **not** suggesting that the data entered in the examples in VCT '87/VCT '86/Gentile is different from that presently claimed in the '547 claims, according to precedent, the type of data, nonetheless, does not matter since the data does not structurally distinguish the claimed analysis control system from the VCT Advantage system. Additionally, the VCT Advantage system has DNIS and ANI capability as well as the capability to

receive and process data entered by a caller via a telephone, including SSN (social security number) and PAN (personal access number). Therefore, the types of data received and processed are actually the same as claimed.

With regard to (2), although strongly believed irrelevant, the claims, nonetheless, do not require the credit card number of claim 12 to be that credit card number of the caller.

Independent claim 11 (from which claims 12-16 depend, directly or indirectly) recites in pertinent part,

> "interface structure...including means to provide **caller data signals** <u>representative of</u> data <u>relating to</u> said individual callers" (emphasis added)

Dependent claim 12 recites in pertinent part,

> "wherein said callers further provide credit card number data as **caller data signals**" (emphasis added)

As above, the merchant is the caller. The merchant provides a **merchant number and** "card number data as caller data signals" that are "caller data signals representative of data **relating to** said individual callers" (emphasis added). The caller is authorized to accept the credit card. There exists no expressed, inherent, or implicit limitation of "relating to" meaning "possessed by" or "owned by". Therefore, Patent Owner, in suggesting that the caller must be the one owning the credit card number, is reading a limitation from the specification into the claims in violation of the prohibition expressed in *Ex parte Bowles*. There is simply no requirement in claims 11 and 12 that the caller own the credit car number. That the merchant has some person's card number does not contradict any feature of claims 11 and 12. Therefore, Examiner does not find the argument persuasive.

The above line of reasoning is presented only if it is assumed that the limitation of (1) from whom the data came, or (2) the data type, were considered to patentably distinguish the device/apparatus of the '547 claims from the VCT Advantage system. Again, the '547 claims 11-20 are not method claims, but are instead device/apparatus claims, so the type of data or who enters the data should not be considered to patentably distinguish the device/apparatus acting on the data so long as the VCT Advantage IVR system possesses the capability to operate on the data provided in the manner limited by the claimed structure. Otherwise, the device/apparatus is being distinguished by method of use, contrary to established precedent. Even so, as demonstrated above, there is no claimed requirement that the caller own the credit card number, as argued by Patent Owner.

Patent Owner continues arguing in regard to the rejection over the VCT '87/VCT '86/Gentile rejection,

Control Number: 90/007,087 & 90/006,979                    Page 69

Art Unit: 3992

Nonetheless, to satisfy the difference observed by the Examiner, he
looks to yet another reference, Gentile.

> Gentile teaches an automated credit authorization system which
> includes the determination of the expiration of the credit card and
> the verification that the card is still valid as of the date upon which
> a request is be processed (col. 5, lines 40-45). "

The Examiner concludes that

> it would have been obvious for one of ordinary skill in the art, at
> the time of the invention to have the caller provide the expiration
> date in the American Express automated telephone credit
> authorization discussed in VCT `87 and VCT `86, to ensure that the
> card was, in fact, still valid as of the date the order is requested, as
> taught to be known in Gentile.

> The claims at issue here depend on claim 1 and are distinct at least for
> the reasons by which claim 1 is distinct. In addition, Gentile teaches
> providing expiration date data in the context of an automatic banking
> system involving automatic dispensing terminal banking machines.
> This is not the same as providing credit card expiration data in voice
> response systems.

As above, the data worked upon does not structurally distinguish a claimed device.
Even if it were considered to structurally distinguish, a card's expiration date is
simply a card's expiration date, another piece of data for verifying that a credit card
is valid. One of ordinary skill would not be perplexed as to applying an expiration
date to credit card validity simply because it is shown useful in ensuring an ATM-
type credit card is still valid. Accordingly, the combination of Gentile with VCT
'87/VCT '86 is considered proper and renders the use of the expiration date obvious
and therefore unpatentable.


## 35 USC 103(a) Rejections using Moosemiller as a base reference

At the middle of p. 44 of the Response, Patent Owner states,

> Rejection of Claims 1-6, and 8 Under Moosemiller in View of Szlam
> (SOA, page 20)

> In paragraph 8 of the office action, Claims 1-6, and 8 are rejected, in
> the alternative, under 35 U.S.C. 103(a) as being unpatentable over
> the article by Moosemiller in view of US 4,797,911 (Szlam et al.).

> Regarding claim 1, the Examiner alleges that

> *[w]hile Moosemiller does not explicitly teach the receiving of calling number identification data signals automatically provided by the facility, Moosemiller does teach that the trunk interfaces receive data signals communicated via the telephone network, including Dialed Number Identification Signals (DNIS), touch-tone and voice command signals received from callers. (Moosemiller at p. 88, third column, last two paragraphs; also at page 89 and Figure 1.) Such information would inferentially contain the phone number gathered by AN1 systems, a suggested by Szlam, described below.*

Indeed, Moosemiller discloses DNIS, but not ANI. That void, the Examiner seeks to fill with the teaching in Szlam.

> *DNIS information is used to classify incoming calls in advance for different applications so that the appropriate script is executed by the System Controller. (See Moosemiller at p. 88, first column, second paragraph and at p.91, section titled "Development.")*

The Examiner readily acknowledges that Moosemiller is deficient in that

> *while Moosemiller provides for transferring a call to an attendant for help (at p. 89, second column), Moosemiller does not spec fy transferring to an attendant in the event that the caller does not qualify during the testing step.*

Patentee respectfully submits that Szlam teaches that it is conventional in the art of telephony to use calling number identification data signals automatically provided by the telephone network (via ANI decoder 10a24) in order to identify a caller's telephone number and to retrieve any previously stored customer account information associated with the calling telephone number prior to answering the incoming call (Szlam, col. 12, lines 9-42). However, Szlam does not teach switching a call to an operator attendant for manual operation only when it is determined that a caller has failed to qualify based on the caller's response to a prompt. Szlam teaches forwarding all calls for an operator directly to the operator and using the calling party telephone number to access customer account information and display that data on the operator's screen. Accordingly, a combination of Moosemiller with Szlam does not result in the system as claimed by claim 1.

Patent Owner's argument is, yet again, based upon **unclaimed** subject matter. Claim 1 states in regard to this feature,

"testing caller customer number data as part of said caller
**qualification** data supplied by the individual callers as at least certain
of said caller data signals against a file of stored customer number
data;" (emphasis added)

"a switch that transfers the individual callers to a manual operation in
the event the individual callers do not **qualify** during the testing step"
(emphasis added)

Interestingly, Patent Owner omits mentioning that there exists **no language in the
claim** that limits qualifying callers from being forwarded to "manual operation."
Because the claim does not limit "all calls" from being transferred, Patent Owner's
argument that all calls are transferred has no weight. Simply because all calls are
transferred does not negative that Szlam teaches that all calls are qualified based
upon the ANI data.

Even if the claims were to be construed as transferring the caller to an operator
**only** when the caller fails the qualifying test, in spite of failing to have claim
language requiring this, **Szlam still teaches this**. As stated in the Office action
(filed 3 November 2005 and 21 July 2006 and above),

"*Szlam* also teaches the desirability of automatically switching a call to
an operator attendant for manual operation when it is determined that
operator assistance is required based on the caller's response to a
prompt. (*Szalm* col. 12, lines 31-54; col. 14, lines 3-18, 33-37; col.
27, lines 41-66.)"

At col. 12, lines 31-54, Szlam states,

"In this case, a decoder, such as ANI decoder **10a24** would provide
the calling party's telephone number to trunk interface control unit
**10a13**. Trunk interface control unit **10a13** would then provide the
calling party telephone number to system controller **11**. System
controller **11** via data controller **15** requests mainframe **16** to provide
the customer account information based upon the calling party
telephone number. If the calling party telephone number **does not
correspond to the telephone number for an existing client** then,
when an operator becomes available, **system controller 11 will
connect the callin [sic] party to the available operator** and also
provide the calling party telephone number to the operator terminal
for manual input."

Szlam claim 53, in cols. 27-28, states in pertinent parts,

"53. Apparatus for online updating of data on customer accounts
contained in an information storage system, comprising:

an **operator terminal** comprising a data terminal and an audio communications means;

trunk **switching means** for selectively connecting a telephone trunk to said audio communications means;

...

wherein, **if said assistance is required**, said control means causes said trunk switching means to connect said telephone trunk to said audio communications means, whereby said data terminal provides data entries made at said data terminal **by said operator** to said information storage system, and said information storage system updates said data for said customer account of said calling party by incorporating said data entries into said data for said customer account;  and

**if said assistance is <u>not</u> required**, said control means provides said decoded response as data entries to said information storage system, said information storage system **updates said data** for said **customer account** by incorporating said data entries into said data for said customer account, and said control means causes said message player means to place a next predetermined message on said telephone trunk.

As demonstrated in Szlam, one instance where the customer is switched to the operator is when the ANI does not match with a customer's account number (Szlam, col. 12, lines 31-54). Note that the operator is only **selectively** required if the caller needs assistance (Szlam, claim 53) --not always, as incorrectly argued by Patent Owner.

Beginning near the end of p. 45, Patent Owner argues with respect to **claim 2,**

Claim 2 recites a "*control system according to claim 1, wherein at least certain of said individual callers at certain of said remote terminals are also subject to qualification based on said calling number identification data signals*." The Examiner alleges that it would have been obvious for one of ordinary skill in the art, at the time of the invention, to have incorporated the receiving of calling number identification data signals (ANI), as taught by Szlam, within the system of Moosemiller so that a calling customer could be identified. Szlam teaches use of ANI to access customer information and to display it on an operator's screen. There is no teaching of receiving the ANI for a caller for the purpose of determining if the caller is entitled to proceed through the automated process. Further, claim 2 depends on claim 1 and is distinct at least for the same reasons that claim 1 is distinct.

Yet again, Patent Owner's argument is premised upon unclaimed subject matter. Examiner invites Patent Owner to indicated wherein claims 1 and 2 require "receiving the ANI for a caller **for the purpose of determining if the caller is entitled to proceed through the automated process**." As noted above, the claim 1 states in pertinent part,

> "testing caller customer number data as part of said caller **qualification** data supplied by the individual callers as at least certain of said caller data signals against a file of stored customer number data;" (emphasis added)

> "a switch that transfers the individual callers to a manual operation in the event the individual callers do not **qualify** during the testing step" (emphasis added)

Claim 2 states,

> A control system according to claim 1, wherein at least certain of said individual callers at certain of said remote terminals are also subject to **qualification** based on said calling number identification data signals (emphasis added)

As can be seen, nothing in the claims limits the type of qualification to be for "entitle[ment] to proceed through the automated process." Even if it did, as shown above, **Szlam teaches this** (Szlam, col. 12, lines 31-54 and claim 53).

Patent Owner continues on p. 46 with respect to claims 3-5 and 8, arguing,

> Regarding claims 3-5 and 8, Moosemiller discloses, a control system according to claim 1, wherein said processor unit generates data identifying an order and provides the data to the individual callers (claim 3) wherein the number data is provided as acknowledgement data to the individual callers (claim 4), or wherein the number data is provided in chronological sequence (claim 5). Claim 8 discloses a control system according to claim 1, wherein the caller data signals include item number data. In the stock quote example, the Examiner alleges that Moosemiller

> > *discloses that a caller enters a stock identification number (i.e. 'item number data' of claim 8) and the Conversant™ system's command ('DOW' 'returns Dow plus time and date' (p. 93, left-most col.). These number data are computer-(processor unit-) generated number data, generated by the computer that is the Stock Quote Data Base, identifying the 'order' (i.e. the requested stock quote). The Conversant™ system speaks the stock quote, time, and date to the caller; therefore, these number data are acknowledgement*

> data. Because there is a time/date stamp provided along with the
> stock quote, the number data is provided to callers in 'chronological
> sequence.'

> Patentee respectfully submits that stock quotes are current values for
> a particular stock that vary from day to day. The quotes are not data
> that is generated by the computer to identify a particular order.
> Moreover, a time/date stamp is not an indication of sequence. In
> Moosemiller, several callers calling at the same instance would be
> accorded identical time/date stamps. In contrast, Applicant's claimed
> system generates sequence data to indicate the sequence or order in
> which callers call the system. Accordingly, Applicant respectfully
> submits that claims 3-5 and 8 are distinct for the reason indicated
> here as well as by virtue of their dependency on claim 1.

Examiner respectfully disagrees that the stock quote data fails to read on the
claimed processor-generated data identifying the order. If a caller requests a quote
for a stock, and the computer generates the stock quote data, that data (1) most
certainly is generated by the computer since the computer provides the data to the
call, which could not otherwise be done absent the computer generating it, and (2)
most certainly identifies a particular order as a request for a quote, for example,
IBM, identifies the order for IBM. Additionally, a time/date stamp is indicative of a
chronological sequence even if it were to be given to several persons
simultaneously.

Patent Owner's argument that "[I]n contrast, Applicant's claimed system generates
sequence data to indicate the sequence or order in which callers call the system," is
--yet again-- **not claimed**. There exists absolutely no claim language that the
"sequence data" indicates "the sequence or order in which callers call the system."
The word "sequence" alone is not used in any of the claims. Only claim 6 mentions
sequence as, "wherein the number data [of claim 4] is provided in **chronological
sequence**." Examiner maintains that a time and date stamp is a chronological
sequence and therefore reads on claim 6.

Finally, Examiner disagrees with Patent Owner's that "order" and "sequence" are
synonymous terms in the context of the claims. Rather the term "order" is related
to a "request for purchase of an item" and the number data is the order number. If
they were intended to be the same, then the claims should so read. Furthermore,
Patent Owner has previously argued in this same Response that an "order" is a
request for purchase of an item as in '547 independent claim 11. Patent Owner
cannot have it both ways.

## 35 USC 103(a) Rejections using Yoshizawa as a base reference

Beginning near the end of p. 46 of the Response, Patent Owner states,

> Rejection of Claims 27 and 28 Under Yoshizawa in view of Kaplan (SOA, page 24)
>
> In paragraph 9 of the office action, Claims 27 and 28 are rejected, in the alternative, under 35 U.S.C. 103(a) as being unpatentable over the article by Yoshizawa in view of U.S. 4,797,913 (Kaplan et al.). The Examiner takes the position that Yoshizawa discloses that the voice response system can be used for other applications including credit authorization and order entry and combines Yoshizawa with Kaplan. The patent to Kaplan issued on January 10, 1989, and was filed on August 4, 1987. Claims 27 and 28 have support in the prior parent patent U.S. Patent No. 4,797,913 (see chart below), which has an earlier filing date of February 24, 1987, which predates Kaplan. Accordingly, Kaplan is not prior art to the claims rejected here. Yoshizawa is distinct from the claims for all the reasons demonstrated.

Examiner disagrees with respect to claims 27 and 28, which include the feature, ANI. As discussed above at length, Examiner respectfully disagrees that the '968 patent enabled automatic provision of calling number identification data (ANI) as of the filing of the '968 patent. Examiner respectfully submits that the earliest priority for ANI is 16 May 1988. Accordingly, Kaplan qualifies as prior art under 35 U.S.C. 102(e).

Beginning near the top of p. 35 of the Response, Patent Owner states,

> Rejection of Claim 26 Under Yoshizawa in view of Moosemiller (SOA, page 24)
>
> In paragraph 10 of the office action, Claim 26 is rejected, in the alternative, under 35 U.S.C. 103(a) as being unpatentable over the article by Yoshizawa in view of the article by Moosemiller. Claim 26 recites the following:
>
> > "A method according to claim 21, further comprising the step of:
> >
> > receiving called number identification signals (DNIS) automatically provided by said communication facility as a part of said data signals. "
>
> The Examiner takes the position that Yoshizawa explicitly suggests using the voice response unit for other application, but the reference does not disclose how to implement the Voice Response Unit to handle

other applications. Yoshizawa's system is dedicated to one single
application and Applicant respectfully submits that when Yoshizawa
suggests other applications it is not with the intention of configuring
this system to run all those applications simultaneously.

Examiner respectfully submits that this is mere speculation by Patent Owner. First
in this regard, one cannot show nonobviousness by attacking references individually
where the rejections are based on **combinations** of references.  See *In re Keller*,
642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091, 231
USPQ 375 (Fed. Cir. 1986). In this case, the system in Yoshizawa may handle
several applications simultaneously when considered with Moosemiller. Patent
Owner fails to address the combination of references.

Second in this regard, the strongest rationale for combining references is a
recognition, expressly or impliedly in the prior art or drawn from a convincing line
of reasoning based on established scientific principles or legal precedent, that some
advantage or expected beneficial result would have been produced by their
combination. *In re Sernaker*, 702 F.2d 989, 994-95, 217 USPQ 1, 5-6 (Fed. Cir.
1983). In this case, given that Yoshizawa expressly suggests that the system can
be used for several different applications, and since the system links to a caller's
bank file (Yoshizawa, Fig. 1 on p. 216), it would be transparently obvious to one of
ordinary skill to use the same system for other applications requiring determining
whether a caller possessed sufficient funds, such as credit authorization or airline
reservations, to thereby save money that would otherwise be spent on a separate
voice response system. Such a multiple-application system would be beneficial to a
company providing expertise in handling the interactive voice response systems for
several different companies who did not each want to purchase and maintain their
own systems.

Patent Owner then summarizes the rejection in the Office action, which is not
repeated here as it can be found in its original form above. Patent Owner then
argues,

    Indeed, Moosemiller does disclose DNIS signals to handle different
    applications, but Applicant submits that Yoshizawa does not invite such
    a combination, as there is no suggestion in Yoshizawa that indicates a
    desire to operate several application simultaneously. Nevertheless, at
    the very least, claim 26 is distinct because it depends on claim 21,
    which is distinct for the reasons demonstrated above. Accordingly,
    even if the combination suggested by the Examiner satisfied the
    recitation of claim 26, the limitations of claim 21, are not met. The
    Examiner is requested to withdraw the rejection of claim 26.

First, there does not need to be an express suggestion in Yoshizawa when the
suggestion is clear from Moosemiller that DNIS would enable a voice response unit

to handle several different applications simultaneously. Again Patent Owner fails to address the benefits of DNIS indicated in Moosemiller.

Second, claim 21 is not distinct from Yoshizawa, therefore claim 26 does not gain distinction from Yoshizawa in view of Moosemiller for this reason.

For these reasons, the arguments are not persuasive.


Beginning near the middle of p. 50 of the Response, Patent Owner states,

> Rejection of Claims 29-31, 34, and 35 Under Yoshizawa in view of Rackman (Office Action, page 27)

> In paragraph 11 of the office action, Claims 29-31, 34, and 35 are rejected, in the alternative, under 35 U.S.C. 103(a) as being unpatentable over the article by Yoshizawa in view of US 3,778,553 (Rackman).

> Claims 29 and 31, depend on claim 21, and additionally recite the following:

> "A method according to claim 21, wherein in response to prompts said individual callers enter credit card data (claim 29), wherein said callers enter credit card number data as credit card data (claim 31). "

> The Examiner takes the position that "Yoshizawa discloses that the voice response system can be used for other applications including credit authorization and order entry. In this regard, Yoshizawa states,"

> "Conceivable applications include (1) telephone directory system, (2) telephone charge service, (3) automatic intercept system (AIS), (4) stock prices information service, (5) winning lot number service, (6) CAI, (7) credit card checking, (8) deposit balance information, (9) seat reservations (for trains, planes, and theaters), (10) hotel and hospital reservations systems, (11) order entry. (Yoshizawa, p. 220, left hand col., section entitled "OTHER APPLICATIONS OFVOICE RESPONSE UNIT"; emphasis added) "

> The Examiner further contends that

> Yoshizawa explicitly suggests using the voice response system for credit card authorization and sales services, including order entry.

> The Examiner admits that "Yoshizawa, as explained above, discloses each of the claimed features except for various details about the other

applications of the Voice Response Unit," and relies on Rackman for its disclosure of providing a credit card number, however, yet again, in the context a third party a credit card number on behalf of the credit card holder. Rackman suggests

> in the art of automated telephone credit authorization to have the caller dial the credit card number, to which an automated voice reply is provided indicating the credit status of the card.

The caller is in the "*credit card verification*" application is "**a store clerk**" who "*dials the credit-card company computer, followed by the dialing of the customer's credit card number, and then listens to a verbal report.*" Clearly, this is not using a credit card number, by a caller, who is interacting with a control system, to order an item for him or herself.

There is nothing in the '547 claims that requires the caller himself to be the one entering the credit card data. Even if this were required, Rackman was used only -- as stated in the rejection-- to indicate that the dialing of the credit card number for verification was known in the art. Therefore, one of ordinary skill would not be baffled at the notion of having any caller placing an order to enter his/her own credit card number. This is all Rackman was provided for, again, to show the dialing a credit card number for credit authorization was known, not that it had to be dialed by some store clerk. Examiner respectfully submits that the method of claims 29 and 31 does not become novel because a caller dials his/her own credit card number.

Patent Owner continues arguing in this regard,

> With respect to providing the type of credit card as claimed in claim 30, the Examiner relies on Rackman indicating that it is
>
> *implicit in any credit card number is the "type of credit card. " In other words, MasterCard, VISA, American Express, all have the type of card coded in the credit number; therefore, mere entry of the credit card number necessarily includes the type of credit card.*
>
> Patentee submits that, the claimed recitation requires an indication of the type of credit card that is apparent to the caller as well as to the system. Coding within the credit card number would only be apparent to the system. Claim 30 depends on claim 29, which depends on claim 21. Both claims 29 and 30 are distinct from the combination suggested by the Examiner, for the reasons shown above, as well as, by virtue of their dependency on claim 21, which is also distinct.

Examiner respectfully disagrees that "the claimed recitation requires an indication of the type of credit card that is apparent to the caller as well as to the system." First, there exists no claim language requiring the caller be apparent of the credit card type. Second, the type of card would very clearly be apparent to the caller. All credit cards have the type of card (e.g. VISA, Mastercard, AmEx) printed on the card itself. The caller's entry of the type separately from the number then amounts to a redundant and unnecessary supply of information, not to mention a waste of time since the information would have already been available to the system.

Finally in regard to the rejection over Yoshizawa in view of Rackman, Patent Owner argues,

> Claim 34 recites a method "*according to claim 31, wherein said credit card number data is received as billing data.*" Claim 34 depends on claim 31, which depends on claim 29 and ultimately on claim 21. Claim 34 is distinct, at least by virtue of its dependency on all those interim claims. Applicant also notes that providing billing data in the context of a third party seeking credit authorization would be improper. The merchant or store clerk who seeks authorization on a credit card for a customer is not providing the credit card number for billing. Once approved, the charge would be made at the merchant or store location.

For reasons indicated above, Examiner respectfully disagrees that the combination of references results only in a third party seeking authorization. Examiner respectfully submits that Patent Owner has not considered the combination of references. A caller placing an order himself/herself using a credit card for the purchase would still dial the credit card number for authorization. It does not matter that in the example in Rackman that a store clerk dialed the number on behalf of a customer.

Beginning on p. 52 of the Response, Patent Owner states,

> Rejection of Claims 32 and 33 Under Yoshizawa in view of Rackman and Gentile (SOA, page 27)
>
> In paragraph 12 of the office action, Claims 32 and 33 are rejected, in the alternative, under 35 U.S.C. 103(a) as being unpatentable over the article by Yoshizawa in view of US 3,778,553 (Rackman) and further in view of US 3,833,885 (Gentile et al.). The claims recite the following:
>
> > "*A method according to claim 31 wherein in response to said prompts said callers enter credit card expiration data as credit card data (claim 32), further comprising the step of verifying on-line the*

> credit card number data and the credit card expiration data (claim
> 33)."

The Examiner alleges that the "*prior art of Yoshizawa in view of
Rackman, as explained above, discloses each of the claimed features
except for indicating*." Applicant has demonstrated above, how the
claim recitations are not met, and why a combination such as the one
Examiner suggests would be improper. The Examiner's reliance on
Gentile again is in the context of

> *an automated credit authorization system which includes the
> determination of the expiration of the credit card and the
> verification that the card is still valid as of the date upon which a
> request is be processed (col. 5, lines 40-45).*

To the extent Gentile suggests providing such data it is by a third
party merchant or store clerk for a customer of the merchant or the
store. In addition, these claims depend on claim 21 and the interim
claims and are distinct also for the reasons indicated with respect to
claims from which they depend.

For the reasons indicated above and in the rejection, Examiner respectfully
disagrees that the combination of Yoshizawa with Rackman alone and further with
Gentile is in any manner improper. Further, Examiner respectfully submits that
each of the claimed features is taught by the combination of references and that
the suggestion to combine is as stated above in the rejection of the claims, or
again,

> "It would have been obvious for one of ordinary skill in the art, at the
> time of the invention to have the caller provide the expiration date in
> response to a prompt in the automated telephone credit authorization
> method of *Yoshizawa* in view of *Rackman*, to ensure that the card was,
> in fact, still valid as of the date the order was requested, as taught to
> be known in *Gentile*."

Beginning at the end of p. 52 of the Response, Patent Owner states,

> Group 8 – Rejection of Claim 42 Under Yoshizawa in view of Emerson
> (office Action, page 29)
>
> In paragraph 12 of the office action, Claim 42 is rejected, in the
> alternative, under 35 U.S.C. 103(a) as being unpatentable over the
> article by Yoshizawa in view of the article by Emerson.
>
> Claim 42 recites the following:

> "A method according to claim 21 wherein the verifying step further
> comprises the step of:
>
> verifying the customer number data provided by the callers against
> a list of negative customer numbers.".

The Examiner alleges that

> "Emerson discloses that it is known for credit card to be "checked
> by sales clerks using periodically published listings of `hot' (stolen)
> cards. " (Emerson, p. 100, center col.) The credit card number is a
> customer number. It would have been obvious for one of ordinary
> skill in the art, at the time of the invention to have the credit
> authorization system of Yoshizawa automatically compare the credit
> card number(customer number) against a look-up table of stolen
> card numbers (negative customer numbers), because Yoshizawa
> explicitly suggests using the voice response system for credit
> authorization but fails to provide the details thereof such that one
> of ordinary skill would use known methods to implement credit
> authorization, such as that in Emerson."

Not only is claim 42 distinct because it depends on claim 21 and is
distinct for the reasons that claim 21 is distinct, but also because the
verification of negative customer numbers is provided to a merchant
and not to a customer directly making an order on his or her behalf as
in the context of Applicant's claims.

Applicant respectfully requests the Examiner to withdraw the 103
rejection of claim 42 and to confirm it.

The claim only requires the customer number data to be verified against a list of
negative customer number. There is no claim language requiring limiting indicating
that the results of the verification be provided to anyone at all --much less only to
the owner of the customer number. Accordingly, the argument is addressed to
unclaimed method steps and is therefore without merit.

Beginning on p. 40, Patent Owner argues,

Group 9 – Rejection of Claim 43 Under Yoshizawa in view of St. Jean
(Office Action, page 30)

In paragraph 14 of the office action, Claim 43 is rejected, in the
alternative, under 35 U.S.C. 103(a) as being unpatentable over the
article by Yoshizawa in view of US 3,702,392 (St. Jean).

Claim 43 recites a "*method according to claim 21 wherein said other form of identification data is social security number data (claim 43).*

Patent Owner cites only a portion of the rejection and then argues,

Claim 43 depends on claim 21 and is distinct at least for the reasons claim 21 is distinct. In addition, St. Jean teaches using an identity code presented by the bearer of a credit card or security card, which most likely are random additional digits imprinted on a credit card. The claim specifically requires a social security number, which is a number issued by the federal government rather than a vendor.

First, claim 21 is not distinct from Yoshizawa and therefore claim 43 is not distinct from Yoshizawa in view of St. Jean on this basis.

Second, Patent Owner ignores the excerpt from St. Jean that was provided in the Office action rejection, which is repeated here,

"*St. Jean* also teaches commonly used forms of information that one uses to identify himself, and suggests storing the identifying information on a storage medium like magnetic tape in a single location, stating

"[I]dentification cards may be developed upon which are encoded in machine readable form an individual's birth certificate information, physical characteristics, **social security number**, service record, employer's identification, employee's number, residential telephone number, life insurance policies, next of kin information, fingerprint classification number and/or **any other form of suitable identifying data** with which he may periodically have to identify himself." (*St Jean*, col. 1, lines 47-56)

(Bold emphasis added by Examiner in the original Office action.)

With this in mind, Patent Owner's argument that the "identity code presented by the bearer of a credit card or security card" is "most likely are random additional digits imprinted on a credit card" is not germane to the rejection made. St. Jean teaches the use of multiple different forms of identification in order to ensure the person presenting the card is, in fact, the person authorized to use the card. Examiner respectfully submits that Katz was not the first person to suggest using the SSN, alone or in combination with other identifying information, for identification purposes, and the claimed method is not rendered novel and non-obvious for requiring the use of a notoriously well-known identification number.

For these reasons the argument is not persuasive.

**Response to Patent Owner's Arguments directed to the Rejections added in the Office action filed 21 July 2006**

Beginning at the middle of p. 54 of the Response, Patent Owner states,

> 1.   Rejection of Claims 24, 45, and 46 as Anticipated by Yoshizawa (SOA, page 30)
>
> Claims 24, 45, and 46 are rejected under 35 U.S.C. Section 102(b) as being anticipated by Yoshizawa et al., entitled "Voice Response System for Telephone Betting" in Hitachi Review 26(6), June 1977, pp. 215-220, (hereafter "Yoshizawa").
>
> Claims 24, 45 and 46 depend on claim 21 and incorporate the limitations of claim 21. The distinctions between claim 21 and Yoshizawa are described at pages 36-38. Claim 24 recites the added limitation "wherein the data identifying the order identifies the order for a mail order house," Claim 45 recites the added limitation of "wherein the callers order multiple items during the course of a call." Claim 46 recites the added limitation of "wherein the facility operating the service is a mail order house." None of these limitations are met by Yoshizawa. Yoshizawa suggests using the voice response system for credit card authorization and sales services, including order entry. However, Yoshizawa does not disclose the details on how its system could be configured to implement an order entry system (see Klein IV).

Examiner maintains that the race track reads on the mail order house. There is nothing explicit, implicit, or inherent in that a mail order house somehow excludes race tracks. Race tracks sell electronic tickets in Yoshizawa. Even if mail order house were to somehow exclude race tracks, then Yoshizawa still teaches the use of the system for train and airline reservations as well as for "order entry" (Yoshizawa, p. 220, left-hand col.).

Near the beginning of p. 55 of the Response, Patent Owner states,

> 2.   Rejection of Claims 35 and 36 as Unpatentable Over Yoshizawa in View of Vij (SOA, page 30)
>
> Claims 35 and 36 (ultimately depend on claim 21) are rejected under 35 U.S.C. Section103(a) over Yoshizawa in view of Vij. Yoshizawa suggests using the voice response system for credit card authorization and sales services, including order entry. However, Yoshizawa does not disclose the details on how its system could be configured to implement an order entry system. Vij is directed to a telemarketing

environment where in conjunction with television advertising broadcasts, an information message is transmitted to the caller prior to a customer agent answering a telephone call. There is no motivation to combine Yoshizawa and Vij in the way that the Examiner suggests to render claims 35 and 36 obvious because both references teach away from each other. Yoshizawa is directed to an automated operator-free environment and Vij is directed to a telemarketing environment where live operators communicate with callers and are assisted by a system only to enable the live operators to recognize which particular advertisement, callers are responding to. The expert declaration (see Klein IV, paragraphs 68-72) traverses this rejection.

Examiner respectfully submits that Patent Owner is mistaken. Yoshizawa and Vij do **not** teach away from each other in any manner. Both are directed to automated telephone mail order.

Near the end of p. 55 of the Response, Patent Owner argues,

### 3.  Rejection of Claims 40, 41, and 48-50 as Unpatentable Over Yoshizawa in View of Kono (SOA, page 32)

Claims 40, 41, and 48-50 (ultimately depend on claim 21) are rejected under 35 U.S.C. §103(a) as being unpatentable over Yoshizawa in view of U.S. Patent No. 3,651,503 to Kono ("Kono").

The primary reference, Yoshizawa, suggests using the voice response system for credit card authorization and sales services, including order entry. However, Yoshizawa does not disclose the details on how its system could be configured to implement an order entry system.

The secondary reference, Kono, on the other hand, is directed to a different purpose. It is directed to a special purpose mechanical device for preparing and merchandizing tags having both magnetic and printed information. Kono teaches the following:

*A reader is provided to respond to the insertion of a tag into a slot. The magnetic indicia is then read and transmitted to a storage tape. Many such transactions are thus repeated with similar tags of the same or similar information. Periodically the information from the storage page is retransmitted to a data processing center for sorting, classifying and tabulating the information for inventory and accounting purposes. (Kono '503 patent, column 1, lines 58-64).*

> The Patentee submits that there is no motivation to combine
> Yoshizawa and Kono in the way that the Examiner suggests because
> the environments in which both system are practiced are completely
> disparate. Kono teaches that digital product information can be used
> for inventory control at the vendor premise. There is no suggestion in
> Kono that customers can order products via an automated system.
> (See Klein IV, paragraphs 73-76)

Examiner respectfully disagrees. The strongest rationale for combining references is
a recognition, expressly or impliedly in the prior art or drawn from a convincing line
of reasoning based on established scientific principles or legal precedent, that some
advantage or expected beneficial result would have been produced by their
combination. *In re Sernaker*, 702 F.2d 989, 994-95, 217 USPQ 1, 5-6 (Fed. Cir.
1983). Given the plural pieces of information entered in the race betting example
provided in *Yoshizawa*, one of ordinary skill would recognize by the teaching in
*Kono*, that similar product information would be required for ordering a specific
item, as in the "order entry" function proposed by *Yoshizawa*, (*Yoshizawa*, p. 220,
left-hand col.). For example, a caller ordering a product, such as clothing, would
enter the codes indicative of color and size, as taught by *Kono*, to ensure that the
item was to the caller's liking and fit. It would have been obvious for one of
ordinary skill in the art, at the time of the invention for a caller ordering clothing in
the sales order entry function of the *Yoshizawa* system to enter data indicating the
color and size of the clothing item, as suggested by *Kono*, to ensure that the item
was to the caller's liking and fit.

### Klein Declaration is NOT Persuasive

Much of Klein's Declaration was directly addressed above already. In those locations
where Patent Owner relies on Klein's opinion, Klein is merely repeating Patent
Owner's arguments. Examiner respectfully submits that Declarant Klein contributes
nothing additional to aid in resolving the issues, particularly because Klein
apparently lacks personal knowledge of the capabilities or functions of the IVR
systems disclosed (1) in VCT '87/VCT '86 (i.e. the VCT Advantage IVR system), (2)
in Moosemiller (i.e. AT&T Conversant I IVR system), or (3) in Yoshizawa. Merely
parroting Patent Owner's arguments does not elucidate that which the IVR systems
are, and are not, capable.

Declarant Klein apparently misses facts presented in VCT '87. For example, Klein
argues in paragraphs 17-21 that the VCT Advantage IVR system cannot handle
multiple applications and that VCT '87 teaches away from such capacity in direct
contradiction to the expressed statement in VCT '87,

> "**DNIS codes <u>received</u> with each call allow the <u>voice response</u>
> <u>system</u> to <u>identify the application</u>** before even speaking with the

> customer. (VCT '87, paragraph bridging p. 1 with p. 6; emphasis
> added)

This is not merely call routing as argued by Patent Owner and Klein. Instead, as
expressly stated in VCT '87, this is identification of the application **by the IVR
system using DNIS**. Yet, Klein fails to appreciate this fact, referring, instead to
specific examples of specific applications in VCT '87. Examiner respectfully submits
that Klein is simply wrong and distracts from the facts presented in VCT '87. For
this reason, Klein's Declaration has no more weight in determining the patentability
of the claims than does Patent Owner's arguments.

### Third Party Evidence of Non-Obviousness

Before beginning, several claims (specifically claims 1-9, 11, 17-25, 37-39, and 44-
47) stand rejected under 35 USC 102. Evidence of secondary considerations, such
as unexpected results or commercial success, is irrelevant to rejections under 35
U.S.C. 102 and thus cannot overcome a rejection so based. *In re Wiggins*, 488 F.2d
538, 543, 179 USPQ 421, 425 (CCPA 1973).

Accordingly, the Krauss declaration will be addressed to the extent that it (1)
provides evidence of commercial success, in general, and (2) is directed specifically
to claims rejected under 35 USC 103(a).

### The Krauss Declaration fails to establish a nexus between specific claims of the '547 patent and commercial success

Examiner understands the doctrine of commercial success in establishing evidence
of non-obviousness. While the information provided in the Krauss Declaration
(submitted in the 10 February 2006 submission by Patent Owner) is acknowledged,
the information fails to establish a nexus between that which is claimed specific in
claims of the '547 patent and the perceived commercial success.

Note that opinions, beliefs, recollections, and the like are, at best, opinion evidence.
In this regard, it has been held, that although factual evidence is preferable to
opinion testimony, such testimony is entitled to consideration and some weight so
long as the opinion is **not on the ultimate legal conclusion at issue**. While an
opinion as to a legal conclusion is not entitled to any weight, the underlying basis
for the opinion may be persuasive. *In re Chilowsky*, 306 F.2d 908,134 USPQ 515
(CCPA 1962) (expert opinion that an application meets the requirements of 35
U.S.C. 112 is not entitled to any weight; however, facts supporting a basis for
deciding that the specification complies with 35 U.S.C. 112 are entitled to some
weight); *In re Lindell*, 385 F.2d 453, 155 USPQ 521 (CCPA 1967) (Although an
affiant's or declarant's opinion on the ultimate legal issue is not evidence in the
case, "some weight ought to be given to a persuasively supported statement of one

skilled in the art on what was not obvious to him." 385 F.2d at 456, 155 USPQ at 524). In this case, any opinions of the declarants as to the ultimate legal conclusion of obviousness are not entitled to "any weight".

Further in this regard it has been held, "[i]n assessing the probative value of an expert opinion, the examiner must consider the nature of the matter sought to be established, [1] **strength of any opposing evidence**, [2] the **interest of the expert in the outcome of the case**, and [3] the presence or absence of **factual support** for the expert's opinion." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 227 USPQ 657 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986). (Emphasis added.) The "nature of the matter sought to be established" is that no combination of any references of record would have been obvious to one of ordinary skill in the telephony art based upon opinions of Declarant Krauss's perception of commercial success. As will be demonstrated herein below, [1] there exists strong opposing evidence to the "nature of the matter sought to be established"; [2] the Krauss Declaration provides no information regarding the interests of the Declarant Krauss in the outcome of the case; and [3] the Krauss Declaration fails to provide "factual support" for the [D]eclarant's perception (opinion) that the commercial success was, in fact, due to the thing claimed in each specific claim of the '547 patent.

With respect to [2], the Krauss Declaration above, Examiner has no manner of determining the "interest of the expert in the outcome of the case" because neither Patent Owner nor Krauss has provided what connection he has to the Patent Owner and Patent Owner's patent portfolio, or what, if any, compensation he is receiving for the declaration.

Assessing the probative value of the Krauss Declaration

With respect to [1] above, the strength of evidence opposing the expert's opinion is strong.

First, the Krauss Declaration points out that there are 35 vendors of IVR systems (Krauss, p. 5, section 1.4, first sentence), but Krauss has not pointed out, which, if any, use any of the combination of features presented in any of the claims of the '547 patent. While Examiner acknowledges the rapid growth in the IVR industry between 1993 and 2000 (pp. 2-3, section 1.2), based upon the absence of information as to what caused the growth of the industry, the growth cannot necessarily be attributed to the '547 patent's claims.

Second, Krauss states,

> Before late 1988 and early 1990's, IVR systems were primarily used to direct callers to the appropriate live customer service representative

(CSR), and/or to play recorded messages such as store hours of
operation.

(Krauss Declaration, p. 2, section 1.2, first sentence)

The word "primarily" is a relative term of degree, and Krauss has not pointed out
specific numbers directed to what is meant by "primarily". This is important
because there is nothing directed to "primary use" of a thing that undermines either
anticipation or obviousness under 35 USC 102 and 103, respectively. Only one
person (i.e. a minority) has to "give", as by publication, information to the public
for the thing to belong to the public within the meaning of 35 USC 102 and 103.
Therefore, it does not matter what the primary use of IVR systems was before "late
1988" if the public has been given the invention before the time of the Katz
patents. If the invention is disclosed to the public by only one person, or if only one
single IVR system is used for something other than the "primary use" indicated
above by Krauss, then it may anticipate or render obvious the thing claimed of
another.

In this regard, while Krauss opines that the primary use of IVR systems before "late
1988" was "to direct callers to the appropriate live customer service representative
(CSR), and/or to play recorded messages such as store hours of operation", **the art
of record shows this to be inaccurate.** Several examples follow:

**The De Bruyn, Canadian patent** (applied earlier and above to reject the claims)
was published in February 1984 (filed in 1981) --**7 years earlier** than "late 1988"-
- and discloses a much more sophisticated system that the one Krauss recollects
was "primarily used". De Bruyn's IVR system allows totally automated entry in a
lottery and eliminates the CRS, contrary to that stated by Krauss.

**The Yoshizawa article** (applied earlier to reject the claims) was published in 1977
--**11 years earlier** than "late 1988"-- and discloses a much more sophisticated
system that the one Krauss recollects was "primarily used". Yoshizawa's article
describes a totally automated IVR system in use in Japan for placing pari-mutuel
bets by telephone callers and eliminates the CRS, contrary to that stated by Krauss.
Yoshizawa also indicates that the IVR system is useful for a large variety of other
applications, including credit card checking (Yoshizawa, p. 220)

**The Emerson article** (applied earlier to reject the claims) was published in 1983 --
**5 years earlier** than "late 1988"-- and discusses the "Periphonics" IVR system,
which is far more sophisticated system that one Krauss recollects was "primarily
used". The Periphonics IVR system allows total automation of, *inter alia*, order entry
(e.g. at p. 101 of Emerson) by a caller without a CSR unless the IVR system cannot
fulfill a specific caller request, in which circumstance the caller is switched to a CSR.

**The Moosemiller article** (applied earlier and above to reject the claims) was
published in 1986 --**2 years earlier** than "late 1988"-- and discusses AT&T's

Control Number: 90/007,087 & 90/006,979                           Page 89
Art Unit: 3992

Conversant™ I, an IVR system using DNIS to "allow advanced classification of calls for different applications" (p. 88, far-right col.), including financial services, credit authorization, sales order entry, marketing, college registration, etc. (p. 88, far left col.). The Conversant™ I system is also totally automated and only optionally uses a CSR. The use of DNIS was first disclosed by Katz in the application filed 16 May 1988; therefore, AT&T applied DNIS to IVR systems **more than 2 years before** Katz did.

**The Norris article** (applied to reject the claims) was published in Feb. 1986 --**2 years earlier** than "late 1988"-- and discusses IVR system promotional applications developed by Dial Info, including, *inter alia*, a cereal promotion wherein a caller calls in and is qualified for a one-time access to the system based on a "**consumable participation key**".

**The article by Bernie Whalen** entitled, "Marketers Expand Applications of Dial-It 900 Technology," <u>Marketing News</u>, November 26, 1982 (*Whalen*, hereafter) (submitted by Patent Owner in a jumbo IDS) --published **6 years earlier** than "late 1988-- also discusses IVR applications for, advertising and polling, far more sophisticated than any of the basic applications Krauss recollects.

Clearly, all of the above systems do more than merely direct calls to a CSR or play simple messages. All of the systems **predate 1988**. All of the systems **predate the earliest priority date of any of Katz's features to which the Katz claims are entitled**. Given Krauss's inaccurate recollection of the state of the art, failing to address the far more sophisticated IVR systems that predated 1988, Examiner respectfully submits that the above constitutes **strong evidence opposing the expert's opinion.** It begs the following question, then: How relevant can Krauss's recollection of the state of the art be, if it entirely dismisses the **relevant** art of record that is clearly far more sophisticated than what Krauss believed existed prior to "late 1988"? Not only were far more sophisticated IVR systems disclosed and in use before 1988, they predate the earliest priority dates to which any of the claims of any of Katz's patents are entitled priority. For this reason, it cannot be properly asserted that the Krauss Declaration is probative of the state of the IVR industry when it fails to address references of record disclosing far more sophisticated features than those of which he was aware that predate the '547 patent's claims. In short, the Krauss Declaration has little weight.

<u>The examples in Krauss are not coextensive in scope with the '547 claims rejected under 35 USC 103(a)</u>

*a. "Touchtone Trading" Example* (Krauss Declaration filed 10 February 2006, pp. 8-14)

Control Number: 90/007,087 & 90/006,979                    Page 90
Art Unit: 3992

Patent Owner suggests that section 2.3 of Krauss correlates to claims 21-50 of the
'547 patent (Patent Owner's Response filed 26 September 2006, pp. 96-111).
Examiner notes with interest that Patent Owner fails to correlate specific parts of
the touchtone-trading example with specific claim language, but instead, simply
redundantly repeats the entirety of Krauss's section 2.3 for each of claims 21-50.

Section 2.3 on pages 8-9 of the Krauss Declaration, entitled "Using a Touchtone
Trading System" is repeated below:

2.3 Using a Touchtone Trading System

To use a touchtone trading system, an individual investor calls a toll-free number
(usually one of several numbers available for different types of investors or
speakers of different languages) at the brokerage where he or she maintains an
account. The investor uses the telephone keypad to input his or her account
number, then a PIN (or creates a PIN if this is the first time using the system), and
then chooses from among several different options, such as:

• Press 1 to Place, Review, Change or Cancel an Order

• Press 2 for Account Information

• Press 3 for Quotes

• Press 4 for Market Indicators

• Press 5 to Switch Accounts

• Press 6 to Change PIN or Create Stocklists.

Typically there will also be options available to request and hear help, speak to a
representative, or access any number of control features (repeat, cancel, go back,
exit, etc.).

To place an order, the investor uses the telephone keypad to enter the ticker
symbol of the security or mutual fund. The numbers entered typically are two-
letter codes, one for the key, one for the position of the letter on the key. For
example, to enter IBM, the investor would enter 43 for I (4 key, 3rd letter), 22 for
B (2 key, 2nd letter) and 61 for M (6 key, 1st letter). To signal that the symbol is
complete, the investor presses another key or code (such as #). Then the investor
responds to voice prompts to confirm the type of order (e.g., buy, sell, short),
number of shares, and order type (e.g., market, limit, stop) and other information
(such as the sell price on a limit order) if appropriate. At this point the investor
gets a voice prompt to confirm the order, or review, change or cancel it. If the
choice is to confirm, the investor then receives an order or confirmation number
back from the system, to be kept for future reference. If the investor enters a trade
that cannot be executed for them (for example, because the trade would exceed
the investor's funds available), they can be transferred to a live agent or denied the

ability to make the trade. The investor can also be sent the stock certificate of the stock that they have just purchased, if they so choose. If the investor used touchtone trading to purchase a bond (they would need to enter issuer, maturity, and number of bonds in lieu of stock symbol, order type, and number of shares, in this case), they can be sent the bond itself.

Actual fills of the order are done either electronically or with broker assistance, depending on the system. The investor typically has the ability to cancel an order using the touchtone trading system until the order is filled.

Other options associated with touchtone trading (e.g., account management, receiving quotes) follow similar processes: The investor uses the keypad to select choices, enter information when appropriate, respond to prompts, and so forth.

Claims 21-25, 37-39, and 44-47 are **anticipated** by Yoshizawa. In addition, **none** of the features of claims 23-36, 38-43, and 45-50 is addressed in Krauss's touchtone-trading example. In other words, the touchtone-trading example does **not** discuss that the computer-generated number data is provided to individual callers in a chronological sequence (claim 23), that the order identifies the order for a mail order house (claim 24), that the data identifying the order facilitates tracing (claim 25), DNIS (claim 26), ANI (claims 27 and 28), credit cards (claims 29-34), TV-initiated ordering (claims 35 and 36), restrictions to a limited number of uses or limited time period (claims 38 and 39), controlling inventory with the order data (claims 40 and 41), negative customer numbers (claim 42), social security numbers (claim 43), **required** ordering of multiple items (claim 45), mail order houses (claim 46), the order data identifying the facility operating the service (claim 47), or the size and/or color of the item (claims 48-50).

Yet, in spite of the **complete absence of these features** in the touchtone-trading example, Patent Owner still argues that this example establishes a nexus between the claim language and claims 23-36, 38-43, and 45-50 of the '547 patent. Clearly, no such nexus can be established if the feature is not even mentioned.

Moreover, none of the '547 claims is specifically drawn to touchtone trading and, in this aspect, the **claims are broader in scope** than the example presented.

For all of the reasons indicated above, none of the claims is coextensive in scope with the example provided in section 2.3 of the Krauss Declaration. In this regard, MPEP 716.03(a) [R-2] states,

> I. EVIDENCE OF COMMERCIAL SUCCESS MUST BE COMMENSURATE IN SCOPE WITH THE CLAIMS
>
> Objective evidence of nonobviousness including commercial success must be commensurate in scope with the claims. *In re Tiffin*, 448 F.2d 791, 171 USPQ 294 (CCPA 1971) (evidence showing commercial

success of thermoplastic foam "cups" used in vending machines was
not commensurate in scope with claims directed to thermoplastic foam
"containers" broadly). In order to be commensurate in scope with the
claims, the commercial success **must be due to claimed features,
and not due to unclaimed features**. *Joy Technologies Inc. v.
Manbeck*, 751 F. Supp. 225, 229, 17 USPQ2d 1257, 1260 (D.D.C.
1990), aff 'd, 959 F.2d 226, 228, 22 USPQ2d 1153, 1156 (Fed. Cir.
1992) (Features responsible for commercial success were recited **only
in allowed dependent claims**, and therefore the evidence of
commercial success was not commensurate in scope with the broad
claims at issue.). An affidavit or declaration attributing commercial
success to a product or process "constructed according to the
disclosure and claims of [the] patent application" or other equivalent
language does not establish a nexus between the claimed invention
and the commercial success because there is no evidence that the
product or process which has been sold corresponds to the claimed
invention, or that whatever commercial success may have occurred is
attributable to the product or process defined by the claims. *Ex parte
Standish*, 10 USPQ2d 1454, 1458 (Bd. Pat. App. & Inter. 1988).
(Emphasis added.)

Similar to *In re Tiffin*, the '547 patent claims are broader in scope than the
combinations in the declaration for failure to recite features of claims 23-36, 38-43,
and 45-50; therefore, nexus has not been established between the "touchtone-
trading" example provided in section 2.3 of the Krauss Declaration and the '547
patent claims.

Similar to *Joy Technologies Inc.*, the declaration fails to show that the success was
not due to the unclaimed features of claims 23-36, 38-43, and 45-50.

Similar to *Ex parte Standish,* given that each of the features of the '547 claims is
broadly recited, the Krauss Declaration fails to provide "evidence that the product
or process which has been sold corresponds to the claimed invention, or that
whatever commercial success may have occurred is attributable to the product or
process **defined by the claims**."

Examiner acknowledges that Patent Owner attempts to correlate various claims and
their specific features to the example in section 2.3, the correlations are not
coextensive in scope. In this regard, Patent Owner has provide case law, stating,

> The Federal Circuit has held that "if the marketed product embodies
> the claimed, features **and is coextensive with them**, then a nexus is
> presumed and the burden shifts to the party asserting obviousness to
> present evidence to rebut the presumed nexus" *Brown & Williamson
> Tobacco Corp v Phillip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir.
> 2000). (Response, p. 156, 1st ¶, last sentence; emphasis added)

Of particular importance, Patent Owner acknowledges the requirement that the claims be **coextensive in scope** with the marketed product. For the reasons indicated above, the '547 claims are not coextensive with the marketed [credit card activation] product". Examiner has rebutted the "presumed nexus" for the reasons provided herein above.

### b. Utilities-Customer-Service Example (Krauss Declaration filed 10 February 2006, pp. 15-21)

Patent Owner suggests that section 3.1 of Krauss correlates to claims 1-20 of the '547 patent (Patent Owner's Response filed 26 September 2006, pp. 62-86). Examiner notes with interest that Patent Owner fails to correlate specific parts of the utilities example with specific claim language, but instead, simply redundantly repeats the entirety of Krauss's section 3.1 for each of claims 1-20.

Section 3.1 on pages 15-17 of the Krauss Declaration, entitled "Use of Sophisticated IVR Technical and Functional Capabilites" is repeated below (footnotes omitted):

> 3 Utilities Industry
>
> 3.1 Use of Sophisticated IVR Technical and Functional Capabilities
>
> The utilities industry uses IVR systems and their various capabilities in several ways. Across the utilities industry, the most common IVR applications include customer service and outage reporting.
>
> *Customer Service* -Southern California Edison (SCE) provides a typical example of the way utilities made use of sophisticated IVR technical and functional capabilities to provide customer service in the mid to late 1990's. SCE is a large electrical utility that handles millions of calls each year:
>
> o "With 4.2 million customer accounts, SCE's customer call centers handle more than 12 million calls annually."
>
> o " 'We are the voice of the customer,' says Linda Gilleland, who directs the sites handling 12 million calls per year, one located in Long Beach and one located in Rancho Cucamonga. There are nearly 600 Customer Center Representatives between the two sites"
>
> SCE's IVR customer service process has three steps:
>
> 1. In the first step, customers call one of SCE's many 800 numbers. SCE has different numbers for customer service than for reporting an outage, and has

different numbers for speakers of different languages. SCE suggests that this call be made from the customer's home phone, so that the utility can use automatic number identification (ANI) to make it easier to identify callers.

2. Depending on which number the customers call, they receive a set of voice prompts asking them if they would like to:

• pay their bill by phone or register to pay their bill by phone

• get account information (such as balance due and payment dates)

• turn on or off service

• transfer service

• find an authorized payment location

• report an outage

3. If the customers have called from their home phone, the IVR system asks them to enter their account number or other identifying information; if they have not called from their home phone, the system asks them to enter their home phone number and their account number or other identifying information. If the caller is unable to enter the correct identifying information, they are directed to a human customer service representative.

Other utilities have adopted similar customer service-related IVR technical and functional capabilities. They also use multiple 800 numbers, ask people to call from their home phones in order to use ANI to make it easier to identify them, prompt callers to enter their account number (or other identifying information), and transfer callers to a live customer service rep in the event of a problem:

*Usage report/diskette ordering*- In addition to general customer service inquiries, some utilities, including SCE and Commonwealth Edison, use sophisticated IVR capabilities to allow customers to order particular items, such as a usage report (ComEd) or a diskette bill which contains the usage information for multiple accounts (SCE). When ordering a usage report, for example, the customer goes through the three steps described above in order to identify themselves. Once they have identified themselves, they can request that a usage report be sent to them through the mail. After IVR system has received this request, a voice indicates that a usage statement has been issued and that it: "should be received by mail in 5 business days."

*Outage reporting* - IVR systems allow utilities to collect and respond to information about outages, often by using the caller's phone number to identify the location of the outage. The system can also provide the caller with an estimated time of restoration. According to Dave Lind of Periphonic Corp., an interactive voice system design company based in Bohemia, N.Y., "Most state

regulators require utilities to respond to every outage call received. IVR allows utilities to meet this requirement without a human response to each call. The utility can use the IVR to accept outage information; report the status of an outage to callers; provide information on estimated repair time; call customers back with updated information or when the outage is over; and, based on the severity, transfer the caller to a live agent."

SCE provides an example of how outage reporting uses sophisticated IVR technical and functional capabilities. When a caller dials the SCE customer service number, he or she hears the following script: "*Good morning and thank you for calling Southern California Edison. Your call may be monitored or recorded.* [Spanish statement- For options in Spanish, press 8.]"

The caller is then asked if their power is completely out ("If your power is completely out, press 1."), and if so, they are asked if they want to report the outage ("To report your outage, press 1. "). The caller then experiences one of two processes:

1. If SCE's IVR system recognizes the telephone number from which the customer is calling (i.e., SCE's system uses automatic number identification to identify callers), the system then prompts the caller to enter his or her house number ("Please input only the house number of the location for which you are calling). Once the system has both the customer's phone number (through ANI) and their house number (because the customer entered it), it can record an outage.

2. If SCE's IVR system does not recognize the telephone number from which the customer is calling, the system then asks the caller if they are calling from the location of the service interruption ("If you are calling from the location of the service interruption, press I.) If the caller presses one, he or she is transferred to a live agent, because the IVR system cannot attach the location's phone number to an actual service location. If the caller presses 2 (indicating that they are not calling from the location of the service interruption), he or she is asked to enter the area code for the location of the service interruption, and then the house number of the location of the service interruption.

In both of these processes, if the caller cannot enter the correct information, they are transferred to a live customer service representative.

In claims 1-9, 11, and 17-20 are **anticipated** by VCT '87. In addition, **none** of the features of claims 3-8, 10, and 12-20 is addressed in Krauss's utilities-customer-service example. In other words, the utilities-customer-service example does **not** discuss that the computer generates data identifying an order and providing the data to the caller (claims 3, 17 ) in the form of number data (claims 4-6, 18-20), a **consumable key** (claim 7), item number data (claim 8), negative file data (claim 10), or credit card data (claims 12-16). Yet, in spite of the **complete absence of**

**these features** in the utilities-customer-service example, Patent Owner still argues that this example establishes a nexus between the claim language and claims 3-8, 10, and 12-20 of the '547 patent. Clearly, no such nexus can be established if the feature is not even mentioned.

For all of the reasons indicated above, none of the claims is coextensive in scope with the example provided in section 3.1 of the Krauss Declaration.

As above, similar to *In re Tiffin*, the '547 patent claims are broader in scope than the combinations in the declaration for failure to recite features of claims 3-8, 10, and 12-20; therefore, nexus has not been established between the utilities customer service example provided in section 3.1 of the Krauss Declaration and the '547 patent claims.

Similar to *Joy Technologies Inc.*, the declaration fails to show that the success was not due to the unclaimed features of claims 3-8, 10, and 12-20.

Similar to *Ex parte Standish*, given that each of the features of the '547 claims is broadly recited, the Krauss Declaration fails to provide "evidence that the product or process which has been sold corresponds to the claimed invention, or that whatever commercial success may have occurred is attributable to the product or process **defined by the claims.**"

Examiner acknowledges that Patent Owner attempts to correlate various claims and their specific features to the example in section 3.1, the correlations are not coextensive in scope. In this regard, Patent Owner has provide case law, stating,

> The Federal Circuit has held that "if the marketed product embodies the claimed, features **and is coextensive with them**, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus" *Brown & Williamson Tobacco Corp v Phillip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). (Response, p. 156, 1st ¶, last sentence; emphasis added)

Of particular importance, Patent Owner acknowledges the requirement that the claims be **coextensive in scope** with the marketed product. For the reasons indicated above, the '547 claims are not coextensive with the marketed [credit card activation] product". Examiner has rebutted the "presumed nexus" for the reasons provided herein above.

Financial information

Although Krauss has provided various financial data industry-wide for IVR system the applications of touchtone trading and utilities customer service, the financial

information does not establish that the commercial success was derived from the claimed invention.

In this regard, MPEP 716.03(b)(I) [R-2] states,

> I. COMMERCIAL SUCCESS MUST BE DERIVED FROM THE CLAIMED INVENTION
>
> In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is **directly derived from the invention claimed**, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such success is not the result of heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee, or other business events extraneous to the merits of the claimed invention, etc. *In re Mageli*, 470 F.2d 1380, 176 USPQ 305 (CCPA 1973) (conclusory statements or opinions that increased sales were due to the merits of the invention are entitled to little weight); *In re Noznick*, 478 F.2d 1260, 178 USPQ 43 (CCPA 1973). In **ex parte proceedings** before the Patent and Trademark Office, an applicant must show that the claimed features were responsible for the commercial success of an article if the evidence of nonobviousness is to be accorded substantial weight. See *In re Huang*, 100 F.3d 135, 140, 40 USPQ2d 1685, 1690 (Fed. Cir. 1996) (Inventor's opinion as to the purchaser's reason for buying the product is insufficient to demonstrate a nexus between the sales and the claimed invention.).
>
> (emphasis added)

In this case, the Krauss declaration fails to provide evidence "that such success is not the result of **heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee, or other business events extraneous to the merits of the claimed invention,** etc." (*In re Mageli*). Without such evidence, Krauss's statements are, at best, "conclusory statements or opinions that increased sales were due to the merits of the invention" and are therefore afforded little weight (*In re Noznick* and *In re Huang*).

MPEP 716.03(b)(I) continues,

> Compare *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 7 USPQ2d 1222 (Fed. Cir. 1988) (In civil litigation, a patentee does not have to prove that the commercial success is not due to other factors. "A requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence.").

However, this is not civil litigation; it is reexamination before the USPTO. The statutory presumption of validity, 35 U.S.C. 282, has no application in reexamination (*In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985)). Moreover, there is no request of Patent Owner "for proof of the negative of all imaginable contributing factors", but instead a request for evidence that the things claimed in the '547 claims are responsible for the commercial success, which has not been provided.

MPEP 716.03(b)(I) continues,

> See also *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 227 USPQ 766 (Fed. Cir. 1985) (commercial success may have been attributable to extensive advertising and position as a market leader before the introduction of the patented product); *In re Fielder*, 471 F.2d 690, 176 USPQ 300 (CCPA 1973) (success of invention could be due to recent changes in related technology or consumer demand; here success of claimed voting ballot could be due to the contemporary drive toward greater use of automated data processing techniques); *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 225 USPQ 20 (Fed. Cir. 1985) (evidence of licensing is a secondary consideration which must be carefully appraised as to its evidentiary value because licensing programs may succeed for reasons unrelated to the unobviousness of the product or process, e.g., license is mutually beneficial or less expensive than defending infringement suits); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 231 USPQ 81 (Fed. Cir. 1986) (Evidence of commercial success supported a conclusion of nonobviousness of claims to an immunometric "sandwich" assay with monoclonal antibodies. Patentee's assays became a market leader with 25% of the market within a few years. Evidence of advertising did not show absence of a nexus between commercial success and the merits of the claimed invention because spending 25-35% of sales on marketing was not inordinate (mature companies spent 17-32% of sales in this market), and advertising served primarily to make industry aware of the product because this is not kind of merchandise that can be sold by advertising hyperbole.).

For the reasons established in the case law above, Krauss's perception that the various combinations lead to the perception of commercial success and the total lack of any financial date (i.e. facts) to support Krauss's opinion make the Krauss Declaration insufficient for establishing a nexus between '547 claims and commercial success.

Should Patent Owner provide factual financial data to corroborate the allegation of commercial success, Patent Owner is advised, MPEP 716.03(b)(IV) states,

### IV. SALES FIGURES MUST BE ADEQUATELY DEFINED

Gross sales figures do not show commercial success absent evidence as to market share, *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 226 USPQ 881 (Fed. Cir. 1985), or as to the time period during which the product was sold, or as to what sales would normally be expected in the market, *Ex parte Standish*, 10 USPQ2d 1454 (Bd. Pat. App. & Inter. 1988)

### *Conclusion*

Patent owner's amendment filed 18 May 2006 necessitated the new grounds of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a).

A shortened statutory period for response to this action is set to expire 2 months from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).** A request for extension of time must be filed on or before the day on which a response to this action is due, and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g). The mere filing of a request will not effect any extension of time. An extension of time will be granted only for sufficient cause, and for a reasonable time specified.

The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional month, which will be granted even if previous extensions have been granted. In no event, however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action. See MPEP § 2265.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA   22313-1450

Control Number: 90/007,087 & 90/006,979                Page 100

Art Unit: 3992

401 Dulany Street
Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the
Reexamination Legal Advisor or Examiner, or as to the status of this proceeding,
should be directed to the Central Reexamination Unit at telephone number (571)
272-7705.

Signed:

Erik Kielin
Primary Examiner
Central Reexam Unit 3992
(571) 272-1693

Conferees:

Sue Lao, RQAS

Kwang Yao, Primary Examiner